UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

FRANTZ BOULOUTE,

      Petitioner,

                                Civ. No. 08-5008 (ILG)

-against-

UNITED STATES OF AMERICA,

      Respondent.

- - - - - - - - - - - - - - - - - X


GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION
TO FRANTZ BOULOUTE'S MOTION TO AMEND HIS ORIGINAL PETITION
PURSUANT TO 28 U.S.C. § 2255


                                         BENTON J. CAMPBELL,
                                         United States Attorney
                                         Eastern District of New York
                                         271 East Cadman Plaza East
                                         Brooklyn, New York 11201


Celia A. Cohen
Assistant United States Attorney,
(<u>Of Counsel</u>).

TABLE OF CONTENTS

PRELIMINARY STATEMENT .........................................1

STATEMENT OF FACTS ............................................2

    A.   The Offense ..........................................2

        1. The Agreement .....................................2

        2. The July 13, 2003 Importation ....................4

        3. The July 14, 2003 Attempt to Possess .............6

        4. Robert Douyon .....................................7

ARGUMENT .....................................................10

    I. APPLICABLE LAW ........................................10

    II. THE GOVERNMENT DID NOT SUPPRESS IMPEACHMENT
        EVIDENCE BECAUSE IT WAS NOT IN POSSESSION
        OF THE INFORMATION IN QUESTION ......................11

    III. PETITIONER WAS NOT PREJUDICED AT TRIAL
        BECAUSE THE UNDISCLOSED IMPEACHMENT EVIDENCE
        IS NOT MATERIAL .....................................15

            A.   Douyon's Testimony Was Not
                The Only Evidence Linking
                Bouloute to the Crime ...................16

            B.   The Undisclosed Impeachment Material
                Is Merely Cumulative ....................18

    IV. HEARING ...........................................21

CONCLUSION ...................................................23

## PRELIMINARY STATEMENT

The government submits this memorandum in opposition to Frantz Bouloute's ("Bouloute" or "Petitioner") motion to amend his petition pursuant to 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence for conviction of conspiring to import cocaine, importation of cocaine, and attempting to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 963, 952(a), and 846, respectively.[1]  Bouloute's direct appeal of his conviction resulted in an affirmance by the Second Circuit Court of Appeals.  This motion seeks to amend a petition denied by this Court by order dated January 15, 2008.  Bouloute's appeal to the Second Circuit from this order is being held in abeyance pending the decision on the present motion.

Petitioner's motion seeks to add a new claim to his petition.  This new claim alleges a violation of his due process rights on the ground that the government failed to disclose impeachment material related to the government's cooperating witness, Robert Douyon.  For the reasons set forth below, Bouloute has failed to demonstrate that the government suppressed the impeachment material and that the information was material such that it would have affected the outcome of the trial.  Accordingly,

---

[1]  The petition was given docket number 07 CV 2201 (ILG).  The motion to which we now respond was submitted on a form for motions under Section 2255 and given the docket number for the instant case.  Strictly speaking, however, as petitioner notes in his current filing, it constitutes a motion to amend rather than a new Section 2255 petition.

2

Bouloute's claim fails, and an evidentiary hearing is not warranted.

**STATEMENT OF FACTS**

A.    <u>The Offense</u>

    1.    <u>The Agreement</u>

        Bouloute participated in a scheme to obtain and import cocaine into the United States from South America with three other individuals. One of the individuals was known as "Footso,"[2] who was arrested by the DEA in early 2003 and who thereafter cooperated with law enforcement. (GA 343).[3] DEA Special Agent William Callahan acted as Footso's handler and directed him to maintain the prior illicit relationships that he had already developed. (GA 343, 394-95, 427).

        Prior to the instant importation scheme, Bouloute knew Footso as someone who could smuggle drugs through New York area airports. (GA 393-94, 424-26). In January and February of 2003, the two discussed having a future meeting when Bouloute was going to be in the New York area. (GA 398).

        On March 5, 2003, Bouloute called Footso and told him that he was in Queens and wished to meet with him. (GA 399). Footso

_____

        [2]At trial, this individual was referred to as "Footso," "the Jamaican," "the confidential source," and "the CS."

        [3]GA refers to pages in the government's appendix that was submitted to the Second Circuit.  The applicable pages are attached hereto as Exhibit A.

met Bouloute in the parking lot of a Wyndham Hotel near La Guardia Airport in Queens, New York. (GA 33). Unbeknownst to Bouloute, Footso was operating as a "confidential source" for the DEA, and that agents were conducting surveillance and were video-recording and tape-recording the meeting. (GA 32-33).

After meeting with Footso, Bouloute approached an individual named Robert Douyon, with whom he had been friends for approximately nine to ten years. (GA 82-83). Bouloute told Douyon that Bouloute had a means by which to import drugs through New York area airports and asked him if he knew of anyone who might be interested in this "service." (GA 84). Douyon told Bouloute that he would look into it. (GA 84-85). Douyon then approached an individual named Frantz Bruno. (GA 83). Douyon asked Bruno if he would be interested in the "service" that Bouloute had offered. (GA 85).

After some discussion between the parties, Bouloute ultimately arranged a meeting in South Beach, Florida for Bouloute, Bruno, and Douyon to meet Footso. (GA 89). The meeting took place on May 8, 2003, its purpose being Bouloute's showing Bruno and Douyon that Footso could "do the job." (GA 89). At this meeting, Footso was still operating as a DEA confidential source. By the end of the meeting, the men had concocted a plan to import cocaine into the United States. (GA 124). During this meeting, they discussed the role that each individual would play in the

importation scheme (GA 125-26, 505, 509), what flights and airlines could be used for the importation (GA 512-13), the methods that they would use (i.e., whether to put the drugs in a suitcase, or, instead, hide them in cargo) (GA 133, 514-17), what countries Bruno could obtain drugs from (GA 129, 516), the quantity of drugs that would be imported (GA 517-18), the price that would be charged (GA 505, 509, 526, 530, 543, 546-47), and potential future importations of drugs (GA 517-18, 548).

Each man had a role to play in the scheme.  Bruno's role was to obtain the supply of drugs.  Douyon's role was to be the middleman between Bouloute and Bruno, both of whom were his longstanding acquaintances.  Bouloute's role was to provide the service of getting the drugs out of the airport, through his contact, Footso.  (GA 125, 128-29).  Bruno and Douyon did not have access to Footso; it was Bouloute who provided access, and it was his responsibility to communicate with Footso throughout the importation scheme.  (GA 127-28).  The parties agreed that when the drugs were sent on a plane to New York, Bouloute would travel from Miami to New York in order to meet with Footso and take possession of the drugs.  (GA 136, 528).

2.  The July 13, 2003 Importation

After a few false starts, Bruno finally acquired a load of cocaine to send to the New York area in July 2003.  (GA 147). Bruno advised Douyon of this, and Douyon passed the information to

5

Bouloute.  (GA 148).  Bouloute then called Douyon back and told him that "everything is okay, set . . . . For the coming Sunday," which was July 13, 2003.  (GA 148).  In response to this information, Douyon drove with three other individuals from Miami to New York City on Saturday, July 12.  (GA 148-49).  On the morning of Sunday, July 13, Bouloute called Douyon, asking for the name and tag number attached to the drug laden suitcase and worrying that it was getting too late for Footso to successfully arrange to get the suitcase off the plane.  (GA 151-53).  Finally, Bruno called Douyon, telling him the name and number on the baggage tag attached to the suitcase, and Douyon passed this information on to Bouloute. (GA 151-53).  Meanwhile, the DEA had been monitoring the progress of the importation through Footso. On the days leading up to July 13, 2003, Footso informed Agent Callahan that he had heard from Bouloute that they were "ready" for a Continental flight originating in Venezuela and flying nonstop to Newark. (GA 355).

On July 13, Footso advised Agent Callahan that he had received a call from Bouloute, who had advised him of the flight number, the baggage tag number, and the name on the baggage tag. (GA 356).  In response, Agent Callahan and his supervisor proceeded to Newark Airport.  The agents accompanied several customs inspectors to the airplane and observed as the inspectors looked for a suitcase with the designated tag number.  (GA 357). Ultimately, the inspectors removed one black suitcase, after a

narcotics-detecting dog alerted them to the bag.  (GA 358).  Inside
the suitcase, Customs inspectors found 30 bricks of cocaine wrapped
in duct tape.  (Id.).  The government introduced at trial a sample
of ten kilograms of the cocaine and a lab report indicating that
the net weight of the total seizure was 30.19 kilograms.  (GA 367-
68).  Agent Callahan instructed Footso to tell Bouloute that the
drugs had arrived.  (GA 369).  Subsequently, Bouloute called Douyon
around 3:00 p.m. to inform him that "everything [was] okay."
(GA 154).  Bouloute was still in Miami at this time, but informed
Douyon that he would travel to New York on Monday, July 14. (Id.).

   3. The July 14, 2003 Attempt to Possess

    When Bouloute arrived in New York, Agent Callahan
instructed Footso to tell Bouloute that his "people" -- the corrupt
airport employee -- had possession of the drugs and would not turn
them over until he was paid.  (GA 369-70).  Footso met with
Bouloute, and later informed Callahan that Bouloute did not have
the money to pay the baggage handler at this time.  (GA 370-71).

    At this point, Agent Callahan directed Footso to tell
Bouloute that the latter needed to meet with the corrupt baggage
handler to discuss payment.  Agent Callahan then arranged for
another agent, Howard Campbell, to pose undercover as the baggage
handler. (GA 371).

    The meeting between Footso, Bouloute, and Campbell,
posing as the baggage handler, took place on the afternoon of July

14, 2003 in a Burger King parking lot in Queens. (GA 371, 437-39). After greeting one another, Bouloute told the undercover agent that in order for him to get paid for his services, he would need to turn over "what he had." (GA 439). Campbell understood this to mean that the cocaine that was supposed to be in his possession. (GA 440). Campbell told Bouloute that was "not the way [he did] business." At this point, Bouloute attempted to persuade Campbell to turn over the drugs without payment by explaining that he had done it that way before with Footso. (GA 440-41). Campbell then gave a pre-arranged arrest signal and the other DEA agents surveilling the meeting moved in and arrested Bouloute. (GA 440).

After arresting Bouloute, DEA agents found in his possession a concert ticket. (GA 375). Written on the back of it was "76718," "black" "Adam Benaim," and "Richmond." The color of the cocaine-filled suitcase was black (GA 358), the number on the baggage tag was 76718 (GA 363), the passenger name on the tag was "Allen/Brian B" (GA 361), and, after clearing customs in Newark, the luggage was supposed to proceed with passenger Allen to Richmond, Virginia. (GA 361).

B. Robert Douyon

Following Bouloute's arrest, the Drug Enforcement Administration in New York (the "DEA-NY") prepared to arrest Bouloute's co-conspirator, Robert Douyon. Before an arrest warrant was issued, Immigration and Customs Enforcement in the Southern

8

District of Florida ("ICE-FL") advised DEA-NY that it was conducting a wire tap investigation of an airport employee named Karl Marcelin, the brother-in-law of Douyon.   See Government Sentencing Letter, dated November 20, 2007, <u>United States v.</u> <u>Douyon</u>, cr -05-15 (RJD) (attached hereto as Exhibit B) at 2.[4]  ICE-FL further informed DEA-NY that it was intercepting conversations between the two.  Accordingly, at ICE-FL's request, DEA-NY delayed Douyon's arrest.  <u>Id.</u>

After several months of investigation, ICE-FL advised DEA-NY that it was not going to arrest Douyon, the implication being that it did not have evidence that he was involved in any criminal activity.  <u>Id.</u>

In October 2003, DEA-NY arrested Douyon, and, shortly thereafter, Douyon agreed to cooperate with law enforcement authorities.  During subsequent proffer sessions, Douyon described his role in the New York cocaine conspiracy, but he denied any other involvement in criminal activity, including narcotics trafficking.  When asked about Karl Marcelin, the original subject of ICE-FL's investigation, Douyon simply stated that he was his brother-in-law.  <u>Id.</u> at 3.  Douyon ultimately pled guilty to an information charging him with conspiring to import over five kilograms of cocaine into the United States from March 2003 through July 14, 2003.  <u>Id.</u>

---

[4]Hereinafter referred to as "Douyon Sentencing Letter."

9

Prior to Bouloute's trial, the government learned of Douyon's assistance in fraudulently acquiring an immigration visa for an individual. <u>Id.</u> While Douyon admitted to this, he continued to deny involvement in any other criminal activity.

At Bouloute's January 2005 trial, Douyon testified about his role in the cocaine conspiracy, including all of his interactions with Bouloute. His testimony was corroborated by the audio tapes of his meetings with Bouloute and the other co-conspirators (GA 495-549), telephone records (GA 377-86), pictures taken by investigating offices (GA 91-95), the seized cocaine (GA 334-35), the concert ticket in Bouloute's pocket when he was arrested with the information that Douyon had relayed to him regarding the cocaine (GA 375), a Western Union receipt confirming that Bouloute sent Douyon money for a hotel room (GA 156), and the fact that Bouloute actually traveled to New York on July 14, 2003.

Douyon further testified about his cooperation agreement with the government, and he was thoroughly cross-examined on the benefits that he expected to receive from his cooperation. (GA 76-81, 165). On cross-examination, consistent with his proffers, he denied involvement in any other narcotics trafficking. (GA 168-69).

In 2006, after Bouloute's trial, the Office of the United States Attorney in the Southern District of Florida ("SDFL"), without notifying this office, charged Douyon via a sealed indictment with various narcotics trafficking activities. He was

later arrested.   This office became aware of Douyon's arrest only through defense counsel in November 2007.

**ARGUMENT**

## I. APPLICABLE LAW

In a criminal prosecution, the Government has a constitutional obligation to disclose evidence in its possession that is favorable to an accused when such evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87 (1963). A Brady violation can only occur where the government fails to disclose "information favorable to the accused that had been known to the prosecution but unknown to the defense." United States v. Bagley, 473 U.S. 678 (1985); see United States v. Agurs, 427 U.S. 97, 112-13 (1976).

The government's obligations under Brady have been extended to cover information that could be used to impeach a key government witness. See Giglio v. United States, 405 U.S. 150, 154-55 (1972). "Brady does not, however, require the prosecution to disclose all exculpatory and impeachment material; it need disclose only material '[t]hat if suppressed, would deprive the defendant of a fair trial.'" United States v. Coppa, 267 F.3d 132, 135 (2d Cir. 2001) (quoting United States v. Bagley, 473 U.S. 667, 675). Such a deprivation occurs only where there is a "reasonable probability" that the suppression "affected the outcome of the case," Coppa, 267 F.3d at 135 (citing Bagley, 473 U.S. at 682), or would have "put the

11

whole case in such a different light as to undermine confidence in the verdict." Coppa, 267 F.3d at 135 (quoting Kyles v. Whitley, 514 U.S. 419, 435 (1995).

To demonstrate a Brady violation, "a defendant must show that: (1) the government either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and (3) the failure to disclose this evidence resulted in prejudice." Coppa, 267 F.3d at 140.

Petitioner claims that he was prejudiced at trial when favorable impeachment evidence related to government witness Douyon was suppressed. But as set forth herein, the defendant fails to satisfy the Brady test because (1) the government was not in possession of the impeachment material at trial and (2) even assuming that the government failed to disclose the impeachment material, its disclosure would not have affected the outcome of the trial.

## II.   THE GOVERNMENT DID NOT SUPPRESS IMPEACHMENT EVIDENCE BECAUSE IT WAS NOT IN POSSESSION OF THE INFORMATION IN QUESTION

The prosecution team in this case cannot be chargeable with the alleged impeachment information about Douyon because it was not known to them at the time of Bouloute's trial. Although the information was known to the United State's Attorney's office, Southern District of Florida, that office's knowledge and its sealed indictment cannot be imputed to this office.

Courts have consistently held that the <u>Brady</u> obligation extends only to material evidence that is <u>known</u> to the prosecutor. <u>See</u> <u>United States v. Avellino</u>, 13 F.3d 249, 255 (2d Cir. 1998) (citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995)).  Although a prosecutor is presumed to have knowledge of all information gathered in connection with his office's investigation of the case and of those acting on behalf of the government, knowledge on the part of persons employed by a <u>different</u> office of the government does not in all instances warrant the imputation of knowledge of the prosecutor.  <u>See Avellino</u>, 13 F.3d at 255 (citing <u>United States v. Payne</u>, 63 F.3d 1200, 1208 (2d Cir. 1995), and <u>United States v. Gambino</u>, 835 F.Supp. 74, 95 (E.D.N.Y. 1993)).  <u>See also</u> <u>United States v. Quinn</u>, 445 F.2d 940 (2d Cir. 1971) (The court refused to impute the knowledge of a Florida prosecutor to an AUSA in New York, rejecting as "completely untenable [the] position that knowledge of any part of the government is equivalent to knowledge on the part of this prosecutor.").

In the instant case, the undisclosed impeachment material at issue was not suppressed because this office was unaware that Douyon was to be indicted in the Southern District of Florida, or that ICE-FL was continuing its investigation against him.  <u>See</u> Douyon Sentencing Letter, at 3.  While initially NY-DEA communicated with ICE-FL regarding the investigation of Douyon's brother-in-law and the communications between the two, in October 2003 ICE-FL told

NY-DEA to proceed with the arrest of Douyon because there was apparently no evidence against him.  Id. at 2.  Armed with that information, the NY prosecutors were confident that Douyon was telling the truth in stating during proffer sessions that he was not involved in any other drug trafficking and that Marcelin was merely his brother-in-law.  Id. at 2-3.  Thus, by the time of the Bouloute trial, this office had no knowledge of any crimes committed by Douyon in Florida, nor did it ever possess any wire taps of Douyon.  See Morgan v. Salamack, 735 F.2d 354, 358 (2d Cir. 1984) (citing United States v. Agurs, 427 U.S. 97, 103 (1976))(The test to determine if a constitutional violation has occurred is whether the prosecutor's office "possessed" the information in question at the time of trial.).  In addition, the fact that the indictment was under seal further demonstrates that this office had no knowledge of the indictment.  See Quinn, 445 F.2d at 944 ("Obviously, the very purpose of a sealed indictment is nondisclosure.").  Accordingly, the Florida prosecutors' knowledge of Douyon's crimes cannot be imputed to this office to warrant a constitutional violation.  See Id.; Avellino, 13 F.3d at 255.

Similarly, in Quinn, a Florida investigation and sealed indictment against a NY government witness was deemed not to be information that should have been imputed to the NY prosecutors. 445 F.2d at 943-44.  In that case, prior to cross-examination of a government witness, the prosecutor (an Assistant United States

14

Attorney in the Southern District of New York) stated that he knew that the witness had no prior criminal convictions and that he was unaware of any arrest record.  Id.  Nine days after the trial, the press announced that the witness had been indicted in Florida.  Id. at 944.  Although the indictment was actually returned during the NY trial, it had been sealed and was not made public until just prior to the press report.  Id.  On appeal, the court held that the knowledge of any part of the government could not be imputed to the Southern District of New York.  In addition, it noted that the chronology of events refuted any knowledge of, or suppression by, the New York prosecutor of the Florida indictment.  Id.

Here, as in Quinn, the chronology of events refutes any knowledge of the investigation and indictment against Douyon.  This office received confirmation in October 2003 that the wire taps reviewed by ICE-FL had no incriminating evidence against Douyon because Florida decided not to prosecute him.  Once ICE-FL confirmed this fact, the NY prosecutors had no Brady material in their possession to produce to the Bouloute.  And at Bouloute's trial in January 2005, a year and three months after ICE-FL informed NY-DEA that it was not going to arrest Douyon, this office was still unaware of any evidence against Douyon in Florida.  See Douyon Sentencing Letter at 2.  In fact, the NY prosecutors did not become aware of the information until defense counsel alerted them to Douyon's arrest, almost two years after the trial.  Therefore, here,

15

as in <u>Quinn</u>, the knowledge held by the Florida prosecutors cannot be imputed to the NY prosecutors as they did not <u>possess</u> the information.  <u>See</u> <u>Morgan</u>, 735 F.2d at 358.

## III. PETITIONER WAS NOT PREJUDICED AT TRIAL BECAUSE THE UNDISCLOSED IMPEACHMENT EVIDENCE IS NOT MATERIAL

Even assuming <u>arguendo</u> that this office should have been aware of the additional impeachment evidence related to Douyon, relief would still not be warranted because that impeachment evidence was not "material."

Failure to produce <u>Brady</u> material, when inadvertent, does not automatically require reversal.  To reverse, the evidence must be "material in the sense that its suppression undermines confidence in the outcome of the trial," i.e., it is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>See</u> <u>United States v. Bejasa</u>, 904 F.2d 137, 140 (2d Cir. 1990) (citing <u>United States v. Bagley</u>, 473 U.S. 667, 678 (1985)). The Second Circuit has counseled that "[i]n general, evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the defendant to the crime." <u>Avellino</u>, 136 F.3d at 256; <u>see also</u> <u>United States v. Wong</u>, 78 F.3d 73, 79 (2d Cir. 1996) ("Evidence of impeachment is material if the witness whose testimony is attacked 'supplied the only evidence linking the defendant(s) to the crime.'"); <u>United States v. Wallach</u>, 935 F.2d 445, 457 (2d Cir. 1991) (witness "was

16

the centerpiece of the government's case."); <u>United States v. Seijo</u>, 514 F.2d 1357, 1365 (2d Cir. 1975) (underlying conviction was "predicated on the now suspect credibility of the crucial witness" who provided "uncorroborated testimony").

A.   <u>Douyon's Testimony Was Not The Only Evidence Linking Bouloute to the Crime</u>

Notwithstanding Douyon's testimony, the evidence against Bouloute in this case was overwhelming.   <u>First</u>, it was clearly established through the government's first witness, Agent Callahan, that Bouloute instigated the conspiracy.   (GA 344-45).   Prior to Douyon's involvement, Bouloute discussed with Footso, a prior acquaintance, his ability to smuggle drugs through New York City airports.   (GA 393-94, 424-26).   In fact, Bouloute's first meeting with Footso in Queens where they discussed the plan, including airlines and flight information, was recorded.   (GA 496-97).   Agent Callahan further testified concerning the messages that he conveyed to Bouloute through Footso regarding the plan to import cocaine. For example, Agent Callahan testified that he instructed Footso to tell Bouloute that the drugs had arrived. (GA 369).   Following Bouloute's receipt of that information, Bouloute indeed traveled to New York to pick up the drugs where he was subsequently arrested. <u>Id.</u>

<u>Second</u>, the audio recordings of the May 5 and May 8, 2003 meetings where the conspirators planned the importation provide undisputed evidence of Bouloute's involvement and corroborate

Douyon's testimony.  For example, during the May 8 meeting, the audio tapes recorded the conspirators discussing the role that each individual would play in the importation scheme (GA 505, 509); what flights and airlines could be used for the importation (GA 512-13); the methods that they would use (i.e., whether to put the drugs in a suitcase, or hide them in cargo) (GA 514-17); from what countries Bruno could obtain drugs (GA 516); the quantity of drugs that would be imported (GA 517-18); the price that would be charged (GA 505, 509, 526, 530, 543, 546-47); and potential future importations of drugs (GA 517-18, 548).  The audio tapes further reveal that it was clear that the conspirators were talking about drugs.  Footso told the group, "give it some time and Columbia will put on some good shit, man.  I'm telling you.  Wholesale, you know?"  (GA 522).  In addition, the conspirators mention "kis" in the conversation, which the government's drug expert testified is a common reference to kilograms of drugs. (GA 540).

Third, the fact that Bouloute arrived in New York to collect the drugs after receiving the baggage information from Douyon undoubtedly demonstrates that he was a crucial player in the importation scheme.  Indeed, when arrested, Bouloute possessed a concert ticket with the exact information about the bag, including its description, the name of the bag's owner, and its place of destination.  (GA 374-77).  The concert ticket is undisputed evidence that Bouloute intended to pick up the suitcase containing

cocaine.  And finally, his direct participation was apparent when, after being informed that the cocaine would not be handed over until he paid a corrupt baggage handler, he personally met with the handler (an undercover DEA agent) and attempted to persuade him to turn over the drugs without payment.  <u>See</u> and Order, 07 CV 2201(ILG)(January 15, 2008), attached hereto as Exhibit C.

The combination of this undisputed evidence demonstrates that there was overwhelming evidence against Bouloute apart from Douyon's testimony.  In addition, much of this independent evidence strongly corroborate's Douyon's testimony.  Accordingly, the undisclosed impeachment evidence in this case is not reasonably likely to have affected the jury's judgment or changed the jury's verdict.  <u>See</u> <u>Amiel</u>, 95 F.3d at 146 (Where independent evidence ties the defendant to the criminal conduct, undisclosed cumulative impeachment evidence would not undermine confidence in the outcome of the trial.).

B.   <u>The Undisclosed Impeachment Material Is Merely Cumulative</u>

The additional impeachment material would not have materially affected the defense's cross of Douyon.  Douyon's testimony at trial was already shown to be questionable, and, therefore, the additional impeachment material was merely cumulative.

Undisclosed impeachment evidence must be "likely to have changed the verdict." <u>Avellino</u>, 136 F.3d at 257.  Accordingly, new

impeachment evidence is not material, and thus no prejudice has
occurred "when the suppressed impeachment evidence merely furnishes
an additional basis on which to impeach a witness whose credibility
has already been shown to be questionable,". United States v.
Amiel, 95 F.3d 135, 145 (2d Cir. 1996) (citing United States v.
Wong, 78 F.3d 73, 79 (2d Cir. 1996)). Accordingly, if the
suppressed evidence is cumulative impeachment material against a
witness's credibility, the failure to disclose it does not violate
Brady. See United States v. Diaz, 176 F.3d 52, 108 (2d Cir. 1999);
United States v. Orena, 145 F.3d 551, 559 (2d Cir. 1998) ("Where
ample ammunition exists to attack a witness's credibility, evidence
that would provide an additional basis for doing so is ordinarily
deemed cumulative and hence immaterial."); United States v.
Locascio, 6 F.3d 924, 949 (2d Cir. 1993)(where government witness
admitted numerous crimes, "[t]he addition of a few more allegations
would not have materially affected the defense's cross-examination
of him."; United States v. Gilbert, 668 F.2d 94, 96 (2d Cir. 1981)
(additional impeachment evidence "could hardly have transformed the
jury's image of [the witness] from paragon to knave").

        Given the ample ammunition in the instant case to attack
Douyon's credibility, the undisclosed impeachment evidence
concerning Douyon's involvement with additional drug importation is
merely cumulative. Douyon provided lengthy testimony at Bouloute's
trial concerning the details of his intimate involvement with the

New York cocaine conspiracy.   Among other evidence, Douyon admitted that he was the individual who located the supplier of the cocaine. He further admitted that the July 14, 2003 importation of drugs was merely a test run and that he planned to be involved in more drug trafficking in the future.  (GA 258).  Accordingly, additional testimony concerning his involvement in a related drug conspiracy in Florida would have been merely cumulative impeachment material against Douyon's credibility.

Moreover, contrary to the Petitioner's claim, there were many instances at trial where Douyon appeared less than completely honest.  See Petitioner's Memorandum of Law in Support of Motion to Amend Original 2255 Petition to Add New Claim, at 5-6.  For example, on cross-examination Douyon testified that he was in business with Bruno, the supplier of the drugs, for about two years but that he never knew where the source of Bruno's drugs was located.  (GA 178-79).  Upon further questioning, Douyon admitted that he "may" have told Agent Callahan that his partner, Bruno, had narcotic contacts in South America and moved narcotics into the United States. (GA 179).  Defense counsel further established the fact that Douyon went to the airport after the May 8, 2003 meeting despite Douyon's denial of that fact.  (GA 170, 326-28).  Defense counsel also compelled Douyon to admit that he lied several times to his co-conspirators during their meetings.  (GA 183-86, 238-22).  Of course the jury could have concluded from that testimony that Douyon was

truthful on the tapes but was lying in court.  Either way, Douyon appeared less than completely honest on the witness stand.  Douyon additionally admitted that his brother-in-law was a drug dealer, despite denying that he was involved in any other drug trafficking. (GA 234).  And on direct examination, Douyon testified that he failed to advise the government until just before trial about money that he received from Bouloute in exchange for purchasing drugs on Bouloute's behalf.  (GA 143-44).  Accordingly, Douyon was continually impeached on the stand, and he apparently displayed a willingness to be untruthful.

Moreover, defense counsel thoroughly cross-examined Douyon on his guilty plea, his cooperation agreement with the government, and his desire to receive a more lenient sentence in exchange for his cooperation.  This testimony demonstrated that Douyon clearly had a motivation to lie.  Accordingly, Douyon's testimony provided the jury with numerous reasons to find his credibility questionable, and, therefore, the undisclosed evidence was merely cumulative, and hence not material.  See Diaz, 176 F.3d at 108.  (Even assuming the evidence was of some impeachment value, it merely constituted cumulative impeachment material.).

**IV. HEARING**

Bouloute requests an evidentiary hearing.  But a hearing is not necessary or warranted under these circumstances.

Section 2255 requires a district court to hold a hearing

22

"[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." <u>Chang v. United States</u>, 250 F.3d 79, 85 (2d Cir. 2001). Such is the case here. The evidence on the record in this case demonstrates that there was overwhelming evidence against Bouloute apart from Douyon's testimony. As such, the result of Bouloute's trial would have been the same even if Bouloute possessed the additional impeachment evidence at that time.

Accordingly, the undisputed facts in the record conclusively show that Bouloute is entitled to no relief, and that no hearing is necessary.

23

**CONCLUSION**

Bouloute's motion to amend his original petition pursuant to 28 U.S.C. § 2255 should be denied.  Bouloute has not satisfied the <u>Brady</u> test.  Not only was information at issue not suppressed by the government, but regardless, it was immaterial in the context of the overall case.  As the record reflects, there was overwhelming evidence against Bouloute, Douyon's testimony was corroborated by other evidence, and Douyon's credibility was already suspect.  For these reasons, and the reasons set forth above, Bouloute's motion should be denied.

Dated: Brooklyn, New York
       February 27, 2009

                              Respectfully submitted,

                              BENTON J. CAMPBELL
                              United States Attorney
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201


                         By: /s/_____
                              CELIA A. COHEN
                              Assistant U.S. Attorney
                              *(Of Counsel)*
                              (718) 254-6147

# EXHIBIT A

1    Q      I would like to direct your attention to March 5th,

2    2003.  Were you working in your capacity as a sergeant with

3    the NCPD on that day?

4    A      Yes, I was.

5    Q      Did you do any surveillance on that day?

6    A      Yes, I did.

7    Q      Can you just explain who you were working with on that

8    day, what other officers were you with?

9    A      I was working with Detective ^ CHEK Robert Barry along

10   with some members of the DEA from New York City.

11   Q      What was the purpose of the surveillance you were

12   conducting on that day?

13   A      I was to surveil and record information regarding a

14   meeting between a confidential source and a man known to me

15   as Frantz Bouloute.

16   Q      Before the meeting with the confidential informant was

17   he equipped with a recording device?

18   A      Yes.

19   Q      Did you check that device to make sure it was working?

20   A      Yes, it was a tape recorder I put into the vehicle and

21   before the individual --  I met with the individual, the

22   confidential source.  I put the tape recorder into the car

23   and before I was finished with him, I started the tape

24   recorder and then went back to the surveillance.

25   Q      Are you finished?

1    A      I went back to the surveillance.

2    Q      Can you describe for the jury what you observed in your

3    surveillance?

4    A      After I placed the recorder into the vehicle, I watched

5    the source pull into the parking lot of the Windham Hotel

6    opposite LaGuardia Airport in Queens.  At that time he was to

7    meet with Mr. Frantz Bouloute in the parking lot.

8    Q      Do you see the person who met with the confidential

9    informant in the courtroom today?

10   A      Yes, I do.

11   Q      Can you please identify the person, say where he's

12   located, what he's wearing?

13   A      Sitting there with the orange tie, black suit, sitting

14   between the two other gentlemen in the middle.

15          THE COURT:  Indicating the defendant.

16   Q      Did you indeed record this meeting between the

17   confidential source and the defendant?

18   A      Yes.

19   Q      As you were conducting surveillance, were you recording

20   this conversation in any other way, any video made of there?

21   A      I also conducted a video of the individual pulling into

22   the parking lot, the source.  When he met up with

23   Mr. Bouloute, I continued to tape them while the two were in

24   the vehicle until which time Mr. Bouloute left the vehicle

25   and the camera stopped.

GA000000076

Douyon-direct-Petersen

76

1   Q       What type of schooling or education have you had?

2   A       High school and college.

3   Q       What degree did you get in college?

4   A       Business administration, marketing.

5   Q       Was it a bachelor's degree?

6   A       Yes.

7   Q       Where do you live now?

8   A       In Miami.

9   Q       How long have you lived there?

10  A       Since '89.

11  Q       Are you a United States citizen?

12  A       No.

13  Q       While living in Miami, have you been in the

14  United States legally?

15  A       Yes.

16  Q       I would like you to think back to October of 2003.  Did

17  anything significant happen to you at that time?

18  A       I got arrested.

19  Q       What were you arrested for?

20  A       For conspiracy, importing drugs into the United States.

21  Q       Since your arrest, have you been on bond?

22  A       Yes.

23  Q       Do you have to report to anyone as part of your bond?

24  A       Pretrial officer.

25  Q       How often do you have to report to that person?

SS, OCR, CSR, CM, CRR

GA000000077

Douyon-direct-Petersen                                        77

1   A    Every week, and has to see me every month.

2   Q    Are you allowed to travel as part of your bond?

3   A    Yes.

4   Q    Have you always been allowed to travel?

5   A    Yes.

6   Q    In the beginning were there restrictions on your

7   travel?

8   A    Yes, at the beginning.

9   Q    When you travel, do you have to report this at all to

10  your pretrial officer?

11  A    Yes, pretrial.

12  Q    You stated that you were arrested for --  please state

13  that again.

14  A    Conspiracy, importing drugs.

15  Q    Did you plead guilty to those charges?

16  A    Yes.

17  Q    What did you plead guilty to?  What was the specific

18  charge?

19  A    Conspiracy importing drugs into the states.

20  Q    What sentence do you face for having pled guilty to

21  that charge?

22  A    Minimum of ten years, maximum of life.

23  Q    In addition to being in prison for ten years to life,

24  do you face a fine?

25  A    Yes.

*SS, OCR, CSR, CM, CRR*

GA000000078

Douyon-direct-Petersen                                          78

1   Q      How much of a fine do you face?

2   A      $4 million.

3   Q      When you pled guilty, did you enter into an agreement

4   with the government?

5   A      Yes.

6   Q      What type of agreement was that?

7   A      Cooperation agreement.

8   Q      Who did you agree to cooperate with?

9   A      The government.

10  Q      Did you enter into this agreement with the help of your

11  attorney?

12  A      Yes.

13  Q      Under that agreement are you obligated to meet with the

14  government if they ask you to?

15  A      Yes.

16  Q      Are you obligated to testify if you're asked to?

17  A      Yes.

18  Q      Are you obligated not to commit future crimes?

19  A      Yes.

20  Q      What happens if you violate any of those terms of your

21  agreement?

22  A      The plea that I entered would be dismissed.

23  Q      Would the plea be dismissed or will your agreement with

24  the government --

25  A      The cooperation agreement with the government would be.

GA000000079

Douyon-direct-Petersen                              79

1   Q     Could you face any criminal charges if you violate some

2   of those obligations?

3   A     Yes.

4   Q     If you abide by the terms of the agreement, what is

5   your understanding of what the government will do for you?

6   A     If I give the information that I give, whatever they

7   ask me to do in testifying and not committing any more

8   crimes, so they write a 5K1 letter.

9   Q     What's your understanding of what will be in that

10  letter?

11  A     That I've been cooperating with the government or

12  whatever they ask me for.

13  Q     Who will that letter go to?

14  A     To the judge.

15  Q     What's your understanding of what that letter will

16  allow the judge to do?

17  A     To sentence me at the lower end, the minimum end.

18  Q     Has anyone made a promise to you what your sentence is

19  going to be?

20  A     No, ma'am, nobody.

21  Q     As you stand here today, as you sit here today, you

22  don't know what your sentence will be for what you pled

23  guilty to?

24  A     No.

25  Q     Whose job is it to sentence you?

*SS, OCR, CSR, CM, CRR*

GA000000080
Douyon-direct-Petersen                                    80

1   A      The judge.

2   Q      Must the judge give you a lower sentence because you
3   cooperated?

4   A      No.

5   Q      Are you testifying today as part of your cooperation
6   with the government?

7   A      Yes.

8   Q      Is there anything else that the government, that you
9   will hope will do for you other than writing a letter if you
10  abide by your side of the agreement?

11  A      If I request a visa, if I do what I'm supposed to do,
12  they might look into it and ask the Department of Justice --

13         THE COURT:  Sorry, I don't understand you.  Can you
14  put the microphone aside, speak a little louder, perhaps?

15  A      I could ask for S one --  S visa to the government and
16  if they decide I deserve it, they will ask the Department of
17  Justice to apply for one for me.

18  Q      If you were granted an S-1 visa, what would that allow
19  you to do?

20  A      Not to be deported.

21  Q      Is it your understanding that because you pled guilty
22  to these charges you could be deported?

23  A      Yes.

24  Q      Who is it up to to decide whether you would get an S-1
25  visa?

GA000000081

Douyon-direct-Petersen                                              81

1   A      Department of Justice.

2   Q      Is it your understanding that it's up to the

3   prosecutor's office?

4   A      No.

5   Q      You stated that you pled guilty to conspiring to import

6   cocaine into the U.S.  can you just describe in general terms

7   at this point what it is that you did, what the basic plan

8   was?

9   A      Myself and a few other people were conspiring to bring

10  drugs from outside the country to the States here.

11  Q      How would the drugs get into the states?

12  A      By air, airplane.

13  Q      Where would they be coming from?

14  A      South America.

15  Q      South America?

16  A      Yes.

17  Q      Where would the planes with the drugs in them, where

18  were they going to land?

19  A      New York area, Newark or Kennedy.

20  Q      When was it that you started to make these plans in the

21  beginning?

22  A      Can you repeat?

23  Q      When was it that you started to plan with others to do

24  this, the beginning of it?

25  A      I was pushed by Mr. --

GA000000082
Douyon-direct-Petersen                                  82

1          THE COURT:  The question is what year, if I

2   understand it correctly, what year did that event begin.

3          MS. PETERSEN:   Yes.

4   Q    General time frame?

5   A    2003;  the spring.

6   Q    Who was involved in this plan?

7   A    Frantz Bruno, Robert Douyon and another guy, a Jamaican

8   guy.

9   Q    Was anyone else?

10  A    No.

11  Q    Was there anyone else involved besides Frantz Bouloute,

12  you and a Jamaican guy?

13  A    Frantz Bruno.

14  Q    Had you just mentioned the name Frantz Bouloute.  Do

15  you know Frantz Bouloute?

16  A    Yes.

17  Q    How long have you known him?

18  A    Nine, ten years, maybe more.

19  Q    Do you see him in the courtroom today?

20  A    Yes.

21  Q    Would you please identify him, state where he's

22  sitting, what he's wearing?

23  A    Black suit and pink tie.

24          MS. PETERSEN:   For the record, I would state the

25  witness has identified the defendant.

SS, OCR, CSR, CM, CRR

GA000000083

1          THE COURT:  What did you say the color of the tie

2    was?

3          THE WITNESS:  Orange.

4          THE COURT:  Orange.  Indicating the defendant.

5          MS. PETERSEN:    A little color problem.

6    Q     Can you describe the relationship over the last nine to

7    ten years that you had with Frantz Bouloute?

8    A     He was a friend, like a big brother to him, whatever he

9    needed to know or to ask advice and everything would come to

10   me.

11   Q     Do you know him by any other names?

12   A     Fan Fan.

13   Q     You also mentioned Frantz Bruno.  Who is that?

14   A     A friend of mine.

15   Q     How long have you known Frantz Bruno?

16   A     Eight, nine years.

17   Q     Did you have any business relationship with Frantz

18   Bruno?

19   A     Yes.

20   Q     Describe that.

21   A     We had a trading company, trading commodities.

22   Q     Like what?

23   A     Sugar, rice, oil.

24   Q     What was his position in the company?

25   A     Mine?

GA000000084
Douyon-direct-Petersen                                    84

1  Q     What was Bruno's position in the company?

2  A     President.

3  Q     What was your position?

4  A     Vice-president.

5  Q     You also said a Jamaican man was involved in this plan.

6  Did you know this man?

7  A     No.

8  Q     Did he go by any names when you met him?

9  A     I met him only once.  His name, I think, was Footso,

10 something like that.

11 Q     You stated you started planning to bring cocaine into

12 the United States sometime around the spring of 2003.

13 A     Yes.

14 Q     How did that plan start?  What started that plan in

15 motion?

16 A     Mr. Bouloute came to me, said he has a way to bring, to

17 get the drugs out of the airport, if I knew anybody or I need

18 somebody that he needs the service, let him know.

19 Q     Did he tell you what that way was at that time?

20 A     What?

21 Q     Did he explain to you?  You said he had a way to get

22 drugs out of the New York area airports.  Did he explain to

23 you what that way was?

24 A     To get it out of the plane.

25 Q     What was your reaction when he told you that?

1  A     I told him I would look into it.

2  Q     So you were interested?

3  A     Yes.

4  Q     What, if anything, did you do next after you said you

5  would look into it?  What did you do to look into it?

6  A     I called my friend Frantz Bruno, told him about it.

7  Q     Did you just say Bruno?

8  A     Frantz Bruno.

9  Q     You called him.  What did you say to him?

10  A     That I said to him what Mr. Bouloute said to me.

11  Q     What was his response?

12  A     He would let me know if he finds something.

13  Q     Directly after that, did Bruno and Mr. Bouloute ever

14  meet?  Did Bruno become interested?  Did you put them

15  together?

16  A     Yes, I did.

17  Q     Describe that.

18  A     Bruno wants to meet with him and I think they met at

19  the hospital in Miami where his mother was sick.

20  Q     Whose mother?

21  A     Bruno.

22  Q     At the hospital you say?

23  A     Yes.

24  Q     The reason they were there was why?

25  A     To get together about what he was telling me.

*SS, OCR, CSR, CM, CRR*

BY MS. PETERSEN:

Q.   Where was this meeting?

A.   In Miami Beach.

Q.   And was this the first time that you met Footso, the
Jamaican guy?

A.   Yes.

Q.   Who proposed to have this meeting?

A.   Frantz Bouloute.

Q.   What was your understanding of why he wanted -- what was
your understanding of why he wanted to have the meeting?
What was his purpose?

A.   To meet with Frantz Bouloute, to show him that the guy
can do the job.

Q.   Did he want the Jamaican guy to meet France Bruno?

A.   Yes.

Q.   At this meeting, did you all use your real names, or did
you use nicknames?

A.   Nicknames.

Q.   What nickname did you go by?

A.   I went by Kojac.

Q.   And did Bruno go by a nickname?

A.   Flash.

Q.   And did Bouloute go by a nickname?

A.   Fanfan.

Q.   Is that a nickname he is normally known by?

GA00000091
Douyon - direct - Petersen

1   Government's Exhibits 4-A, 4-B, 4-C, 4-D and 4-E.

2            Could you take a look at those, please, each one.

3            (Pause.)

4   Q.   Do you recognize those?

5   A.   Yes.

6   Q.   What are they, what are they pictures of?

7   A.   That is the meeting in South Beach.

8   Q.   Are those accurate depictions of the meeting?

9   A.   What?

10  Q.   Are those accurate depictions of what the meeting looked

11  like?

12  A.   Yes.

13           MS. PETERSEN:  Your Honor, I would like to move to

14  admit Government's Exhibits 4-A, B, C, D and E into evidence.

15           MR. WATTS:  No objection, your Honor.

16           THE COURT:  They are all received.

17           (So marked.)

18           MS. PETERSEN:  May I publish them to the jury, your

19  Honor?

20           THE COURT:  You may.

21  BY MS. PETERSEN:

22  Q.   Now, I would like you to set the scene -- where did you

23  first meet at the May meeting?

24  A.   At the Starbucks on Ocean Drive.

25  Q.   I'm showing you Government's Exhibit --

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA0D0000092
Douyon - direct - Petersen

1          THE COURT:  I don't think the witness can see it.

2          Do you have a monitor there?

3          THE WITNESS:   No.

4          THE COURT:   Can you all see that screen?

5    BY MS. PETERSEN:

6    Q.   Is this where the meeting began?

7    A.   Yes.

8    Q.   And can you point out who it is, who are the individuals

9    in this picture?

10   A.   Me, the Jamaican guy --

11   Q.   Actually, who is that (indicating)?

12   A.   Me.

13   Q.   Who is that (indicating)?

14   A.   Bouloute.

15   Q.   Mr. Bouloute?

16   A.   Yes.

17   Q.   Who is this (indicating)?

18   A.   The Jamaican guy.

19   Q.   Okay.  I would like to show you --

20          THE COURT:  What picture was that?

21          MS. PETERSEN:  That was 4-A.

22   BY MS. PETERSEN:

23   Q.   I would like to show you Exhibit 4-B.  What are you

24   doing in this picture?

25   A.   Myself, Mr. Bouloute and the Jamaican guy behind the

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000093

Douyon - direct - Petersen

1   tree.

2   Q.   You think that is the Jamaican guy, right there

3   (indicating)?

4   A.   Yes.

5   Q.   Who is this (indicating)?

6   A.   Mr. Bouloute.

7   Q.   And that is (indicating)?

8   A.   That's me.

9   Q.   What are you doing in this picture?

10  A.   Getting off -- stepping out of Starbucks.

11  Q.   You're doing what?

12  A.   Stepping out of the Starbucks.

13  Q.   Where did you go next after the Starbucks?

14  A.   Across from Starbucks.

15          THE COURT:   Across from Starbucks?

16          THE WITNESS:   Yes.

17  BY MS. PETERSEN:

18  Q.   How far away did you go?

19  A.   A few minutes.

20  Q.   I'm showing you Government's Exhibit 4-C.  What is this

21  a picture of?

22  A.   All four of us.

23  Q.   All four of you?

24  A.   Yes.

25  Q.   What are you doing in this picture?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Douyon - Direct - Petersen
GA000900094

1   A.   Talking about, you know, the importation of the drugs in

2   the States.

3   Q.   Who is this (indicating)?

4   A.   Robert Douyon.

5          THE COURT:   You mean you?

6          THE WITNESS:   That's me, yes.

7   BY MS. PETERSEN:

8   Q.   Who is that (indicating)?

9   A.   The Jamaican guy.

10  Q.   Who is this (indicating)?

11  A.   Frantz Bouloute.

12  Q.   And this face that's coming up right there (indicating),

13  who is that?

14  A.   Frantz Bouloute.

15  Q.   That is Frantz Bouloute.   Okay.

16          One final picture.

17          THE COURT:   What's the exhibit number?

18          MS. PETERSEN:   This is 4-D, your Honor.

19  BY MS. PETERSEN:

20  Q.   What is that a picture of?

21  A.   The four of us again.

22  Q.   Who is that (indicating)?

23  A.   Mr. Bouloute.

24          THE COURT:   You mean the defendant, Mr. Bouloute?

25          THE WITNESS:   Yes.

GA0000000095

Douyon - direct - Petersen

1  BY MS. PETERSEN:

2  Q.   And who is that (indicating)?

3  A.   The Jamaican guy.

4  Q.   Who is that (indicating)?

5  A.   Mr. Bruno.

6  Q.   And do you recognize that man (indicating)?

7  A.   And me.

8  Q.   Okay.

9        I would like you to look in front of you, there

10 should be two CD's, Government's Exhibits 3-A and 3-B.

11       Do you recognize those?

12 A.   Yes.

13 Q.   What are those?

14 A.   They are the audio from the meeting in South Beach.

15 Q.   It's what?

16 A.   The audio tape in the South Beach meeting.

17 Q.   Have you listened to that CD?

18 A.   Yes.

19 Q.   Both of those CD's?

20 A.   Yes.

21 Q.   And you were there -- you were there for that

22 conversation?

23 A.   Yes.

24 Q.   As you listened to those CD's, did they actually capture

25 the conversation that you were a part of?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000124

Douyon - direct - Petersen

1          (Tape continues.)

2          (Tape stops.)

3      MS. PETERSEN:  Shall I gather headsets up from the

4  jury?

5          THE COURT:  Yes.

6  BY MS. PETERSEN:

7  Q.   Sir, you were a part of that conversation?

8  A.   Yes.

9  Q.   Is that -- the conversation that you just listened to on

10  those tapes, is that the conversation that was had in South

11  Beach?

12  A.   Yes.

13  Q.   At the time you were participating in this conversation,

14  did you realize that it was being recorded?

15  A.   No.

16  Q.   You didn't know.

17          At the conclusion of this meeting, did you have an

18  agreement with Footso, Bruno and the defendant, Frantz

19  Bouloute -- called Fan Fan on this tape -- did you all have

20  an agreement to bring drugs into the United States?

21  A.   Yes.

22  Q.   Now, throughout the tape, was there ever a specific

23  mention of the word "cocaine" or "drugs" that you heard?  Did

24  you hear specifically the word "cocaine"?

25  A.   They were talking about keys.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000125

109

Douyon - direct - Petersen

1   Q.    Keys?

2   A.    Yes.

3   Q.    What's a key?

4   A.    A kilo of cocaine.

5   Q.    Was it your understanding that what you were talking

6   about in this conversation was cocaine?

7   A.    Yes.

8   Q.    What did you understand were various people's roles in

9   this plan?  What was your understanding of Bruno's role?

10  A.    He was supposed to provide the drugs.

11  Q.    Did he have contacts where he could -- a source -- he

12  had a contact where he could get a supply of drugs?

13  A.    I guess, yes.

14  Q.    And what was your role?

15  A.    I was the middleman between Bouloute and Bruno.

16  Q.    Bouloute?

17  A.    Yes.

18  Q.    What was Bouloute's role?

19  A.    To take the drugs out of the airport.

20  Q.    Was Bouloute himself taking it out of the airport, or

21  what was he doing, specifically?

22  A.    I think he had somebody else with him, like the Jamaican

23  guy, to do the job.

24  Q.    What was Footso's role, the Jamaican guy's role?

25  A.    He was supposed to take it from the airport for

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000126

Douyon - direct - Petersen

1  Bouloute.

2  Q.  I would like to go through some specific portions of the

3  transcript with you.  If you could go to 3-AT, the first half

4  of the tape of the transcript.

5      On page 2, in the very middle of the page, you say:

6  "Where did Fan Fan go?"

7      And the Jamaican says:  "He's gone to use the

8  restroom."

9      Then, if you turn over the page to page 5, five

10  speakers down, it's Fan Fan saying:  "I'm not white, so I

11  can't say under the sun."

12      Is this the point where he returns from the

13  bathroom?

14      MR. WATTS:  Objection.

15      THE COURT:  Overruled.

16  BY MS. PETERSEN:

17  Q.  You can answer.

18      Let me rephrase.  I'm sorry.

19      Has he returned to the conversation at this point?

20  You earlier said he was at the restroom.  Has he returned to

21  the conversation?

22  A.  Yes.  He came from the bathroom at the time.

23  Q.  After this point, does Fan Fan ever leave this

24  conversation again; does Bouloute ever leave this

25  conversation again?

1   A.   No.

2   Q.   He's there the entire time?

3   A.   Yes.

4   Q.   I would like you to turn to page 10, please.

5        Four speakers down, you say:  "Right now we're

6   getting to know each other well.  Right.  Okay.  After that,

7   that will be Fan Fan's duty to talk to you.  Okay?"

8        JAMAICAN:  "Okay."

9        KOJAC:  "Once in a while I might have to talk to

10  you, or my partner might talk to you."

11       "Okay, okay.

12       "But his duty is you.

13       "No problem.

14       "We don't want to...Because everybody have

15  some...like I told you, something to do...."

16       "I think we should do something to do where.

17       "Except...exactly.

18        "Yeah.

19       "If there's an emergency I could call you, hey, but

20  that's his responsibility...."

21       The Jamaican says:  "To deal with me.  Communicate."

22       Was it your understanding that Bouloute, this

23  defendant, the one who had access to the Jamaican, that he

24  had the connection with the Jamaican?

25  A.   Yes.

GA000000128
Douyon - direct - Petersen

1  Q.   Was it Bouloute's responsibility, was he the one who was

2  allowed to communicate with the Jamaican?

3  A.   Yes.

4  Q.   Did you feel like you could directly call Footso

5  yourself?

6  A.   Me, no.

7  Q.   How did you feel about this?  How did you feel about the

8  lines of communication?

9          MR. WATTS:  Objection to form, your Honor.

10         THE COURT:  I'll allow it.

11  A.   That it's Bouloute's duty to talk to the Jamaican guy.

12  Q.   Now, I would like you to turn to page 13.

13         On this page, the Jamaican makes various comments

14  about having connections at Newark, connections at JFK on

15  American Airlines, and talks about various flights.  Caracas

16  into Newark.  At the bottom, American Airlines out of Aruba.

17         What does he mean -- what does the Jamaican mean,

18  saying he has connections at these airports?  What's your

19  understanding of what he meant?

20  A.   What he meant by that was, anything coming from those

21  countries going to Newark Airport or Kennedy Airport, he

22  would be able to take it out of the airplane.

23  Q.   And describe more what you mean.  He would be able to

24  take what out of the airplane?

25  A.   The drugs out of the airplane.

GA000000129
Douyon - direct - Petersen

1   Q.   Did you know how he could do that, specifically?

2   A.   No.  No.

3   Q.   So, your understanding was just that he had some way

4   that he could do that?

5   A.   Yes.

6   Q.   I would like you to turn to page 16, at the very bottom.

7        Flash -- again, who is Flash?

8   A.   Bruno.

9   Q.   Bruno?

10  A.   Yes.

11  Q.    (Reading):

12       "Right now I have either Caracas...and I have

13  Curacao."

14       The Jamaican says:  "Nothing out of Aruba?"

15       Flash says:  "Now I will try."

16       Kojac:  "We'll work the same thing."

17       Flash says:  "I will try to do the same thing there

18  but I, I, I have Curacao but I don't have Aruba.  I can also

19  have whatever Latin countries, like Costa Rica, Trinidad."

20       Mr. Douyon, what's your understanding of what Flash

21  was discussing when he was saying these things?

22  A.   He was telling the Jamaican guy that out of those

23  countries, he can work to get the drugs out of that country,

24  too.

25  Q.   Just to be sure we're clear:  You're saying Flash's

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Douyon - direct - Petersen

1   A.   They used to do three suitcases.

2   Q.   So, when the number three is put out there, that's in

3   references to suitcases?

4   A.   Yes.

5   Q.   Now, Fan Fan keeps saying:  "We used to do three.  We

6   used to do three."

7         What is he referring to when he says "We used to

8   do," do you know?

9   A.   No.  Between him and the Jamaican guy.

10  Q.   Explain that further.

11  A.   When he says he used to do three, he used to do three,

12  because it was between him and the Jamaican guy.

13  Q.   In the past?

14  A.   Yes.

15  Q.   So, your understanding was -- was your understanding

16  that they had done this before?

17  A.   What?

18  Q.   Was it your understanding that they had done this before

19  together?

20  A.   Yes.

21  Q.   Now, you can go to 3-B-T, the second transcript.

22         MS. PETERSEN:  One second, your Honor.

23         (Pause.)

24  BY MS. PETERSEN:

25  Q.   Can you please turn to page 4.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Douyon - direct - Petersen

1    says: "So, fine.  I will work it out then, right?  The

2    delivery in New York, right?  You will come up over the

3    weekend?"

4            Fan Fan says:  "Yeah, I could go there."

5            What was your understanding of Fan Fan's role with

6    regard to this?  Was Fan Fan supposed to travel to New York

7    when the delivery came in?

8            MR. WATTS:  Objection, leading the witness.

9            THE COURT:  Sustained.

10   BY MS. PETERSEN:

11   Q.   What was your understanding, in this part of the

12   conversation, that was being discussed with regard to

13   Fan Fan's role?

14   A.   When the drugs would be in New York, so Fan Fan is to

15   come to New York to meet with the Jamaican guy.

16   Q.   On page 11, on this page, the conversation is discussing

17   giving a name and a tag number, and the name Carlos Alberto

18   is decided upon.  When the drugs actually came in, was the

19   name Carlos Alberto actually used?

20   A.   No.

21   Q.   Why not?

22   A.   My understanding was, Mr. Bruno told him he could not

23   use that name, because that person has to be on that plane.

24   The person was not traveling, so he could not use the name.

25   Q.   So, you are saying, when you say -- I'm sorry.  Can you

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Douyon - direct - Petersen                          126

GA000000143

1   BY MS. PETERSEN:

2   Q.    Okay.   I'm putting this on the screen.

3          So, looking at this, how much was he paying you at

4   this point?

5          MS. PETERSEN:   Can you see it?

6          We should bring it out.

7   BY MS. PETERSEN:

8   Q.   Was this one of the payments you received from

9   Mr. Bouloute?

10  A.   Yes.

11  Q.   What was the point of this?  What was this a payment

12  for?

13  A.   Same thing.

14  Q.   Same thing what?

15  A.   To buy the drugs for him.

16  Q.   How much is this for?

17  A.   2400.

18  Q.   2400.

19         You just testified overall, he gave you about 80 or

20  90,000?

21  A.   Yes.

22  Q.   What form did that come in?

23  A.   Cash.

24  Q.   In cash?  Was that before or after this check?

25  A.   Before the check.

Douyon - direct - Petersen

```
1    Q.    What's the date on this check?

2    A.    January 22, 19-- I mean, 2003.

3    Q.    Where did this come in the payments?  Was it first,

4    last?

5    A.    That was the last.

6    Q.    The last payment?

7    A.    Yes.

8    Q.    Do you know why he wrote out a check this time instead

9    of cash?

10   A.    I don't know.

11   Q.    Just looking at the top -- I'll zoom in here a little

12   bit -- what is the name on the actual check?  Can you see up

13   at the very top who it says it's a check of?

14   A.    Fan's Productions, Inc.

15   Q.    What is Fan's Productions?

16   A.    That's his business.

17   Q.    What kind of business is it?

18   A.    He's a promoter.

19   Q.    A promoter of what?

20   A.    Concerts, balls.

21   Q.    Would there be any reason that you would be receiving a

22   check from Fan's Productions?

23              MR. WATTS:  Objection.

24              THE COURT:  Overruled.

25   A.    No.
```

Douyon-direct-Petersen                                      130

1    Q     In the tape you all said that you would try to bring

2    the drugs in on the next Sunday, that very next Sunday?

3          Did that happen?

4    A     No.

5    Q     Why not?

6    A     Bruno was not ready.

7    Q     Bruno was not ready?

8    A     Yes.

9    Q     Okay.  I just want to make sure when you say Bruno and

10   Bouloute, sometimes they sound the same.

11         Can you be very clear when you are saying Bruno or

12   Bouloute?

13         What do you mean he wasn't ready?

14   A     I guess his source overseas was not ready to --  to do

15   the job.

16   Q     Did there come a time when you all did get drugs aboard

17   a plane bound for the US?

18   A     Excuse me?

19   Q     Did there come a time when Bruno did successfully get

20   drugs to come to the US?

21   A     Yes.  In about summer 2003.

22   Q     How did you find out that Bruno was ready?

23         How did you first find out about this?

24   A     He told me that.

25   Q     In the following days after you found out, can you just

Douyon-direct-Petersen

1  explain what happened?

2              What did you do?

3  A    I called Bouloute and told him Bruno was ready.

4  Q    Okay.  Then how did you participate in this, in the

5  next few days?

6              How did you participate in the plan in the next

7  couple of days?

8  A    I don't understand.

9  Q    After Bruno said he was ready, and you passed the

10 information on to Bouloute, then what did you do?

11 A    I waited until Bouloute calls me back, tell me that his

12 guy was ready.

13 Q    Okay.  Then what happened?

14 A    He called me back and said everything is okay, set.

15 Q    Okay.

16 A    For the coming Sunday.

17 Q    Okay.  So then what happened around the coming Sunday?

18             How did you participate?

19 A    I was on my way to New York on the Sunday morning.

20 Q    When did you go to New York?

21 A    On Saturday.  I left on Saturday.

22 Q    Whom did you have with you?

23 A    Me, Jean Faustin.

24 Q    Can you spell that, please?

25 A    F --

GR      OCR      CM      CSR      CRR

GA000000149

Douyon-direct-Petersen                                    132

1  Q     If you can?

2  A     F A U S T I N.

3  Q     Who else?

4  A     Guy by the name of Big.

5  Q     Say that?

6  A     Big.

7  Q     Big as in B I G?

8  A     Yes.

9  Q     Okay.  Who else?

10  A     Herve, H E R V E.

11  Q     Who is Jean Faustin?

12  A     Bruno's buddy.

13  Q     Bruno's what?

14  A     Buddy.  Friend of Bruno.

15  Q     Oh.  I'm sorry.  His buddy?

16  A     Yes.

17  Q     Who is Big?

18  A     Bruno's friend too.

19  Q     Why was Big in the car?

20  A     Bruno was supposed to leave when I get there.  That's

21  what he told me.  He said -- he sent Big in his place.

22  Q     Bruno sent Big instead?

23  A     Yes.

24  Q     Had Big been involved before this?

25  A     No.

GR        OCR        CM        CSR        CRR

GA000000151

Douyon-direct-Petersen                                    134

1              Start with Saturday, please.

2    A    We drove from Saturday to Sunday morning.

3    Q    You drove from where?

4    A    From Miami to New York.

5    Q    To?

6    A    To New York.

7    Q    Okay.  All right.

8         And?

9    A    Sunday morning, I --  if I remember, the flight was

10   supposed to leave at 8:30.

11   Q    The flight?

12   A    Yes.  From Caracas to Newark.  Bruno did --  he had the

13   name and the tag number.  About maybe ten, eleven.  I don't

14   know exactly the time.  Bruno calls telling me the name and

15   the tag number.

16   Q    Before that call, had you had any contact with the

17   defendant, with Mr. Bouloute?

18   A    Yes.

19   Q    What was the nature of that contact?

20   A    He was asking for the name and the tag number.

21   Q    Was he --  where was he?

22        Where was Bouloute at this time?

23   A    In Miami.

24   Q    He was in Miami?

25        Was it telephone contact?

GR        OCR        CM        CSR        CRR

Douyon-direct-Petersen

1   A     Yes.

2   Q     Okay.   Explain a little more.   What was he saying to

3   you in these phone calls?

4   A     He was asking me for the name and the tag number.   He

5   was getting too late for his guy to pick up the --  the drugs

6   at the airport.

7              About 10:00, 10:30, Bruno calls with the name and

8   the tag number.

9   Q     What did you mean by the name and the tag number?

10             What was this name and tag number?

11  A     On the suitcase was coming.

12  Q     So it was your understanding that this was actually the

13  bag tag and the name?

14  A     That's --

15             MR. WATTS:   Objection as to leading the witness,

16  Your Honor.

17             THE COURT:   Sustained.

18  Q     So after you passed this information on to Bouloute,

19  what happened next?

20  A     I waited for his call, to call me back telling me that

21  the --  maybe it's too late.   We might not get it today

22  because it was too late.

23  Q     Who said that to you?

24  A     Bouloute.

25  Q     He said okay, explain a little bit more.   What was

GR      OCR      CM      CSR      CRR

GA000000153

Douyon-direct-Petersen                          136

1    he -- why was it maybe too late?

2    A    Because Bruno gave the name and the bag tag number too

3    late.

4    Q    Too late for what?

5    A    Too late.  He was supposed to give it way before the

6    plane leaves.

7    Q    Why was that?

8         Why was the information needed in advance?

9    A    That's --

10   Q    When he said it may be too late, it may be too late to

11   do what?

12   A    To pick it up at the airport.

13   Q    What -- do you remember what the flight was on Sunday?

14   It was from where to where?

15   A    I think it's Venezuela.  I don't know exactly.  Caracas

16   or Venezuela to Newark.  Newark to Richmond.

17   Q    Richmond?  To Richmond?

18   A    Yes.

19   Q    Okay.  At any point, did you hear again from Bouloute

20   on the 13th?

21        Did you hear back from him?

22        Strike that.  Let me reask the question.

23        Did you receive word at any time that day that the

24   bag -- that the suitcase had made it successfully to Newark

25   Airport?

                GR      OCR      CM      CSR      CRR

Douyon-direct-Petersen                                    137

1   A    Yes.

         MR. WATTS:  Objection.  Leading the witness.

2

3        THE COURT:  Overruled.

4   Q    You can answer the question.

5   A    Yes.  In the afternoon, about 3:00 o'clock.

6   Q    Who -- who did you receive word from?

7   A    Bouloute.

8   Q    What did he tell you?

9   A    That everything is okay.

10  Q    Did he say anything else?

11  A    No.

12  Q    Did he tell you where he was at the time?

13  A    He was still in Miami.

14  Q    What was your understanding of where he was supposed to

15  be?

16  A    In New York.

17  Q    Did he tell you whether he would -- whether he would

18  indeed be coming to New York?

19  A    Told me he was not traveling that Sunday.  He was

20  coming the next day.

21  Q    The next day?

22  A    Yes.

23  Q    Okay.  Did you ask him for anything in this

24  conversation?

25  A    Which conversation?

GR      OCR      CM      CSR      CRR

Douyon-direct-Petersen

1  Government's Exhibit 22.

2              What is that?

3  A    A Western Union receipt.

4  Q    Do you recognize what Western Union receipt that is --

5  A    Yes.

6  Q    Who is it to?

7  A    To me.

8  Q    Have you seen that before?

9  A    Yes.

10 Q    Is your signature on it?

11 A    Yes.

12 Q    When did you receive it?

13 A    July 13, 2003.

14 Q    Is that copy an accurate copy of the Western Union that

15 you received?

16 A    Copy, yes.

17         MS. PETERSEN:  Your Honor, I'd offer this Exhibit

18 number 23 into evidence.

19         MR. WATTS:  No objection.

20         THE COURT:  It is received.

21         (Marked.)

22         THE COURT:  May I see it?

23         MS. PETERSEN:  Yes, Your Honor.

24         THE COURT:  Please, proceed.

25 Q    Okay.  Let's see if we can get the top part.

GR        OCR        CM        CSR        CRR

1   Q      Before you met with the government, you met with your

2   attorney; is that correct?

3   A      Yes.

4   Q      He explained to you in some sense what your cooperation

5   may entail; is that correct?

6   A      Yes.

7   Q      He told you what benefit you would receive from

8   cooperating; isn't that correct?

9   A      That I will receive or I may receive?

10  Q      May receive or will receive.  Okay, did he tell you you

11  will in fact receive some benefit?

12  A      He told me it would be better for me to plead guilty

13  because I was guilty.

14  Q      Your lawyer told you to plead guilty because you were

15  in fact guilty?

16  A      I was guilty.

17  Q      He didn't just tell you to plead guilty because, in

18  fact, you were guilty.  He also told you if you cooperate

19  that cooperation will help you; isn't that correct?

20  A      Yes.

21  Q      And you were seeking, you knew that if you plead guilty

22  that you were also facing potential of being deported; isn't

23  that correct?

24  A      Yes.

25  Q      Because you're a noncitizen in this country; is that

Douyon-cross-watts

1   A     Yes.

2   Q     Commodities mean sugar, oil, things of that nature?

3   A     Yes.

4   Q     Did you trade them on some public exchange, the

5   Commodity Exchange Bureau?

6              MS. PETERSEN:  Objection, irrelevant.

7              THE COURT:  I'll sustain the objection.

8   Q     You said Mr. Bruno was your partner --  withdrawn.

9              At some point you met with the government, the

10  prosecutors in the case involving your involvement in the

11  conspiracy; is that correct?

12  A     Yes.

13  Q     You agreed to cooperate?

14  A     Yes.

15  Q     You signed a cooperation agreement; is that correct?

16  A     Yes.

17  Q     A condition of the agreement was for you to tell the

18  truth about everything; is that correct?

19  A     Yes.

20  Q     Not only about your involvement in this case, but

21  everything else you have possibly done; is that correct?

22  A     Yes.

23  Q     That means other criminal acts; is that correct?

24  A     Yes.

25  Q     That means if you use any aliases, any other names

GA000000169

Douyon-cross-Watts                                    152

1   before; is that correct?

2   A    Yes.

3   Q    You agreed to do that; is that correct?

4   A    Yes.

5   Q    A condition, one of the conditions, as I indicate, you

6   have to be truthful; isn't that correct?

7   A    Yes.

8   Q    Who determines whether or not you are truthful,

9   Mr. Douyon?

10  A    I don't understand that.

11  Q    You have to be truthful in the information that you

12  provide to the government and in your testimony here; is that

13  correct?

14  A    Mmm mm.

15  Q    Who determines whether or not you are truthful in the

16  information you have provided?

17  A    I do.

18  Q    You determine?  Okay.

19        When you met with the government you told them what

20  your full name was; is that correct?

21  A    Yes.

22  Q    Robert Douyon?

23  A    Yes.

24  Q    Did you ever tell them about the name that you used,

25  Salvatore Grisanti?  Did you ever tell them about that name,

GA000000170
Douyon-cross-Watts                                  153

1    sir?

2    A      No.

3    Q      Had you ever used that name, Salvatore Grisanti?

4    A      No.

5    Q      Sir, after May 8th, after this meeting between you,

6    your partner, the confidential source and Mr. Bouloute, did

7    you leave the area and go to the Miami airport that day after

8    the meeting?

9    A      No.

10   Q      At the airport were you stopped by police officers?

11   A      No.

12   Q      At the airport did you produce a ticket identifying

13   yourself as Salvatore Grisanti?

14   A      I was not at the airport.

15   Q      You never went to the airport and you never used that

16   name?

17   A      Never.

18   Q      Were you planning to travel --  withdrawn.

19          Did you travel at all on May 8th, 2003?

20   A      May?

21   Q      May 8th, 2003, did you travel that day?

22   A      I don't recall that.

23   Q      After you met with the government, at some point you

24   appeared in court before a judge; is that correct?

25   A      Yes.

1  agreement; is that correct?

2  A     No.

3  Q     Because you want to remain in this country; isn't that

4  correct?

5  A     Yes.

6  Q     You and Mr. Bruno, you said you testified you were

7  partners with him for about two years.

8  A     Mmm mm.

9  Q     In describing your role in this conspiracy, you

10  basically describe yourself as a middleman; is that correct?

11  A     Yes.

12  Q     You didn't know, is it fair to say, you didn't know

13  where Mr. Bruno's source of drugs was coming from; is that

14  your testimony?

15  A     No, I don't know.

16  Q     Didn't know.

17  A     No.

18  Q     You didn't know Mr. Bruno is your partner's contact of

19  a source of drugs; is that correct?

20  A     No.

21  Q     This is a gentleman that you were in business with; is

22  that correct?

23  A     Yes.

24  Q     When you say you didn't know, as a matter of fact, sir,

25  you in fact did know?

Douyon-cross-Watts                                    162

1   A      I didn't know.

2   Q      You didn't know.  Your business partner was dealing in

3   drugs and you had no idea what his source of drugs was from?

4   A      Exactly.

5   Q      Do you recall speaking to some of the special agents,

6   Mr. William Callahan as part of your cooperation?

7   A      Who.

8   Q      This gentleman right here (indicating).

9   A      Yes.

10  Q      You remember speaking to him?

11  A      Yeah.

12  Q      How many times did you speak to Mr. Callahan?

13  A      A few times.

14  Q      Isn't it a fact, sir, you told Agent Callahan that

15  Mr. Bruno had contacts at various parts of South America and

16  moved narcotics into the United States?

17  A      Say that again?

18  Q      Sure.  Didn't you tell Agent Callahan that your

19  partner, Mr. Bruno, has narcotic contacts in South America

20  and moved narcotics into the United States?

21  A      I might have told the agent about that, but I never

22  know about it.

23            (Continued on next page).

24

25

GA000000183
Douyon - Cross - Watts

1   Q.   You heard?

2   A.   Yes.  But never from him.

3   Q.   And did you have any money in Haiti, sir?

4   A.   Nothing.

5   Q.   Well, you heard the tape of your conversation; is that

6   correct?  You have just heard the tape that was played

7   earlier of your conversation?

8   A.   Yes.

9   Q.   Isn't it a fact, in the tape, sir, you indicated that

10   you have about seven to eight million dollars in Haiti?

11   A.   Yes, I said that.

12   Q.   Was that a lie?

13   A.   Yes.  It was what I heard from Bruno.

14   Q.   Sir, when -- let me direct you to the page, so that you

15   are clear on what I'm asking you.

16         Page 20, that is Government's Exhibit 3-B-T, page

17   20, four lines from the top, and just follow me for a second.

18         It says: "KOJAC:  Yeah, but you know we have about

19   seven -- we have about seven to eight million dollars right

20   now in Haiti that we would want to bring back.

21         "JAMAICAN:  You would want to send it back?

22         "KOJAC:  To bring it back here.

23         "JAMAICAN:  You want to bring it here?  I'll have to

24   talk to my people.

25         "KOJAC:  Seven to eight right now."

GA000000184
Douyon - Cross - Watts

1    A.    Yes.  I said that.

2    Q.    Was that -- about the money, was that all a lie?

3    A.    No.  I said I heard that from Bruno.  Bruno was telling

4    me that he has some money, or a friend of his has money in

5    Haiti.  That's not my money.

6    Q.    Is there any reference to Mr. Bruno, in this part of the

7    transcript, where you are talking to the confidential

8    informant about the seven or eight million dollars?

9    A.    Yes.

10   Q.    Point to a page in the area in this conversation where

11   you indicate that it's Bruno's money that you are speaking

12   about.

13   A.    I said "we" --

14   Q.     "We" meaning who?

15   A.     -- and I was referring as a group.  But that was

16   Bruno's money.

17   Q.    What group are you referring to, sir?

18   A.    Me and Bruno.

19   Q.    So, you and Bruno had about eight million dollars in

20   Haiti?

21   A.    Yes, that's what he told me.  I don't know if it's true

22   or not.

23   Q.    So, your partner is telling you things, and you are not

24   certain whether or not they are a lie or they are truth?

25   A.    Yes.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000185
Douyon - Cross - Watts

1   Q.   And your partner is this big narcotics dealer that you

2   will take information from, and just to pass on to other

3   people without knowing the truthfulness of it?

4   A.   I trusted him.

5   Q.   You trusted him?

6   A.   Yes.

7   Q.   So, the eight million dollars that you had in Haiti,

8   that was your money?

9   A.   Say that again.

10  Q.   The eight million dollars that you had, you and Bruno

11  had in Haiti, was your money; is that correct?

12  A.   I didn't have any money in Haiti.

13  Q.   Well, the eight million dollars --

14  A.   That was not my money, sir.

15  Q.   The eight million dollars that you referred to in this

16  transcript, sir, was that money from narcotics proceeds that

17  you and Bruno had obtained?

18  A.   No.

19  Q.   Where did the eight million dollars come from?

20  A.   From Bruno.

21  Q.   From Bruno?

22  A.   Yes.  That's what he said.

23  Q.   So, when you say, in the transcript, "We have about

24  seven to eight million dollars," you are just referring not

25  to yourself, but to Bruno?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GAO0000186

Douyon - Cross - Watts

1   A.   I was bragging.

2   Q.   You were bragging.  So, you were lying on the

3   transcript; is that what you are saying?

4   A.   If you mean it like that, yes.

5   Q.   No, sir.  I'm asking you.

6   A.   I was bragging, I said.

7   Q.   Bragging?

8   A.   Yes.

9   Q.   What about lying?  Were you lying when you made

10  reference to the eight million dollars on the transcript?

11  A.   I was not lying, because Bruno did tell me that he had

12  the money to bring to the States.

13  Q.   Why did you say Bruno had eight million dollars?  Why

14  did you not say, when asked about bringing money back into

15  the country -- you didn't say Bruno had eight million

16  dollars; is that correct?

17  A.   That was my mistake, maybe.  I shouldn't have said that.

18  Q.   And you don't know anything about money?

19  A.   No.

20  Q.   And you never saw eight million dollars?

21  A.   Never.

22  Q.   Now you are a little bit more familiar about money than

23  on the transcript; is that correct?  Withdrawn.

24          Isn't it a fact you went to Haiti early in 2003 at

25  the request of Mr. Bruno, and you brought back from Haiti

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000234

Douyon-cross-Watts                                    217

1    statements, were you?

2    A    Yeah.

3    Q    You were under oath when you made the statements in the

4    transcript?

5    A    What?

6    Q    The statements in the transcript, you were speaking

7    outside the courtroom; is that correct?

8    A    Yes.

9    Q    You were not under oath as you are now?

10   A    Correct.

11   Q    So in the courtroom under oath you tell the truth; is

12   that correct?

13   A    Yes.

14   Q    But outside when you're talking with your

15   co-conspirator, your partner, about a narcotics deal, you're

16   making it up?

17   A    I was not making it up.  We were talking about the

18   number, but I never get a number from him.

19   Q    Let's move on.  When you met this confidential source,

20   isn't it a fact you asked him to tell him -- tell you what

21   countries we could deal with, isn't that correct?  Let me

22   rephrase it.  Withdrawn.

23        When you met the confidential informant, you asked

24   him, tell us what countries we can deal with, isn't that

25   correct?

*Burton H. Sulzer, OCR, CRR, CSR, CM*

GA000000238

Douyon-cross-Watts                                                221

1   confidential source, also known as Jamaican, says:  No, no,

2   no, I just want to ask you a quick question.  In New York,

3   right?  Flash:  Yeah, I don't like that thing.  Since I was

4   very young they told me by the time, by the time you touch

5   that thing you will get F'd over.  Jamaican:  Yeah, yeah,

6               What is Flash making reference to in that line, if

7   you touch that thing, you will get F'd over?

8   A    I think he was talking about cracks.

9   Q    About what?

10  A    Cracks.

11  Q    About crack?

12  A    Yes.

13  Q    And then there's a laugh in the next line:  Yeah, yeah,

14  okay.  Then you conclude:  I have two in Haiti.

15              Were you also making reference to crack in Haiti?

16  A    I say that but I don't know what I was talking about.

17  Q    Did you just make that up also?

18  A    Again, I wanted to show the Jamaican guy that we knew

19  what we are talking about.  That's why I came up with all

20  those things, I mean, that thing.  The same thing is why he

21  came to Miami, to prove that he can do the job too, same

22  thing.  He was telling us, we were telling him.

23  Q    I'm just asking you about this line here.

24  A    Okay, I say that.

25  Q    When you made reference to, I have two in Haiti, were

Burton H. Sulzer, OCR, CRR, CSR, CM

1   you referring to having crack in Haiti, yes or no?

2   A     I think so, yes.

3   Q     So you were dealing crack in Haiti?

4   A     Again, I was making up to make the Jamaican more

5   confident in what we are talking about.

6   Q     Sir, during the entire conversation that was occurring

7   between the Jamaican and yourself, is it fair to say

8   everything was recorded?

9   A     Yeah.

10  Q     Okay.  There were not portions of the conversation where

11  he was not present when you were discussing the events; is

12  that correct?

13  A     No.

14  Q     Okay.  So you were telling us that you were trying to

15  kind of make yourself appear as if you are a drug dealer and

16  you knew what you were doing?

17  A     Exactly.

18  Q     And when Kojac talks about touching that and getting F'd

19  over, you just chimed in and say, I have two in Haiti, so it

20  would make it appear that you were also selling crack in

21  Haiti?

22  A     Yeah.

23  Q     So you know how to do mix drugs up?

24  A     No, I don't.

25  Q     In order to sell crack, don't you have to cook crack and

Dorlyon Cross - Watts

1   A.   Yes.

2   Q.   Now, just a few more questions.  I'm almost done.

3        How far were you in relationship to the airport at

4   Newark, how far a distance?

5        THE COURT:  I'm not sure I understand the question.

6        MR. WATTS:  Let me withdraw it.

7   BY MR. WATTS:

8   Q.   You said you were in New Jersey where you were at a

9   hotel waiting to hear from Mr. Bouloute?

10  A.   Yes.

11  Q.   Is that correct?

12  A.   Yes.

13  Q.   You were in close proximity to the airport?

14  A.   Yes.

15  Q.   You can drive directly to the airport?  You can?

16  A.   What?

17  Q.   You had a vehicle at that point?

18  A.   Yes.

19  Q.   When you finally spoke to Mr. Bouloute, he indicated he

20  was in New York?

21  A.   What?

22  Q.   When you finally spoke to Mr. Bouloute on July 13, did

23  he indicate that he was in New York?

24  A.   The first time, he was in Miami.  The second time, he

25  was in New York.

GA000000326
Douyon - recross - Watts

1    A.   No, I don't recall.  No.

2    Q.   Did they show you any -- did they show you the video of

3    May 8, of the meeting?

4    A.   Yes.

5    Q.   And the events that occurred after the meeting?

6    A.   Yes.

7    Q.   Did they show you that?

8    A.   Yes.

9    Q.   Did you see this video at some point prior, then, to

10   today?

11   A.   No.

12   Q.   So, the government never showed you this video that you

13   are seeing?

14   A.   No.

15   Q.   The first time you saw it was yesterday?

16   A.   This morning.

17   Q.   This morning.

18        As part of your preparation, they never showed you

19   this video?

20   A.   No.

21   Q.   As part of your preparation, they never asked you any

22   questions about an individual by the name of Salvatore

23   Grisanti?

24   A.   Yes.

25   Q.   They did?

Douyon - recross - Watts

1   A.    Yes.

2   Q.    And they asked you about whether or not you used that

3   name?

4   A.    Yes.

5   Q.    Okay.  When did they ask you that?  When did the

6   government ask you those questions?

7   A.    Before the trial.

8   Q.    So, sometime before the trial, they made an inquiry

9   about some activity that you were involved in after you left

10  the meeting; is that correct?

11  A.    Yes.

12  Q.    Yesterday, when I asked you whether or not you went to

13  the airport, you said -- you responded, Never, no, I didn't

14  fly or travel that day; do you recall that response?

15  A.    I remember that I said, No, I didn't fly that day, yes.

16  Q.    You said, No.  I believe you also used the word "never"?

17  A.    I couldn't say never, because I travel all the time.  I

18  didn't fly on that day.

19  Q.    You have a problem recalling the events of May 8, 2003?

20  A.    No.

21  Q.    So, you don't recall going to the airport and being

22  stopped by a police officer, who requested to see a plane

23  ticket?  You don't recall that?

24  A.    That's never happened.

25  Q.    You don't recall that you produced a plane ticket to the

GA000000328
Douyon - recross - Watts

1   officer under the name of Salvatore Grisanti?

2   A.   Never happened.

3   Q.   And you don't recall that in checking the flight

4   manifest for Delta Airplane 242, it revealed that Mr.

5   Grisanti is listed as a passenger on that flight that day?

6   You don't recall that?

7   A.   No, never.

8   Q.   So, if the report was prepared of a surveillance

9   identifying those activities, it is your contention that the

10   report is totally inaccurate?

11          MS. PETERSEN:  Your Honor, objection.

12          THE COURT:  Overruled.

13          You can answer it.

14   BY MR. WATTS:

15   Q.   If a report was prepared describing those activities as

16   yours, is it your contention that that report is totally

17   inaccurate?

18   A.   Yes.

19   Q.   That the person who recorded that information was

20   mistaken?

21   A.   Exactly.

22   Q.   Okay.  So, your memory was refreshed when you first saw

23   the video?

24   A.   Yes.

25   Q.   And that refreshed your memory that you were in fact at

1   current drug pricing?

2   A.    Yes.  We get information not only from my undercover

3   operation, but as well as from confidential informants.

4   Q.    Have you acquired knowledge about the pricing of

5   cocaine?

6   A.    Yes.

7         MS. PETERSEN:  Your Honor, at this time, I move,

8   pursuant to Federal Rule of Evidence 702, to qualify this

9   witness as an expert in the pricing of cocaine and methods

10  and practices of importation.

11        THE COURT:  He'll be received.

12        MR. WATTS:  No objection.

13        MS. PETERSEN:  Your Honor, at this time, I'll read

14  the stipulation into evidence.

15        "It is hereby stipulated and agreed, by and between

16  the United States of America by Assistant United States

17  Attorney Paige Petersen and the defendant Frantz Bouloute by

18  his attorney, Gregory S. Watts, Esq., that:

19        "1.   The substances inside the packages pictured in

20  Government's Exhibits 14-B, 14-C, 14-D, 14-E and 14-G was

21  tested by the Drug Enforcement Administration, DEA Northeast

22  Laboratory.

23        "The testing by the DEA Northeast Laboratory

24  revealed that the packages contained cocaine with an

25  approximate net weight of 30.13 kilograms and a purity of

GA000000335
Douyon - redirect - Petersen

1    seventy-nine percent.  Net weight is the weight of the

2    substance analyzed excluding its packaging material.

3         "The item identified as Government's Exhibit 12 is a

4    sample of the cocaine contained within the packages, and the

5    document identified as Government's Exhibit 13 is a true and

6    accurate copy of the laboratory analysis of the cocaine

7    contained within the packages pictured in Government's

8    Exhibits 14-B, 14-C, 14-D, 14-E and 14-G.

9         "Government's Exhibits 12, 13 and this stipulation

10   may be received in evidence at trial."

11        THE COURT:  All right.  They are received,

12   Government's Exhibits 12, Government's Exhibits 13.

13        MS. PETERSEN:  And Stipulation S-5, your Honor.

14        THE COURT:  Received.

15        (So marked.)

16   BY MS. PETERSEN:

17   Q.   For the record, I'm showing the witness what is admitted

18   into evidence as Government's Exhibit 13.

19        Now, just to clarify:  Have you been involved in the

20   investigation of the case United States vs. Frantz Bouloute?

21   A.   No.

22   Q.   Based on your training and experience, do you have an

23   opinion about the wholesale value of cocaine on July 13

24   and 14, 2003 in New York City, the wholesale value?

25   A.   Yes.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Case 1:08-cv-05008-ILG   Document 9   Filed 02/27/09   Page 82 of 195 PageID #: 158

GA000000343
Callahan - direct - Petersen

1   investigation.  What was your role in regard to him?

2   A.   I'm the handler of that confidential source.

3   Q.   What does that mean?

4   A.   That means I provide the direction.  I'm the primary

5   person who would receive information from that source.

6   Q.   Does he report to you?

7   A.   Yes.

8   Q.   When you say give him direction, what does that mean?

9   A.   Depending on what information he learns or hears, I

10  would direct him either to go forward with it, to meet with

11  somebody to try to gather more information, but basically,

12  anything after I get the initial information, I would direct

13  him or maybe direct him not to have any more contact with a

14  certain individual.

15  Q.   Just briefly, without getting into too much detail:

16  When and how did he first become a confidential source?

17  A.   He became a confidential source in February of 2003,

18  following his arrest by an investigation I was conducting.

19  Q.   All right.

20       I would like to talk to you about March 5, 2003.

21  There's been testimony about a meeting conducted or that was

22  surveilled on March 5 between the defendant Frantz Bouloute

23  and the confidential source.

24       Was this meeting initiated by the DEA through the

25  confidential source?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Callahan - direct - Petersen

1    A.    The meeting was not initiated by the DEA through the

2    confidential source.

3    Q.    Did you plan this meeting?

4    A.    No.   The meeting was not planned ahead of time.

5    Q.    How did the meeting come about?

6    A.    Basically, that morning, I received a call from the

7    confidential source, who advised me that he had received a

8    call from Mr. Bouloute, who advised him that he was in the

9    area, in Queens.

10   Q.    Who did he receive a call from?

11   A.    Mr. Bouloute.

12   Q.    Okay.

13   A.    And he advised me that he wanted to meet him.   He had a

14   flight out soon or sometime that morning or early afternoon,

15   and that he had called him and wanted to meet up with him at

16   the hotel or in the area of LaGuardia Airport.

17   Q.    Who had called who?   He advised you who had called who?

18   A.    He advised me that Mr. Bouloute had called him.

19   Q.    Who was flying out?

20   A.    Mr. Bouloute was flying out sometime that morning or

21   early afternoon.

22   Q.    Were you present at this -- when the meeting -- did this

23   meeting take place?

24   A.    Yes.

25   Q.    When the meeting took place, were you present at the

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Callahan - direct - Petersen

1    meeting, conducting surveillance?

2    A.    No.

3    Q.    Why were you not present at this meeting?

4    A.    It happened fast.  I was in another part of the area,

5    and couldn't respond quick enough to LaGuardia Airport.

6    Q.    So, did you ask anyone else to cover for you?

7    A.    Yes.

8          I had asked some individuals, law-enforcement

9    individuals who either lived or worked more toward LaGuardia

10   Airport, if they could respond.

11   Q.    Was one of these individuals Pat Ryder?

12   A.    Yes.

13   Q.    Now, I would like to talk to you about a meeting on

14   May 8, 2003 that there has been testimony about.  Did you

15   attend this meeting?

16   A.    Yes.

17   Q.    What was your understanding of the purpose of this

18   meeting?

19   A.    The purpose of that meeting was, Mr. Bouloute had

20   contacted the CS and invited him to come to Miami to meet

21   with his people -- at the time, that's all we had known.  We

22   didn't know who those people were or what that meant, by "his

23   people" -- to discuss a future importation of drugs into the

24   New York area.

25   Q.    Did you conduct surveillance of this meeting?

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000355

322

1  now, was to notify them, to also work, establish a

2  relationship with the potential country that this would be

3  coming out of so we could maximize the investigation,

4  hopefully identify who was the source, how it was getting

5  outside the country.

6  Q     Were you going to attempt to try to intercept these

7  drugs?

8  A     Yes.

9  Q     Did there come a time when this happened --  I'm sorry.

10 Did there come a time when the drugs actually were imported

11 into the United States?

12 A     Yes.

13 Q     When did this happen?

14 A     July 13th, 2003.

15 Q     Can you describe how you first found out about that to

16 the jury?

17 A     Sure.  A few days prior to July 13th, which was a

18 Sunday, it could have been a Thursday or Friday beforehand, I

19 received a call from the Jamaican confidential source who

20 advised me that he had received a call from Mr. Bouloute who

21 informed him they were ready that weekend, ready for that

22 weekend, ready for a Continental originating from Venezuela,

23 nonstop to Newark Airport.

24 Q     On Sunday the 13th, July 13th, what actually happened

25 on that day?

GA000000356

323

1    A      On that day in the morning, I would say 11:00 o'clock,

2    the 11:00 o'clock hour, I got a call from the confidential

3    source who advised me he had just received a call from or was

4    in contact with Mr. Bouloute who advised him of a tag number,

5    a bag tag or tag assigned to that bag, a name that the bag

6    would be under and, of course, Continental Airlines and that

7    particular flight information.

8    Q      What did you do in response to this information?

9    A      At that time I contacted my supervisor.  Both of us had

10   responded to Newark Airport, met up with a Customs official.

11   Q      What did you do with the Customs official or officials?

12   A      Myself and the Customs officials, when that plane

13   arrived, we waited for that plane to arrive.  When the plane

14   arrived, we went out in a van to the tarmac where the plane

15   would come in.  We waited for the plane to pull into its

16   spot.

17   Q      What flight was this?

18   A      Continental flight direct from Venezuela.  I don't know

19   the flight number offhand.

20   Q      Caracas to where?

21   A      Newark.

22   Q      As you were out there at the plane with the Customs

23   officials, what did you observe?

24   A      When the plane had pulled into the spot, I observed the

25   baggage cart pull up to the side where the cargo baggage is

324

1  kept.  The Customs inspectors also brought out some sort of

2  machine, I believe an x-ray machine they had also brought

3  out.  I also observed a number of uniformed Customs

4  inspectors, basically surround that area of the plane where

5  the baggage was off-loaded.  Then I observed the inspectors

6  off-load each bag, basically one by one checking each tag as

7  it came off.

8  Q    What were they checking for?

9  A    They were checking for the tag number, at least one

10 thing they were checking for was the tag number I had

11 provided to them.

12 Q    Was there any canine surveillance in the area?

13 A    There was a dog.

14 Q    I shouldn't say surveillance.  Were there dogs in the

15 area with Customs?

16 A    There was at least one dog that Customs had with them.

17 Q    What's the purpose of the dog?

18 A    The purpose of the dog is to basically sniff the bag,

19 open up each piece of luggage for detection of things like

20 narcotics or explosives.

21 Q    What happened?  Did the inspectors find anything?

22 A    I observed the inspectors remove, as the baggage was

23 coming out, comes down some sort of conveyer-type belt on to

24 a truck where it would then be loaded on to a baggage truck.

25 At a certain point I observed the Customs inspectors remove

SS, OCR, CSR, CM, CRR

1   one black bag.

2   Q      What happened with this suitcase that they removed?

3   A      What happened with the suitcase?

4   Q      Yes.

5   A      I --

6   Q      You just stated they removed one black bag; is that

7   right?

8   A      Yes.

9   Q      What happened with that?

10  A      I observed them looking at the tags to it.  Then the

11  next thing I observed was the canine giving a positive

12  indication there was something of interest to that dog inside

13  the bag.

14  Q      What did the dog do?

15  A      Started scratching at the bag as if trying to open up

16  the bag.

17  Q      Then was that opened?

18  A      Yes.

19  Q      What did you see inside?

20  A      When the bag was opened, there were 30 bricks wrapped

21  in a tape, duct tape, plastic, at least 30 bricks.

22  Q      Was there anything over the bricks?

23  A      Yes, there was a foam cushion between each layer of the

24  bricks.

25  Q      What then happened once the bag was opened?  What

GA000000361

328

1  Q    Do you recognize the sticker on the front of it?

2  A    Yes.

3  Q    You recognize on the backside of this (indicating)?

4  A    Yes.

5  Q    It was on this suitcase that these two exhibits were

6  attached, 19 and 20 were attached?

7  A    Yes.

8  Q    I'll now publish these to the jury.  What can you tell

9  from this baggage ticket?  What company and flight is this?

10 A    It's a bag tag used by Continental Airlines.  Basically

11 it's in the name of a Brian B. Allen, who is the passenger.

12 As you see here, EWR is coded for Newark.  CD is Continental

13 flight 1916, the flight, I believe.  The bag was to go on to

14 Richmond, Virginia, the RIC.

15 Q    Would it have come through Customs at Richmond or at

16 Newark?

17 A    Newark, all flights, all international flights will

18 clear Customs at their first destination.

19 Q    This passenger would have received his bag, he would

20 have gotten it from Customs, would have come off the plane in

21 Newark?

22        MR. WATTS:  Objection as to form.

23        THE COURT:  Overruled.

24 A    It would have come off at Newark?  Yes, is that what

25 you're asking me?  I'm sorry.

SS, OCR, CSR, CM, CRR

GA000000363

330

1  A    76718.

2  Q    Then on the other side?

3  A    76718.

4  Q    What did you do with the suitcase at this point?

5       Actually, let me go back a little bit.

6       You've testified that Customs then gave you custody

7  of the suitcase?

8  A    Correct.

9  Q    What did you then do?

10 A    Myself and another special agent, we transported the

11 suitcase back to our offices in Manhattan.  We processed it,

12 basically meaning we photographed, I took the photographs,

13 photographed the bag, the contents of the bag, then secured

14 the contents in evidence boxes, DEA evidence boxes, placed

15 the evidence in an overnight vault.

16 Q    When you talk about the evidence, what was the

17 evidence?

18 A    It was the 30 kilograms of cocaine.

19 Q    I would like to show you now what's been marked as

20 Government Exhibits 14-A, B, C, D, E, F, G and H.  Can you

21 take a look at each one of those and tell me if you recognize

22 those?

23 A    Yes, I recognize these photos.

24 Q    What are they?

25 A    They're photos of the bag and the contents of the bag.

*SS, OCR, CSR, CM, CRR*

334

1    Q     In the lab.

2    A     The laboratory, yes.

3    Q     That's where they remained?

4    A     Yes.

5    Q     I would like to show you Government Exhibit 12.   What's

6    that?

7    A     That's the DEA evidence box.   It contains, I believe,

8    10 kilograms of the cocaine in this box.

9    Q     How do you know that that 10 kilograms of cocaine is

10   from the July 13th seizure?

11   A     When it was secured, I placed a sticker on the box and

12   my initials are right on the sticker.

13   Q     Why is there only 10 kilograms in there?

14   A     Two reasons.   One, the box won't fit more than 10

15   kilograms, starts to get very heavy.   The other reason, we

16   destroy --  we only maintain a sample of the drugs.   We don't

17   keep it all.   So, 20 kilograms were destroyed.

18   Q     This is a sample of the July 13th seizure?

19   A     Correct.

20         MS. PETERSEN:   Your Honor, this is already in

21   evidence as read by Government Exhibit S-5.

22   Q     If we were to open the box, would it be safe?   Could we

23   see what's inside of it?

24   A     I believe so.   I have to put on gloves.

25         MS. PETERSEN:   For the record, I'm just cutting

*SS, OCR, CSR, CM, CRR*

GA000000368

335

1    the tape.

2           (Pause.)

3           MS. PETERSEN:   Your Honor, may I publish to the

4    jury the inside of the box?  Can everyone see that?

5    Q     What is that that you're holding?

6    A     A kilogram of cocaine that was seized on July 13th,

7    2003.

8    Q     How many of those were inside of the suitcase?

9    A     Thirty of these bricks inside the suitcase.

10   Q     There are how many inside the box?

11   A     I believe there should be 10.  This is the first time

12   it's opened.  I believe it's 10.

13   Q     On July 13th after you had seized this cocaine, did you

14   have any more contacts with the confidential source?

15   A     Yes, that afternoon I contacted the CS.

16           (Continued on next page.)

17

18

19

20

21

22

23

24

25

Case 1:08-cv-05008-ILG Document 9 Filed 02/27/09 Page 93 of 195 PageID #: 169

Callahan - direct - Petersen

BY MS. PETERSEN:

Q.   And what were your instructions to him, if any?

A.   Well, I advised the CS that I was in possession of the narcotics, and that he could relay that information to Mr. Bouloute.

Q.   Relay what information to Mr. Bouloute?

A.   Basically, to tell Mr. Bouloute that the CS's people, the corrupt-baggage people, had the cocaine and that the CS would take delivery of the cocaine.

Q.   So, you didn't tell him to tell Mr. Bouloute that the DEA had it?

A.   No.

Q.   Okay.  Just to be clear about that.

A.   Right.

Q.   So, what happened after that?

A.   The CS advised me that he had spoken to Mr. Bouloute, and Mr. Bouloute would come to New York on Monday, the following day, and take delivery of the cocaine.

Q.   So, on the next day, July 14, what happened on that day?

A.   That morning, I formulated an operational plan to have a meeting with Mr. Bouloute and a delivery -- a delivery, we don't actually bring the cocaine onto the street and deliver it -- but that we would deliver the cocaine to Mr. Bouloute.

Q.   So, if you don't actually deliver the cocaine, what do you do?  Do you just pretend to deliver the cocaine?

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

GA000009370

337

Callahan - direct - Petersen

1   A.   Correct.

2   Q.   So, then, what happened?

3   A.   That afternoon, as we were getting set up for the meet,

4   I had decided to try to further the investigation and to

5   identify others in the conspiracy.

6        I advised of the CS to advise Mr. Bouloute -- to

7   tell Mr. Bouloute that the CS's baggage people will not turn

8   over the cocaine until they get paid their fee for doing this

9   service.  And subsequently, that early afternoon, we

10  conducted a meeting with Mr. Bouloute.  The CS met with Mr.

11  Bouloute, advised him of that, and parted ways after that

12  meeting for a little while.

13  Q.   Where was that meeting?

14  A.   That meeting was in Queens.

15  Q.   Were there any other meetings on that day?  What else

16  happened on that day, the 14th?

17  A.   Yes.  What we did, Mr. Bouloute had indicated to the CS

18  that --

19        MR. WATTS:  Objection.

20        THE COURT:  Overruled.

21  A.   The CS advised me that Mr. Bouloute indicated he didn't

22  have money to pay for this fee.

23  Q.   I'm sorry?  Say that again.  He did not have money to

24  pay the fee?

25  A.   He did not have the money to pay for the baggage

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Callahan - direct - Petersen

1   handlers, for their service.  So, at that time, I advised the

2   CS I was able to get the services of an undercover agent to

3   pose as the baggage employee.

4   Q.   Who was that?

5   A.   Howard Campbell, Special Agent Howard Campbell.

6           What I told the CS was, to contact Mr. Bouloute and

7   tell him that his people -- meaning the undercover agent --

8   wanted to meet with Mr. Bouloute and discuss this payment.

9   Maybe two hours or so after the first meet, we arranged a

10  second meet, also in Queens, in the area of a Burger King, in

11  the parking lot, I believe.  Either right in the parking lot,

12  or right on the sidewalk of the Burger King.

13  Q.   Did you observe this meeting?

14  A.   Yes, I did.

15  Q.   What happened?

16  A.   We had the undercover set up in the parking lot, waiting

17  outside.  We had the confidential source go and meet with

18  Mr. Bouloute.  Mr. Bouloute did not have a car.  He was not

19  driving at the time.  The CS went and picked Mr. Bouloute up

20  and brought Mr. Bouloute to the Burger King parking lot.  At

21  that time, I observed the undercover officer and Mr. Bouloute

22  and the confidential source meet up with each other.

23  Q.   What did you observe at that point?

24  A.   I observed all three -- the confidential source, the

25  undercover and Mr. Bouloute -- engage in some conversation.

GA000000374
Callahan - Direct - Petersen

1          (So marked.)

2          MS. PETERSEN:  May I publish these to the jury, your

3   Honor?

4          THE COURT:  Yes.  You may show it to the jury.

5          MS. PETERSEN:  Thank you.

6   BY MS. PETERSEN:

7   Q.   What is this exhibit in right now?

8   A.   The exhibits are sealed in a DEA evidence bag.

9   Q.   So, Government's Exhibit 15, can you just describe again

10  what that is for the jury?

11  A.   It's a Nextel cellular telephone.

12  Q.   Where was this?

13  A.   It was on Mr. Bouloute's person.

14  Q.   And how about this; what's that?

15  A.   That's a T-Mobile cellular telephone.

16  Q.   And where was this?

17  A.   It was also on Mr. Bouloute's person.

18  Q.   Finally, what's that?

19  A.   That's a concert ticket to a festival that Mr. Bouloute

20  had promoted in --

21          MR. WATTS:  Objection.

22          THE COURT:  Sustained.

23  BY MS. PETERSEN:

24  Q.   Can you read what is written right there on the ticket?

25  A.   Yes.  "Fan's Productions and Babou's Production present

ANTHONY M. MANCUSO, CSR  OFFICIAL COURT REPORTER

Callahan - direct - Petersen

1   the Haitian-American Day Festival."

2   Q.   What's the date on that?

3   A.   Sunday, July 6, 2003.

4   Q.   I'm flipping this over to the other side.  Can you read

5   what's written on the back of this ticket?

6   A.   Yes.  I see the number "76718, black."

7        I see a number "3."

8        I see "Adam, Benaim."

9   Q.   Underneath that, what do you see?

10  A.   "Richmond."

11       MS. PETERSEN:  Your Honor, I would like to show the

12  witness what's been marked as Government's Exhibit 21.

13  BY MS. PETERSEN:

14  Q.   Do you recognize these pictures?

15  A.   Yes.

16  Q.   Do you recognize what these are pictures of?

17  A.   Yes.

18  Q.   Is this an accurate enlargement of what's depicted in

19  that picture?

20  A.   Yes.

21  Q.   Is this an accurate enlargement of the transit ticket?

22  A.   Yes.

23  Q.   Is that an accurate enlargement of the baggage tag?

24  A.   Yes.

25  Q.   Is this an accurate enlargement of both sides of the

GA000009376

Callahan - direct - Petersen

1   ticket that has just been shown to you?

2   A.   Yes.

3            MS. PETERSEN:  Your Honor, I would offer

4   Government's Exhibit 21 into evidence.

5            MR. WATTS:  Objection.

6            THE COURT:  Overruled.

7            (So marked.)

8   BY MS. PETERSEN:

9   Q.   If you could step down for one second.

10           So, it was your testimony that this was the tag that

11  was on the suitcase containing the cocaine; is that correct?

12  A.   Yes.

13  Q.   And what was the significance of this number, 76718?

14  A.   That was the number provided to me by the confidential

15  source earlier, on July 13.

16  Q.   Did you pass that number on to customs, is that what

17  they were looking for?

18  A.   Yes.  That's the number that I passed the customs

19  inspectors.

20  Q.   Was this number indeed found on this suitcase?

21  A.   Yes.

22  Q.   Comparing this to the back side of the ticket in

23  Mr. Bouloute's possession, do those numbers match up?

24  A.   Yes.

25  Q.   Now it says "Black" here.  What does that match with?

Callahan - direct - Petersen

GA000000377

1   A.    The color of the bag, black bag.

2   Q.    The name Adam Benaim, is that anywhere on the ticket, on

3   the baggage-claim ticket?

4   A.    It's not. "Brian Allen" is on the tag itself.

5   Q.    Is this Brian Allen and that's Adam Benaim?

6   A.    Yes.

7   Q.    Here, what's written right there (indicating)?

8   A.    "Richmond."

9   Q.    And it was your testimony that this flight was then

10  going on to where?

11  A.    The passenger, not the flight.  The passenger was going

12  on to Richmond.

13  Q.    Thank you?

14        MS. PETERSEN:  Your Honor, at this time, I would

15  like to read into the record two stipulations.

16        THE COURT:  Go ahead.

17        MS. PETERSEN:  "It is hereby stipulated and agreed

18  by and between the parties that the telephone number for the

19  T-Mobile telephone found on the person of Frantz Bouloute on

20  July 14, 2003 was 786-543-8809, and the telephone number for

21  the Nextel telephone found on the person of Frantz Bouloute

22  on July 14, 2003 was 305-360-9623."

23        And I would move Government's Exhibit S-3, this

24  stipulation, into evidence.

25        THE COURT:  All right.  It's received.

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Callahan - direct - Petersen

1          (So marked.)

2          MS. PETERSEN:  I would also like to read

3   Government's Exhibit S-4, which is a little long.  I

4   apologize.

5          S-4: "It is hereby stipulated and agreed by and

6   between the United States of America by Assistant United

7   States Attorney Paige Petersen and the defendant Frantz

8   Bouloute by his attorney Gregory S. Watts that:

9          "1.  Government's Exhibit 6 is a three-page record

10  of, among other things, the subscriber and account

11  information as well as the incoming and outgoing calls for

12  the telephone number 876-543-8809, which is a prepaid

13  telephone with T-Mobile for the period of July 11, 2003

14  through July 14, 2003.

15         "Government's Exhibit 7 is a seventeen-page record

16  of, among other things, the subscriber and account

17  information as well as the incoming and outgoing calls for

18  the telephone number 786-252-2907, which is subscribed to

19  Eugenie Douyon, with an address in Miami, Florida for the

20  period of July 3, 2003 through July 22, 2003.

21         "Government's Exhibit 8 is a forty-page record of,

22  among other things, the subscriber and account information as

23  well as the incoming and outgoing calls for the telephone

24  number 305-360-9623, which is subscribed to Frantz Bouloute

25  with an address in Hialeah, Florida for the period of

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

346

Callahan - direct - Petersen

1    June 21, 2003 through July 21, 2003.

2            "Government's Exhibit 9 is a twenty-four-page record

3    of, among other things, the subscriber and account

4    information as well as the incoming and outgoing calls for

5    the telephone number 305-496-0036, which is subscribed to

6    Marie Douyon, with an address in Miami, Florida for the

7    period of June 21, 2003 through July 10, 2003.

8            "Government's Exhibit 10 is a three-page record of,

9    among other things, the subscriber and account information as

10   well as the incoming and outgoing calls for the telephone

11   number 917-213-8736, which is a prepaid telephone of T-Mobile

12   for the period July 11, 2003 through July 14, 2003.

13           "Government's Exhibits 6, 7, 8, 9, 10 and this

14   stipulation, which is Exhibit S-4, may be received in

15   evidence at trial."

16           THE COURT:   They are all received.

17           (So marked.)

18           MS. PETERSEN:   For the record, I'm showing the

19   witness what's been marked --

20           THE COURT:   Are you going to go through those

21   telephone records now?

22           MS. PETERSEN:   Yes.  Would you like to take a break

23   first?

24           THE COURT:   Let's take a brief recess.

25           (Jury excused.)

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

GA000000380
Callahan - direct - Petersen

1      THE COURT:  I take it your next witness would be

2   Howard Campbell?

3          MS. PETERSEN:  Howard Campbell, and he's my last

4   one.

5          THE COURT:  He's the last witness?

6          MS. PETERSEN:  Yes.

7          THE COURT:  I thought you said you had three more.

8          MS. PETERSEN:  The expert, Callahan, and Campbell.

9          THE COURT:  Pete and O'Keefe are not being called?

10         MS. PETERSEN:  Yes, your Honor.

11         (Recess.)

12         (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

ANTHONY M. MANCUSO, CSR   OFFICIAL COURT REPORTER

Callahan-direct-Petersen                    348

1              (After recess;  the following occurs in the absence

2      of the jury.)

3              THE COURT:  Is the government ready?

4              MS. PETERSEN:  Yes, Your Honor.

5              THE COURT:  Mr. Watts, are you ready?

6              MR. WATTS:  Yes, Your Honor.

7              (Jury present.)

8              THE COURT:  Thank you very much.  Thank you.

9              All right, Ms. Petersen.

10     EXAMINATION CONTINUES

11     BY MS. PETERSEN:

12     Q    I am showing the witness what's now in evidence as

13     Government Exhibits 6, 7, 8, 9 and 10.  I will take them out

14     of their little --

15              Do you recognize those?

16     A    Yes, I do.

17     Q    What are those?

18     A    These are toll records to telephones utilized by

19     Mr. Bouloute and Mr. Douyon or phones --  these are phones --

20     let me back up.

21              These are the two phones that you previously saw.

22     Q    Yes.

23     A    Of Mr. Bouloute's.  They are two telephones that I had

24     found associated with Mr. Douyon and they are also telephone

25     records of the confidential source.

GR        OCR        CM        CSR        CRR

1  Q      Did you obtain these phone records as part of your

2  investigation of this case?

3  A      Yes.

4  Q      Let's go to Government Exhibit 6.

5  A      Six.  Yes.

6  Q      What's the telephone number on that record?

7  A      Telephone number is (786) 543-8809.

8  Q      Who is that telephone subscribed to?

9  A      There is no subscriber information.  This is a prepay T

10 mobile telephone.

11 Q      Can you describe what a prepaid T mobile telephone is?

12 A      Sure.  A prepaid telephone is a telephone that would

13 not have subscriber information.  You pay as you go.  Buy a

14 phone card for it.  Generally, there is no subscriber, there

15 is no credit history check, as most cellular telephones have.

16 Q      On that record, there is no phone number?  I'm sorry.

17 On that record, there is no name?  There is no subscriber

18 name to that phone?

19 A      It just states not given.

20 Q      Okay.

21        You said that phone number is (786) 543-8809?

22 A      Correct.

23 Q      Okay.  Government Exhibit 7, what is the telephone

24 number for those phone records?

25 A      Eugene Douyon.  It has an address.  Do you want that?

GR      OCR      CM      CSR      CRR

Callahan-direct-Petersen                          350

1   Q    I'm sorry?

2   A    Did you want --

3   Q    No.  What is the telephone number?

4   A    Oh, the number.  (786) 252-2907.

5   Q    Okay.  Going back do Exhibit 6 for one moment.

6   A    Yes.

7   Q    As part of your investigation, have you confirmed who

8   was using --  whose telephone and telephone number that is?

9   A    Yes.

10        That was the phone on Mr. Bouloute's person the day

11  of his arrest.

12  Q    Which telephone?

13  A    The --  (786) 543-8809.

14  Q    Is that the T-Mobile phone?

15  A    T-Mobile.  The T-Mobile prepaid telephone.

16  Q    Okay.  And then Exhibit number 7, you said is --  you

17  testified that's subscribed to a Ms. Eugenia Douyon?

18  A    That's correct.

19  Q    As part of your investigation, have you determined if

20  anyone was using that telephone on July 13 and 14?

21  A    Yes.  Mr. Robert Douyon.

22  Q    Government's Exhibit 8, what is the telephone number

23  for those records?

24  A    Telephone number is (305) 360-9623.

25  Q    Does the subscriber information show whose telephone

GR       OCR      CM      CSR      CRR

1    that is?

2    A      Yes, it does.

3    Q      Whose phone us it.

4    A      Frantz Bouloute.

5    Q      What type of phone is it?

6    A      A Nextel cellular telephone.

7    Q      Government Exhibit 9, what telephone number is that?

8    A      Telephone number (305) 496-0036.

9    Q      Whose name is that in?

10   A      A Marie Douyon.

11   Q      Was that telephone being used by Robert Douyon on July

12   13 and 14?

13   A      I -- I don't believe this one was being used by him at

14   that time.

15   Q      Government's Exhibit 10, what telephone number is that?

16   A      Telephone number is (917) 213-8736.

17   Q      What kind of phone is that?

18   A      That is also a T-Mobile prepay cellular telephone.

19   Q      Do you know who was using that telephone on July 13 and

20   14?

21   A      Yes.  The confidential source was using this telephone.

22   Q      Okay.  In your review of these records, and I am not

23   going to have you go through specific numbers or anything,

24   but in your review of these records, did you find that Robert

25   Douyon and the defendant Frantz Bouloute were in phone

Callahan-direct-Petersen                    352

1   contact on July 13?

2   A     Yes.

3   Q     Can you just describe in general terms that phone

4   contact?

5   A     In general terms, there were a number of calls.  When I

6   say "number, " between three and five contacts between Robert

7   Douyon's phone and the Frantz Bouloute Nextel phone.  All of

8   those contacts took --  or in the morning, prior to 11:00

9   o'clock, there were a number of contacts between the two

10  phones.

11  Q     Okay.  How about on July 14, were the Douyon and

12  Bouloute phones in contact?

13  A     Yes.

14  Q     In your review of the records, did you find that the

15  defendant Frantz Bouloute was in contact with the

16  confidential source Footso on July 13?

17  A     Yes.  Again, leading up to about 11:00 o'clock,

18  thereabouts, the Bouloute prepay T-Mobile prepay telephone

19  was in contact with the CS --  a second phone, another phone.

20  Q     Was the defendant Frantz Bouloute and the confidential

21  source in phone contact on July 14?

22  A     Yes.

23  Q     You said you found two telephones on Frantz Bouloute.

24        From your review of the records, does it look like

25  he was using both of these phones on that date?

GR      OCR      CM      CSR      CRR

Callahan-direct-Petersen                    353

1   A    Which date?

2   Q    On both dates, on July 13 and 14.  Was he using both

3   phones?

4   A    Yes, I believe so.  Yes.

5   Q    Was he using --  was there any particular pattern to

6   how he was using them?  Was he calling --

7   A    Zeroing in on July 13, it a period the pattern was that

8   he would speak to Mr. Douyon on the Nextel phone and he would

9   speak to the confidential source on the T-Mobile phone.

10  Q    How about on the 14th?

11  A    I believe it was the same pattern.  But I will go back.

12  Q    When did --  if you could look at Government's Exhibit

13  6, when did Mr. Bouloute subscribe to that T-Mobile prepay

14  telephone?

15  A    The account was established on July 10, 2003.

16  Q    In your review of the records, does it appear that

17  Mr. Douyon ever contacted the confidential source directly?

18  A    On --

19  Q    Mr. Douyon on --

20  A    With confidential source?  No, Mr. Douyon did not

21  contact the confidential source directly.

22  Q    Okay.  Just a couple more matters.

23       I just wanted to quickly show you one more thing.

24  You can see this.

25       On July 14 --  tell me if you recognize that?

GR      OCR      CM      CSR      CRR

Callahan-cross-Watts                                    360

1   Q     Part of your use of this confidential source is to use

2   him as an informant to make contacts with people who were

3   involved in the narcotics trade, is that correct?

4   A     Okay.

5   Q     Is that correct?

6   A     Yes.

7   Q     So you sent him out and you equipped him with certain

8   electronic information, electronic recording device, to

9   record conversations of people who were involved in narcotics

10  trading, is that correct?

11  A     That is correct.

12  Q     Okay.  So it was the confidential source who went out

13  with the story that he had contacts at the airport and that

14  he had the ability to bring drugs in from the airport, is

15  that correct?

16  A     In this particular case?

17  Q     Yes, in this particular case.

18  A     That was the story was known prior to the arrest.

19  Q     Okay.  But my question to you --

20  A     Sure.

21  Q     Known prior to the arrest of the confidential source

22  and subsequent to the arrest, he was the person who went out

23  with that story?  He had the ability to bring drugs into the

24  airport through dishonest employees, is that correct?

25  A     In this particular case?

GA000000394

Callahan-cross-watts                    361

1   Q     This is the only case I'm speaking about.

2   A     Right.  I'm saying, with this --  the defendant

3   previously knew that.

4   Q     Okay.

5           THE COURT:  The defendant, you mean this defendant

6   previously?

7           THE WITNESS:  That is correct.  I am just trying to

8   follow the line of questioning.

9   Q     Just try to respond to my questions.

10  A     Sure.

11  Q     In terms of what I am asking.  If you don't understand

12  the question, please ask me to repeat it.

13  A     Sure.  That's what I'm asking.

14  Q     So when this confidential source contacted

15  Mr. Bouloute, this is the story he represented to him, is

16  that correct?  That he had the ability to bring narcotics

17  into the country through this airport?

18  A     Sure.  That's the story.

19  Q     All right.  And you then requested that he initiate

20  contact with individuals he may have known or who he thinks

21  are involved in narcotics arrests --  narcotic

22  investigations, is that correct?

23  A     My request basically was to maintain at that point

24  previous relationships that he had built, that he had advised

25  me that he had built in the past, just to maintain those

              GR      OCR      CM      CSR      CRR

GA000000395

Callahan-cross-Watts                         362

1    relationships that we learned about.

2    Q      Was he being paid for the services that he was going to

3    be providing to the government, that is, being an informant?

4    A      Was he being paid?

5    Q      Yes.

6    A      Other than reimbursement for expenses, like, for

7    instance, traveling down to Miami, he is not being paid, no.

8    Q      Okay.  But he was going to earn some kind of reduction

9    in any sentence that he may have received with respect to the

10   arrest that you had arrested him on, is that fair?

11   A      That reduction would be up to the judge, not me.

12   Q      He was acting similar as Mr. Douyon who came into this

13   courtroom and spoke about his cooperation, is that correct?

14          MS. PETERSEN:  Objection.

15          THE COURT:  Overruled.

16   Q      Isn't that correct?

17   A      Yes.  Yes.

18   Q      He's attempting to earn a benefit from that agreement,

19   is that correct?

20   A      Attempting, right.  That I don't control.

21   Q      So did you --  so then he started out by contacting

22   Mr. Bouloute, isn't that correct?

23   A      That --  I don't know if that's correct.

24   Q      Isn't it a fact that on the March 5 contact between

25   Bouloute and the confidential source, isn't it a fact

GA000000398

Callahan-cross-Watts                                365

1   source was calling him?

2   A       Yes.

3   Q       Mr. Bouloute?

4   A       Yes.

5   Q       Okay.  And he was calling him at your direction, isn't

6   that correct?

7   A       Correct.

8   Q       And he was urging Mr. Bouloute to come to New York to

9   meet with him, isn't that correct?

10  A       As I recall, they were talking about meeting.  Would it

11  by here or Miami?  He were talking about meeting.

12  Mr. Bouloute may have been offering up that he was going to

13  be in New York and that they would meet while he was in

14  New York.

15  Q       How many months before March 5 were they talking?

16  A       I would at least say, at least I believe January of

17  that year, 2003.  That's when we learned of the contact

18  between the two of them.

19  Q       Between January and March, the confidential source is

20  attempting to meet Mr. Bouloute and then they finally meet on

21  March 5.  Is that correct?

22  A       Correct.

23  Q       Physically finally meet March 5?

24  A       March 5, yes.

25  Q       You are not around so you don't know who initiated the

GR      OCR      CM      CSR      CRR

GA000000399

Callahan-cross-Watts

366

1   call but you are able to arrange surveillance of that

2   meeting, is that correct?

3   A      No.

4          I knew that that morning that the CS received a

5   call saying to come and meet me at LaGuardia Airport area.

6   Q      My question to you, do you know if the -- is it your

7   testimony that Mr. Bouloute called the CS?

8   A      That morning and told him to come meet him, yes.

9   Q      You earlier said, as far as who made the call, you are

10  not sure who did it because you were away and you --

11  A      No.  What you asked me before, okay, was the prior

12  conversation that had been ongoing.  When that had happened.

13  If you are asking about that day, and that hour, I know who

14  made the calls.

15  Q      Your testimony now is that Mr. Bouloute made that call

16  on March 8 for that meeting?

17  A      I believe it's March --

18  Q      March 5th.  I'm sorry.

19  A      March 5th.  I will be clear.  On March 5, the CS

20  received a call saying to come to the hotel, LaGuardia

21  Airport area, and meet me.  I have to get out of here.

22  Something to that effect.  Because of a flight.  The CS, I

23  was able to rush some people to the location, to cover the

24  meet.

25  Q      Okay.  Does the phone records reflects that

GR      OCR     CM     CSR     CRR

```
 1  A    Correct.

 2  Q    It didn't come from the police officer who stopped him

 3  at the airport?

 4  A    To me?

 5  Q    Correct.

 6  A    Correct.

 7  Q    Did you not speak to that individual?

 8  A    To the police officer, no, I did not speak to the

 9  police officer.

10  Q    Do you know if the person who gave you the information

11  about the surveillance that day, if he had any firsthand

12  knowledge about what the police officer saw, any firsthand

13  knowledge?

14  A    I couldn't tell you that.

15  Q    You were asked questions about the confidential source,

16  Footso, and the defendant and who approached who and how they

17  met each other.  Did Footso, the confidential source, know

18  Bouloute before the March 5th, 2003 meeting?

19  A    Yes.

20  Q    How did they know each other?

21       MR. WATTS:  Objection.

22       THE COURT:  Overruled.  You can answer it.

23  A    What was told to me by the CS was that the confidential

24  source had previously worked bags of cocaine into the

25  New York area airports on behalf of Mr. Bouloute.
```

GA000000425

Callahan-redirect-Petersen                          392

1  Q     That the confidential source had done that?

2  A     The confidential source had done that.

3  Q     For Mr. Bouloute?

4  A     For Mr. Bouloute.

5  Q     Was he acting as a confidential source at that time?

6  A     Not at all.

7  Q     He did that on his own?

8  A     On his own.

9            THE COURT:   Would you like a limiting instruction?

10           MR. WATTS:   Yes, your Honor.

11           THE COURT:   What you just heard from Agent Callahan

12  regarding the prior relationship between the confidential

13  source who has been referred to either as the confidential

14  source, the Jamaican, Footso, was received for a very limited

15  purpose.  It was received for the purpose of establishing or

16  intending to prove that in connection with this case and this

17  transaction, Mr. Bouloute had the knowledge and intent to

18  commit the crime with which he's charged.  That prior

19  evidence, evidence of that prior relationship, was received

20  only for that limited purpose only, to establish his

21  knowledge and intent with respect to this crime.  It is not

22  received and you must not consider it for the purpose of

23  intending to establish that Mr. Bouloute had a propensity,

24  was a bad person and had been dealing drugs before.  It

25  wasn't intended and it's not received for that purpose.

GA000000426

1      .  It's being received for the limited purpose of

2  proving that Mr. Bouloute, or the government is attempting to

3  prove as they're required, had knowledge, had the knowledge

4  and intent required for the commission of this crime, not to

5  show that he had a propensity for this kind of conduct, not

6  to show that he was of bad character.  It's being received

7  for that limited purpose.  I hope that's clear.

8           MS. PETERSEN:  May I request one thing at side bar?

9           THE COURT:  Yes.

10          (Side bar.)

11          MS. PETERSEN:  Only I would like to argue it shows

12  the relationship that existed between them.

13          THE COURT:  It already did that, didn't it?  Move

14  on.  You can argue that.

15          MS. PETERSEN:  Thank you.

16          (Open court.)

17  Q     You testified that this Footso became a confidential

18  source at about what time?

19  A     Early February, 2003.

20  Q     When he became a confidential source, did you ever

21  instruct him to specifically target anyone involved in this

22  case?

23  A     Specifically target?  No.

24  Q     What were your instructions to him along those lines?

25  A     My initial instructions to him, after debriefing him of

*SS, OCR, CSR, CM, CRR*

Callahan-redirect-Petersen                    394

1    information, was to maintain those contacts with various

2    narcotics associates and that we will make a decision on a

3    case-by-case basis.

4    Q      These were associations that he already had?

5    A      Yes.

6    Q      On March 5th, 2003, just to be completely clear, your

7    testimony is that who contacted whom on March 5th, 2003, on

8    that date?

9    A      Mr. Bouloute had contacted the CS, Footso, the

10   Jamaican, contacted him sometime in the morning to tell him

11   that he was at the airport or in the area of LaGuardia

12   Airport, wanted to meet with him before his flight left, late

13   morning or afternoon flight.

14   Q      You were asked a question, asked questions about the

15   ticket.  I believe it's Government Exhibit 17, the ticket,

16   the concert ticket that was found in the possession of Mr.

17   Bouloute at the time of his arrest.

18   A      Yes.

19   Q      On cross-examination.

20          When you seized this item, where was it kept after

21   you seized it?

22   A      It was kept in our non-drug evidence vault as we call

23   it.

24   Q      Was it inside anything?

25   A      Yes, it was inside a bag.  It was sealed with other

Campbell-direct-Petersen                                    404

1    A      The case agent asked me if I could do it.

2    Q      Prior to this, had you been involved in the

3    investigation of the individual that you were about to meet

4    with?

5    A      In a peripheral kind of way, doing surveillances, stuff

6    like that, but not directly.

7    Q      Were you assigned to the case at all?

8    A      Just in terms of helping out, stuff that needed to be

9    done, yes.

10   Q      On July 14th you stated that you were working

11   undercover.  Who were you holding yourself out to be on that

12   date?

13   A      I was supposed to be the person in possession of 30

14   kilos of cocaine.

15   Q      What was the role you were playing?

16   A      As a baggage handler or a person who had facilitated

17   getting the cocaine off the airplane at Newark Airport.

18   Q      Were you given any instructions about whether you were

19   supposed to pretend to give over the drugs or stated you

20   wouldn't?  What were your instructions along those lines?

21   A      My instructions, as I understood it, that I was

22   supposed to be meeting with the person who I was supposed to

23   be handing the drugs over to, and I was going to be getting

24   paid for the service that I had provided.

25   Q      Can you just kind of go through the details of the

SS, OCR, CSR, CM, CRR

GA000000438

Campbell-direct-Petersen                              405

1   meeting on the 14th?  Did a meeting actually end up

2   occurring?

3   A       Yes, it did.

4   Q       Where was the meeting?

5   A       The meeting occurred adjacent to a Burger King

6   restaurant at 217th Street and Hillside Avenue, Queens,

7   New York, on the sidewalk.

8   Q       About what part of the day was it?  Was it morning?

9   A       It was in the afternoon.  It was maybe 5:30 in the

10  afternoon.

11  Q       What was your understanding of who you were supposed to

12  be meeting with at this meeting?

13  A       In planning to meet with the case agent, I was told

14  there was going to be the cooperating source, was going to be

15  there.  There was an individual who I was supposed to be

16  meeting with who was supposed to be the recipient of the

17  cocaine and that basically was told to me in the preplanning

18  before I went to the meet.

19  Q       Can you describe what you observed that day as you

20  executed this operation?

21  A       Yes, I approached the intended meet location in my

22  vehicle.  I made a right turn from Hillside Avenue on to

23  217th Street, pulled over to the curb.  I had my radio on in

24  the vehicle so I could hear the surveillance team as they

25  were going back and forth.  I heard there was a gray Volvo

Campbell-direct-Petersen                                        406

1   approaching the area which I had known previous to be the

2   gray Volvo that was operated by the cooperating source.  I

3   looked over to my left and I saw the car pulling into the

4   Burger King parking lot.

5   Q     What happened after that?

6   A     Once I saw the car pulling in, I got out of my vehicle.

7   I started crossing the street towards the Burger King parking

8   lot.

9   Q     Did you see anyone get out of the green Volvo?

10  A     Yes, two people got out.

11  Q     What happened at that point?

12  A     As I'm crossing the street, the two people that got out

13  of the car, they were approaching me, so we were kind of

14  converging and it ended up where we actually met right on the

15  sidewalk just before getting into the parking lot of the

16  Burger King.

17  Q     What happened after you met on the sidewalk?

18  A     Greetings were exchanged.  The two people that were at

19  the meet --  three, myself included, but the two people, one

20  was the cooperating source who I had known, seen before.  The

21  second person I had never met before.  Once the greetings

22  were exchanged, so forth, he indicated to me in order for me

23  to get paid for my services, I would need to turn over what I

24  had.

25        (Continued on next page).

Campbell-direct-Petersen                              407

1   EXAMINATION CONTINUES

2   BY MS. PETERSEN:

3   Q     And meaning what?  What was your understanding?

4   A     My understanding was the cocaine, which was supposed to

5   be in my possession.

6   Q     What did you say in response to that?

7   A     My response was that that's not the way I do business.

8   Q     Did he say anything back to you?

9   A     Yes.

10  Q     What did he say?

11  A     In substance, and not verbatim because I don't remember

12  the exact words that were exchanged at the meeting, but he

13  indicated to me that he had done it before with --

14            MR. WATTS:  Objection.

15            THE COURT:  Overruled.

16            Go ahead.

17  A     Could I answer?  He indicated to me that he had done it

18  before with the --  with the source and at that point I

19  activated a prearranged arrest signal and the arrest team

20  came in.

21  Q     When he --  when he said to you that he had done it

22  before with the source, why was he telling you that?  What

23  was your understanding of why he was telling you that?

24  A     My understanding at the time was simply because my

25  response initially was that that's not the way I do business.

Campbell-cross-Watts                          408

1   I expected to be paid before handing anything over, and I

2   don't know this for a fact, but my assumption is that he was

3   trying to convince me that it had been done prior with the

4   source and I suppose to give me confidence to say okay, it

5   was okay for me to turn it over before getting paid for it.

6   That's just my understanding.

7   Q    Do you see the person who made those statements to you

8   in the courtroom today?

9   A    Yes, I do.

10  Q    Would you please identify that person by where he is

11  located and what he is wearing?

12  A    That's the gentleman that's sitting over at the table.

13  He's got a blue shirt on, tie, no glasses.

14       THE COURT:  Indicating the defendant.

15  Q    Now, if I already asked you this, I apologize, are you

16  aware of whether this conversation was recorded or not?

17  A    I know it was not recorded.

18  Q    Do you know why it wasn't recorded?

19  A    The machine was broken.

20       MS. PETERSEN:  That's all the questions I have for

21  this witness, Your Honor.

22       THE COURT:  Mr. Watts?

23  CROSS-EXAMINATION

24  BY MR. WATTS:

25  Q    Special Agent Campbell, you began --  you became

GR      OCR      CM      CSR      CRR

GA000000495

CASE NAME:           <u>U.S. v. FRANTZ BOULOUTE</u> 03-CR-904 (S-1) (ILG)

TAPE NO.:             N–12

DATE:                 March 5, 2003

PARTICIPANTS:        Confidential Source       [CS]
                        Frantz Bouloute          [BOULOUTE]

ABBREVIATIONS:

[Brackets]              Transcriber's notes

[U/I]                   Unintelligible conversation

[ph]                    Phonetic rendering

1



GOVERNMENT
EXHIBIT
03-CR-0904 (S-1)(ILG)

GA000000496

CS                    Hey!

CS:                   [U/l] Drive [U/l]  Alright?

BOULOUTE:             Yes, she's gonna drop [U/l] me

CS:                   What was she gonna [U/l] you? [U/l]

BOULOUTE:             [U/l]

CS:                   [U/l]

[Laughter]

CS:                   So, what's happening, what's happening?

BOULOUTE:             Nothing, man.  I'm, to I'm working hard, man.  You gonna, you
                      gonna look good this year, you're gonna look good.  [U/l]  Guess
                      what?  I have, I have a hundred, man.

CS:                   Yeah?  [U/l]  Ask him 'cause we might need him, we
                      might need him.  To send that down.

BOULOUTE:             [U/l]

CS:                   Trying, trying, right?

BOULOUTE:             Yeah.

CS:                   But when do you think you will have some work, man.

BOULOUTE:             [U/l]  I know.

CS                    You come back.  I won't do anything else, man.

BOULOUTE:             Yeah.  [U/l] alright.  So what's new new [U/l] man?

CS:                   Hey that thing  remember  that thing we were talking about?  Ok,
                      that thing in New Jersey?  From Panama?

BOULOUTE:             From Panama, AH!

CS :                  They.  Oh ......

BOULOUTE:             They have the connection from [U/l] Continental Airlines

2

CS:              Uh-huh .

BOULOUTE:        They can get them, can get them out.  They have the one stop and
                 they have [U/I] but if we can.

CS:              Oh, yeah.

[Phone Ringing]

BOULOUTE:        Can get them out, can get that, can get it out like, uh, in here, by
                 Newark.

CS:              Umm, hmm.

BOULOUTE:        To pick it up.

CS:              Uh, hmm.

BOULOUTE:        But another thing can do for Continental Airline [U/I]

CS:              Continental, right?

BOULOUTE:        Yeah it can be from American, inside, outside [U/I]

CS:              [U/I] American [U/I]?

BOULOUTE:        Yeah, yeah.

CS:              You can do that for me?

BOULOUTE:        Yeah, so for me to include you?

CS:              Me?

BOULOUTE:        Yeah.

CS::             [U/I]

BOULOUTE:        [U/I]?

[Phone Ringing]

CS:              Seriously [U/I] to American [U/I]?

BOULOUTE:        Yeah.

GA000000498

CS:            When you come back, you can do that?

BOULOUTE:      Yeah, yeah.

CS:            You sure you can do that?

BOULOUTE:      Yeah!

CS:            I think I would like to get in on it

BOULOUTE:      Yeah.

CS:            Yeah [U/l]

BOULOUTE:      [U/l] work that out and let me know.

CS:            O.K.

BOULOUTE:      [U/l] When I come back, I'll give you a call.

CS:            Give me a call, alright?

BOULOUTE:      O.K. [U/l]

CS:            [U/l]

BOULOUTE:      O.K.

CS:            [U/l]

BOULOUTE:      Uh-huh.

CS:            [U/l]

BOULOUTE:      Uh-huh.

CS:            [U/l]

BOULOUTE:      O.K.

CS:            [U/l]

BOULOUTE:      Uh-huh.

CS:            Give me a call sometime

4

GA000000499

| | |
|---|---|
| BOULOUTE: | O.K., alright, brother. |
| CS: | Take care, brother. |

[Driving Away]

End of Transcript

5

GA000000500

| | |
|---|---|
| CASE NAME: | <u>U.S. v. FRANTZ BOULOUTE</u> 03-CR-904 (S-1) (ILG) |
| TAPE NO.: | N–14; 1 of 2 |
| DATE: | May 8, 2003 |
| PARTICIPANTS: | Kojac LNU        [KOJAC] |
| | Fanfan LNU     [FANFAN] |
| | Jamaican        [JAMAICAN] |
| | FLASH            [FLASH] |

**ABBREVIATIONS:**

| | |
|---|---|
| [Brackets] | Translator's notes |
| [U/I] | Unintelligible conversation |
| [ph] | Phonetic rendering |
| *Italics* | Conversation in Haitian Creole |

1



GOVERNMENT
EXHIBIT
3A-T
03-CR-0904 (S-1)(ILG)

GA000000501



JAMAICAN:     [Laughs] What's up, bro?

KOJAC:     *[Aside phone conversation: ... Is that him that you must give the five thousand dollars?...*

JAMAICAN:     [Laughs] Ooh, shit! I'm just getting some sun man and I feel cold from the winter, boy. I gonna get some sun. This is the ideal spot for me, man.

KOJAC:     *O.K. Let me ask you something should I send the thousand dollars for you? O. K. I'll send it for you. In the meantime I'll give him the thousand dollars, then I'll send the money for you too. O.K. darling no problem, we'll talk later. Oh, you mean you have it already and I don't have to send it. So if you have it already then I don't have to send it, because you "there is always a mystery in the little nigger's affairs." (Haitian Proverb) Did Ti Cam come already? O.K. Bye, bye.  Whatever you have is not good?  Bye-bye...]*

KOJAC:     *Where did Fanfan go?*

JAMAICAN:     He's gone to use the restroom.

KOJAC:     Okay. How are you doing, man?

JAMAICAN:     Hey Kojac. How are you doing?  Good, good, good. I like the spot... I was telling him you know because I need the sun, you know.

KOJAC:     Yeah, yeah, yeah.

JAMAICAN:     The winter was rough, man. [Laughs] Yeah.

KOJAC:     So how you doing, man?

2

JAMAICAN:     Okay, man.

KOJAC:        So you flew yesterday, right?

JAMAICAN:     Huh?

KOJAC:        Last night you came?

JAMAICAN:     Yeah, yeah. [U/I], you know, I tell you I must prepare to come, I'm much better in the sun, I'm [U/I].

KOJAC:        Definitely. That's the way, that's the way business is done; otherwise, you know, you never know.

JAMAICAN:     You never know, man. You never know, you know?

KOJAC:        Do you have a phone that we can talk the value up there? That we could ask you to, even if it's not a 100 percent clear, but at least will give you 60 percent [U/I]...? But we need to talk to you.

JAMAICAN:     Yeah! Uh! Fanfan has the number?

KOJAC:        Yeah but, for me, do we have to use your regular phone?

JAMAICAN:     No, no, this is... Yeah, yeah, yeah, yeah. I wouldn't talk on my regular phone, man.

KOJAC:        You see, now I understand.

JAMAICAN:     Huh? Well, we need to get the number. [U/I].

KOJAC:        I will never call you at that number.

3

GA000000503

JAMAICAN:      No. Right, right. Yeah, yeah, this too. But see, I have it... I have my regular phone number. [Laughs] Come on, bro'. [Laughs] And I wanna tell you something, I have one for my girlfriend. [Laughs]

KOJAC:         [Laughs] Now you're talking.

JAMAICAN:      Huh?

KOJAC:         Who is up there?

JAMAICAN:      Up there it's all right, man.

KOJAC:         I used to live up there.

JAMAICAN:      Oh yeah?

KOJAC:         I lived [U/I]. I left in 1979.

JAMAICAN:      Oh, you left 79?

KOJAC:         Once in a while I go back there, not that often.

JAMAICAN:      This is your turn?

KOJAC:         Yeah!

JAMAICAN:      Yeah, yeah, yeah, yeah, yeah. [Pause] Now I'm back home... Your home and even my home, all right? Jamaica. And you? [Laughs]

KOJAC:         Haiti.

JAMAICAN:      Oh, oh, O.K. Yeah, yeah, yeah. Right, right, right, right, right.

4

GA000000504

KOJAC:         So, you work up there or you just [U/I]....?

JAMAICAN:      No. I just have the right time.

KOJAC:         Are you percent... 200 percent sure?

JAMAICAN:      Well, you can ask my boy, you know. [Laughs] [U/I]... Yeah, man. No, no.
               Very good, very good, very good.

FANFAN:        I'm not white, so I can't say under the sun.

JAMAICAN:      Oh, shit! Where do you wanna go, under the tree or something?

KOJAC:         Any where we have to move some, uh... we'll talk about whatever it is.
               Even though [U/I]...

JAMAICAN:      Yeah, yeah, yeah, maybe we can take a walk or something.

KOJAC:         Yeah, yeah. My partner is coming.

JAMAICAN:      Oh, oh, okay, okay, okay.

KOJAC:         Send some works.

JAMAICAN:      Okay, good, good, good.

FANFAN:        This guy I used to take him to school.

JAMAICAN:      [Laughs] Oh, shit!

KOJAC:         But again, whatever we're gonna be talking... Everything is... what FanFan
               says, right?

5

JAMAICAN:    Uh-huh.

KOJAC:    We need to do a lot of shit.

JAMAICAN:    Okay.

KOJAC:    We have things we need to do. Okay? Everything is, you know...

JAMAICAN:    Right.

KOJAC:    You, you... it's like, you know, we are in a band. Everybody has to play their own instrument. Right?

JAMAICAN:    Right, right.

KOJAC:    Uh, but the band is owned by somebody else.

JAMAICAN:    Uh, I know. Yeah.

KOJAC:    So, they give you... let's say, uh, I don't know if you heard what music either me or Ray or whatever it is, but today we have to play quite good...

JAMAICAN:    Right.

KOJAC:    We cannot be playing with somebody else [U/I].

JAMAICAN:    Right.

KOJAC:    Otherwise, you know, the sound will not be...

JAMAICAN:    You're right. Yeah, yeah, yeah...

6

GA000000506

KOJAC:          Do you understand what I'm saying?

JAMAICAN:       I understand, I understand. Right, right, right.

KOJAC:          With that we'll keep on playing good music.

JAMAICAN:       All the time.

KOJAC:          And then...

JAMAICAN:       [U/I]. Right, right, right. [Pause]

FanFan:         Like I told you before...He doesn't do anything like me, and what's going on!..

KOJAC:          You're welcome. That's the way it is; otherwise, you know, it is better [U/I]...

JAMAICAN:       Okay. Right, right...

KOJAC:          He gave you something...

JAMAICAN:       [U/I].

KOJAC:          [U/I]...

JAMAICAN:       I believe in that. I believe in that.

KOJAC:          Shooting, trying to shoot...

JAMAICAN:       Uh-huh.

7

GA000000507

KOJAC:        [U/I]...

JAMAICAN:     That's Right.

JAMAICAN:     [U/I]... Everything, you can't do that, man. [U/I].

KOJAC:        [U/I]

JAMAICAN:     .. I'll decide to come myself, you know? Remember, when I don't like the phone. Remember too that I have to get the vibes, you understand...

KOJAC:        Yeah.

JAMAICAN:     And I know that because if anything goes wrong it's coming back to them. That's how they operate now. If it's coming at seven, they'll send some people to that ship.  Do you understand what I'm saying. [U/I]

KOJAC:        [U/I]...the thing is [U/I]....all over the country.

              [Muffled conversation between Jamaican and Kojac]

              [Telephone rings]

FANFAN:       [U/I]

JAMAICAN:     [Laughs] I need it man.

FANFAN:       [U/I]

KOJAC:        *[Aside - telephone conversation: Hello. I'm there. You should have checked me out, man. I have something out there. Where exactly are you? What street are you in? Ninth Street? You've passed it then. Haven't you seen a truck? You're over a block further, turn around.]*

8

FANFAN:    *Where is he at?*

KOJAC:    *[Aside - telephone conversation: I did not say that. I said on Ocean. Keep on going on Ocean. When you get to the corner, make a right, turn then and you'll be right there. Don't tell me that. I precisely said on Ocean, then a right turn at the corner. Are you all right?]*

FANFAN:    *Those country men? [U/I]...*

JAMAICAN:    So how is the music thing?

FANFAN:    Yeah man [U/I]

   [U/I background conversation between Fanfan and Jamaican about a concert promoted by Fanfan in Florida.

KOJAC:    [Aside - telephone conversation: Are you good? Now where are you? Turn right on 15th and then when you get to Ocean turn right again. Then you'll be right there... 15th, turn right. Oh, you've passed it? Yes. I'll be waiting for you outside. Okay.

KOJAC:    One more thing, do you have a nickname like us Kojac or whatever?

JAMAICAN:    Footso. But they call me Sol, Sol.

KOJAC:    Sole?

JAMAICAN:    So. Footso. It's like Footso, but they just call me Sole, yeah...

KOJAC:    So S, O, L, E. Right? Sole? Now I know it's...

JAMAICAN:    No it's the nickname is Footso.

9

GA000000509

KOJAC:          Oh, Footso.

JAMAICAN:       But, Just so. It's the name of a..

KOJAC:          Yeah, [U/I]. Let me tell you what

KOJAC:          Right now we're getting to know each other well. Right. Okay. After that, that will be Fanfan's duty to talk to you. Okay?

JAMAICAN:       Okay.

KOJAC:          Once in a while I might have to talk to you, or my partner might  talk to you.

JAMAICAN:       Okay, okay.

KOJAC:          But his duty is you.

JAMAICAN:       No problem.

KOJAC:          Uh, we don't want... because everybody have some... like I told you, something to do...

JAMAICAN:       I think we should [U/I] something to do where...

KOJAC:          Except... [U/I], exactly.

JAMAICAN:       Yeah.

KOJAC:          If there is an emergency I could call you, hey, but that's his responsibility...

JAMAICAN:       To deal with me. Communicate.

10

KOJAC:            This is the number one.

JAMAICAN:         Okay.

KOJAC:            I'm the number two.

JAMAICAN:         Okay.

KOJAC:            I don't know what Fanfan is.

JAMAICAN:         Okay.

KOJAC:            Footso his nickname, ok

                  (Flash enters the scene)

JAMAICAN:         And they call you?

FLASH:            AH! AH!

KOJAC:            [Laughs] They call him Flash.

KOJAC:            You know what, because you know we don't want to...

JAMAICAN:         Right, right.

FLASH:            *The things are in your hands...*

FANFAN:           *Things are no longer in my hands.*

11

GA000000511

JAMAICAN:    I just now, I found a girl, on the board with in a thong.

JAMAICAN:    No bikini, a dental floss. Dental floss bikini.

FLASH::      Just butt naked, right?

JAMAICAN:    Yeah. Yeah. [Laughs]

FLASH:       How is everything, guy?

JAMAICAN:    Everything is good.

FLASH:       Perfect.

JAMAICAN:    Yeah, yeah, yeah, everything is good.

KOJAC:       He said he came just to make sure that he meets us and feels the vibes. [U/I].

JAMAICAN:    And I don't like the phone...

KOJAC:       Even, even if he has a fake phone but he'll prefer to contact us.

JAMAICAN:    [Laughs]

FLASH:       This is the best way.

JAMAICAN:    Yeah, yeah, this is the best way, you know, because that telephone is very serious. So, uh, as Fanfan was telling you, right, we will have... what other countries that you have?

KOJAC:       You tell us which country we could deal with.

12

| | |
|---|---|
| JAMAICAN: | Okay. Look, I have connections at Newark... |
| KOJAC: | Uh-huh. |
| JAMAICAN: | Right? On Continental... |
| KOJAC: | Uh-huh. |
| JAMAICAN: | Okay? And I have ton connections also at JFK on American Airlines. |
| KOJAC: | From... coming from where? |
| JAMAICAN: | And look, we have a... All right. Well, listen, a lot of the... since September 11th, right, we used to have a flight every day out of Caracas, we don't anymore. There is one flight on Sunday... |
| KOJAC: | Uh-huh. |
| JAMAICAN: | Out of Caracas into Newark... Okay? |
| KOJAC: | Continental? |
| JAMAICAN: | Continental, that's good. Um... Curacao has nothing coming straight to New York and I'll tell you what, I don't deal with anything that stops anywhere. I like it when it leaves point A, it comes to point B. If it goes to another place, no good for me, you know? |
| FLASH: | So what else? |
| JAMAICAN: | Uh, so I can also get American Airlines out of Aruba and um, out of your country... Haiti. Okay? |

13

GA000000513

FLASH:          So let me tell you, there's no... You don't think there's any flight, American Airlines coming from Caracas to, to JFK?

JAMAICAN:       No, there is none. There used to be, used to be everyday, but they don't anymore.

FLASH:          None of them?

JAMAICAN:       None of them.

FANFAN:         *Give me an answer. They sent me to get the things from you? He told me that the things are ready and everything?*

                [Telephone rings in background]

FLASH:          Only... You only have Continental, right?

JAMAICAN:       Only Continental, Newark and American Airlines into JFK.

KOJAC:          From anywhere?

JAMAICAN:       From anywhere. Yeah, yeah.

FANFAN:         [Aside - telephone conversation: *I'm in a meeting now. Call me back, I'm in a meeting now. Why you did not call me last night.* O.K. call me back... I'm in a meeting call me back... O.K.]

KOJAC:          How you want it, as a passenger, or do you have to be on a... what you call, a I, T, I... or on a B, I, T, I... or what?

JAMAICAN:       No, no. The I, T, I, all right... I don't need that. It's like it's going on [U/I]. Two ways we can do this. All right, we can do cargo...

14

KOJAC:        Cargo?

JAMAICAN:     We can also do cargo. Right.

KOJAC:        And?

JAMAICAN:     And we can do the baggage. Right. Because I... listen, let me tell you, what I like to do it with supervisors. I don't like dealing with regular guys [U/I]. Let me tell you how I work. When I work, I don't like to bring my things at the airport. I don't do that type of shit. You know the supervisor takes it to his house then he brings it to me and then I look over to... Usually, the same night.

FANFAN:       Yeah.

JAMAICAN:     Okay. So, Uh, if we're using the suitcase, [U/I]. I usually like to use a hard suitcase with a combination. [U/I]. I don't need to know the combination. Whatever you tell me, you put in there, that's what I expect...

KOJAC:        Okay. Now, but the problem is... Do I have to give you the number or just...

JAMAICAN:     No. What you do, usually if it is a container. Then you give me the container number. Remember what I like is to just wait for my people... This is the plane, right... this is the pilot up here, this is the tail of the plane, the last door to the back is called, "Whole Five." Number five...

KOJAC:        Uh-huh.

JAMAICAN:     Right? Just put it in number five. You understand?

KOJAC:        Uh-huh.

JAMAICAN:     And that's how we get it. That's how we used to work it over here [U/I]. And let me tell you, I got nothing to [U/I].

15

GA000000515

KOJAC: Does someone need to be traveling with the baggage or... ?

JAMAICAN: No, no, no...

KOJAC: Just, I know...

JAMAICAN: No, Kojac.

FLASH: *Let him finish speaking.*

JAMAICAN: Right? So look... once you put the bag in, when it comes, and it comes uh... then it's not good to take it right there, you understand? How we do it, we have to... it goes to the belt. [U/I]. You know, before it goes on the belt, the man of the belt takes it and puts it back out. So... even if, even Customs is not going to know... They don't suspect anything.

FANFAN: Remember the last time, we had the, we had the trouble... Customs took everything...

JAMAICAN: Yeah.

FANFAN: They took everything and put it... put it on the floor? They called me and said [U/I].

JAMAICAN: [Laughs]

FANFAN: They called me back later and said everything is everything.

JAMAICAN: [Laughs] I left my coat, I let you know. I always tell you that, you know? So you guys tell me what country is gonna be important about what we talked about.

FLASH: Right now I have either Caracas ... and I have Curacao

16

GA000000516

JAMAICAN:     Nothing out of Aruba?

FLASH:        Now I will try.


KOJAC:        We'll work the same thing.

FLASH:        I will try to do the same thing there but I, I, I have Curacao but I don't have
              Aruba. I can also have whatever Latin countries, like Costa Rica,
              Trinidad...

JAMAICAN:     Oh, you can work out of Costa Rica?

KOJAC:        [Laughs]

JAMAICAN:     No, but listen, you see, Costa Rica... There is something from Honduras
              and a thing that comes back to Costa Rica. I will give you the name. [U/I].
              Paco, Paco, Paco...

KOJAC:        Paco?

JAMAICAN:     Yeah, that I can work... Paco, yeah... Because I am getting ready to do
              something like that with the Costa Rica [U/I].

FLASH:        [U/I].

JAMAICAN:     I don't know. I never checked this thing; it comes direct. If it comes direct
              [U/I].

KOJAC:        Well, talk to them for us. Talk to this guy... [U/I].

FLASH:        The point from wherever you are to Costa Rica [U/I]... (low tone).

JAMAICAN:     O.K., Costa Rica. Give me have some other countries like Curacao, Venezuela and Costa Rica.

FLASH:     Whatever the other one is, whatever the other one...

JAMAICAN:     [U/I].

FLASH:     If I can work it out, I will do it.

JAMAICAN:     If it is Curacao, Curacao has nothing direct to New York. I've been checking. I don't see anything out of Curacao coming straight to New York. There is Curacao to Miami, and then they change and come back.

KOJAC:     One more thing. Let me ask you something, you said something about cargo. How can we work on the cargo?

JAMAICAN:     All right. All I'd like to do, I'd like the suitcase going first.

KOJAC:     Uh-huh.

JAMAICAN:     When I see that it can go then we can go to the bigger situation, because cargo is a bigger situation. You follow what I'm saying to you? That's when we start to step up into bigger situations.

FLASH:     And we are talking about in fact every, every Sunday?

FANFAN::     You told me cargo, you can do like. Five hundred...

JAMAICAN:     Yeah, we have to go [U/I]. At least, [U/I].

FANFAN:     We have to go low...

18

GA000000518

JAMAICAN:    Yeah, we go low and move up.... You understand? Get the confidence here. You know?

FLASH:    Two, three boxes?

JAMAICAN:    Two, three boxes, yeah, but we need suitcases, that's where I'd like to go. [25-25. Like 50 and [U/I]. You understand? [U/I].

FANFAN:    You used to do three, but...

FLASH:    How many...?

JAMAICAN:    Or you can put 30, you know... We can put 30...

FANFAN:    We used to have...

JAMAICAN:    We used to do three, we used to do three. Right?

FANFAN:    We used to do three, though.

JAMAICAN:    We used to do three, sometimes with 40. You know what I mean?

FANFAN:    That's mean we can do, we can make it thirty.

FLASH:    [U/I]. How many you can take? Maximum: two, four?

JAMAICAN:    [Laughs] No more than four for now. [Laughs] Anytime you reach more than that, they go to into cargo, okay?

KOJAC:    I like the cargo idea... As long as we can live, we need to ship another group and it is under control, 200 percent, right?

GA000000519

JAMAICAN:   It's under control. That goes to a warehouse, and we... you know, we... we can make you have... [U/I]. You know, we make up a [U/I]. You understand what I'm saying, you know?

KOJAC:   You tell us exactly how to ship it and everything.

JAMAICAN:   No, no, no. I just want to ask you a quick question,  In NY right, [U/I].

FLASH:   Yeah, I don't like that thing. Since I was very young, they told me by the time you... by the time you touch that shit, you will get fucked over.

JAMAICAN:   [Laughs] Yeah, yeah. Okay.

KOJAC:   I have two in Haiti..

JAMAICAN:   No, I just asked you this kind of thing, that's what the market is. You know?

KOJAC:   Yeah. The market is, but...

FANFAN:   How much is it? You don't know?

KOJAC:   It's around, it's around...

JAMAICAN:   About 65, 70.

FLASH:   I'm just asking you...

KOJAC:   [U/I].

JAMAICAN:   Yeah, yeah... around 65, 70....

KOJAC:   Even this one, what kind?

20

[Recording interruption]

**End of N14 - 1 of 2**

GA000000521

*1-24-05*

| | |
|---|---|
| CASE NAME: | <u>U.S. v. FRANTZ BOULOUTE</u> 03-CR-904 (S-1) (ILG) |
| TAPE NO.: | N–14; 2 of 2 |
| DATE: | May 8, 2003 |
| PARTICIPANTS: | Kojac LNU          [KOJAC]<br>Fanfan LNU         [FANFAN]<br>Jamaican          [JAMAICAN]<br>Flash            [FLASH] |

ABBREVIATIONS:

| | |
|---|---|
| [Brackets] | Translator's notes |
| [U/I] | Unintelligible conversation |
| [ph] | Phonetic rendering |
| *Italics* | Conversation in Haitian Creole |
| <u>Underlined</u> | Conversation in Spanish |

1



GOVERNMENT
EXHIBIT
3B-T
03-CR-0904 (S-1)(ILG)

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

[Conversation in progress]

**JAMAICAN:** Give it some time and Colombia will put on some good shit, man. I'm telling you. Wholesale, you know? Uh, uh...

**KOJAC:** Wholesale?

**JAMAICAN:** Wholesale. At that time I'll call the guy who went, so he can do other shit [U/I] or whatever, you know?

**KOJAC:** They're gonna cut it by every ounce then they'll give you like two, three, four ounces and it depends on the quality. And then they keep...

**FLASH:** *Have you done it before?*

**KOJAC:** Yeah! I've done it two times.

**FLASH:** *So you know how to do it then?* You have, you have, you have a plan for it?

**JAMAICAN:** Up there. Yeah. But...

**FLASH:** In the long run, if you want it, I can find it.

**JAMAICAN:** Okay, let's concentrate. I just ask you after you know, what we were talking about last night... I ought to know.

**FANFAN:** In case we have, so...

2

GA000000523

| NAME | **ENGLISH TRANSLATION** |
|------|------------------------|
| JAMAICAN: | We know what to do. You understand what I'm saying? So look, right now then, if anything we could set something out of Continental. And on Sunday... You can work something up there? You can do Continental? |
| FLASH: | Yeah, it doesn't matter for me the name of the plane. Whatever it is, I can do something. |
| JAMAICAN: | Okay, then... Okay, so you want me try to shoot for not this Sunday, but for the following Sunday? |
| FLASH: | Maybe, you know I'll have to make a phone call with you and talk to that guy because he is ready to do it. |
| JAMAICAN: | But let me know. |
| FLASH: | I think I will do everything before this Sunday. |
| JAMAICAN: | For this Sunday? Okay, no problem. |
| FLASH: | Maybe two. |
| JAMAICAN: | Two suitcases, yeah? Uh huh! |
| FLASH: | To have the case of it. |
| JAMAICAN: | Yeah. |
| FLASH: | *Have you talked to him about the things? I mean, our things?* |
| FANFAN: | *Let me finish business with him first, then I'll talk to him later.* |

3

GA000000524

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**FLASH:** *Oh? You'll talk to him later!*

**FANFAN:** I'll talk to him about it later.

**FLASH:** Huh?

**FANFAN:** *Let me finish first.*

**KOJAC:** *Why don't you...?*

**FLASH:** *Anyway, I'm done.*

**FANFAN:** *So we could wait a little bit and do everything once in for all. Because I'd like for us to do everything at once.*

**KOJAC:** *It's the same thing.*

**FANFAN:** *No, I'm talking about the other brother's things.*

**KOJAC:** *Let me tell you, you know the guy. Therefore you will not approach ...*

**FANFAN:** *This is the guy that Maxim tried to steal business away from me.*

**KOJAC:** *Ooh, damn it!*

**FANFAN:** Yeah. Do you remember Maxim?

**JAMAICAN:** Yeah.

**FANFAN:** I'm telling him.

4

| NAME | ENGLISH TRANSLATION |
|---|---|
| FLASH: | That's his brother-in-law. |
| JAMAICAN: | Oh, yeah? |
| KOJAC: | He married my sister. |
| JAMAICAN: | Oh, yeah? |
| KOJAC: | But I don't deal with him. [Laughs] |
| JAMAICAN: | [Laughs] |
| FANFAN: | I was telling him how much money Maxim owes me. |
| JAMAICAN: | Yeah. Maxim owes everybody. |
| KOJAC: | And he is still alive! |
| JAMAICAN: | Oh, he's alive. I was gonna ask you for him. He's alive. [Laughs] Oh, that's good. All right. |
| FLASH: | *Shorty, do not forget what I told you to tell him.* |
| FANFAN: | Yeah. |
| FLASH: | *Man, you have to be patient.* |
| FANFAN: | Easy, man. |
| KOJAC: | *Don't call him Shorty. Okay, call me Little Shorty.* |

5

| NAME | ENGLISH TRANSLATION |
|---|---|

**FLASH:** *Listen. Like I told you before, if it's 100 dollars, then let's do it for 130 dollars.*

**FANFAN:** *What do you think? Four cases for how much?*

**FLASH:** *Whatever it is.*

**FANFAN:** *Even if we do it for 30. Let's see 4 times 30 is 115, is it not?*

**KOJAC:** *Huh?*

**FLASH:** *Huh! 120*

**KOJAC:** *Ooh, damn it!*

**FLASH:** *Easy! I'm just testing your math skills!*

**KOJAC:** *[Laughs]*

**FLASH:** *Do you see where I'm heading?*

**KOJAC:** *Yeah. He should be able to give us a break because we're doing four.*

**FLASH:** You know the point is that I've been telling them that this is something that I will try to do in the current way. That means by the time we start, if we had, for example, five times, we'll make the maximum off of it. Because we don't wanna miss...We don't wanna miss.

**JAMAICAN:** [Laughs]

6

GA000000527

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**FLASH:** Because we have the production, and if you have the production you have to have a gate out for you, you know?

**JAMAICAN:** Yeah, yeah.

**FLASH:** So we have the production for it. So the maximum we can do for... What I told him, I wanna do that with you guys like, like a formal partnership.

**JAMAICAN:** Yeah.

**FLASH:** You know?

**JAMAICAN:** Okay.

**FLASH:** Let's say, let's say we pay each of them this amount, this amount, this amount, we can then make a package... so in this way, I can come up with your stuff and my stuff will come up too... and we do it like share, you know?

**JAMAICAN:** Uh-huh.

**FLASH:** I don't see, don't see... I don't want you to see like we're making this deal with me and you know it is supposed to be that kind, you know?

**JAMAICAN:** Right, right.

**FLASH:** We have to work it out because at the same time, I'm in the middle of those, of my people...

**JAMAICAN:** People yeah.

7

GA000000528

| NAME | ENGLISH TRANSLATION |
|---|---|

**FLASH:** ...and you guys, because I have to do something too. You know what I'm saying?

**JAMAICAN:** Sure, sure. That's not a problem.

**FLASH:** And I have to put the entrance, and you put the way out, and I'll have to put the rest of the stuff. He has all the details?

**JAMAICAN:** So, fine. I will work it out then, right? The delivery, in New York, right? You will come up over the weekend?

**FANFAN:** Yeah. I could go there.

**JAMAICAN:** When we give it too. [Laughs]

**FANFAN:** He has somebody to pick it up.

**JAMAICAN:** Oh, he has somebody to pick it up, right?

**FANFAN::** *So you want me to take it or... ?*

**KOJAC:** *Let me tell you something, if he has the connection to snatch it, then would you let it happen. I'm gonna ask him...*

**FLASH:** *Hold on a second*

**FANFAN::** *I learned my lesson with the Maxim incident. So I don't want anybody else to conduct business with him. Only we must deal with him.*

**FLASH:** [Aside - telephone conversation in Spanish: <u>Hello. Yes, how are you?</u> [Pause] Uh-huh...]

8

GA000000529

| NAME | **ENGLISH TRANSLATION** |
|------|------------------------|

**FANFAN:**   *Yeah, you understand what I mean. It is a big responsibility.*

**FLASH:**   [Aside - telephone conversation in Spanish. <u>Give me, give me... no, hold on. Let me say something. I had to talk to [U/I] a relative of mine - talking, talking about the [U/I]... of the thing. Everything is ready for... I just [U/I] from your part. Everything is ready for God's Day. Do you understand?</u> [Pause] *For Sunday*. So, <u>do it... the apple.</u>]

**KOJAC:**   *That's what I was about to say, because you remember that I was telling him about the notes. Because if he sends the notes it will be tough. I don't have to say that in English so he doesn't understand, but I know. Do you understand what I'm saying to you?*

**FLASH:**   [Aside - telephone conversation in Spanish: Okay, <u>but it's important that it gets done. Okay?</u>]

**FANFAN:**   *So when will we start taking some Spanish lessons?*

**KOJAC:**   *You, you have no clue about what he is talking about, but I understand.*

**FLASH:**   *What do you understand from the conversation?*

**FANFAN:**   <u>El dia de Dios</u> (God's day.)

**KOJAC:**   *That's all you know? [Laughs]*

**FANFAN:**   *My girlfriend speaks nothing but Spanish. Before, you know, I'll call her and you'll be in shock. [Laughs]*

**JAMAICAN:**   So are we gonna try for Monday? Or for Sunday? For Sunday, right?

**FANFAN;:**   This Sunday or the next one?

9

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| FLASH: | This one, this one. |
| JAMAICAN: | He wants to go this one. |
| FLASH: | Okay. Because the guy is already down there. |
| JAMAICAN: | All right. So we're gonna try to shoot for two. |
| FLASH: | Two or four. |
| JAMAICAN: | Okay, all right. |
| FLASH: | You scared? |
| JAMAICAN: | No come on, scared. How much are you gonna put in each? Because, listen, let me tell you what happened. As I always said, "I don't want to break anybody's back." People have to lift this thing, right? And, you understand? [Laughs] This guy wants to kill me, man. |
| FANFAN: | *Tell him the first numbers that you have stated before, because no one is gonna open it to check it out. If you tell him a bigger number then he will charge us more. So tell him the price you told him before, 25.* |
| JAMAICAN: | *Thirty... 30.* |
| KOJAC: | About 25. |
| JAMAICAN: | Okay, all right. |
| KOJAC: | We're not gonna, uh, that's what we want to do, "Team work", because one works the other one. |

10

| NAME | ENGLISH TRANSLATION |
|---|---|

**JAMAICAN:** Yeah, but let me tell you something. When you put the suitcase, right, just put a tag with a name on it.

**KOJAC:** Uh-huh.

**JAMAICAN:** Right, a tag with a name. And you know that it is the last door to the back. [Telephone rings] What name are you gonna use this time?

**KOJAC:** We'll give you the name and the tag number.

**JAMAICAN:** Okay. All right.

**FANFAN:** Just give him the name right now.

**JAMAICAN:** We'd better use the name right now than on the phone. Carlos Alberto... Carlos Alberto. Okay, that's a great soccer player.

**FANFAN:** He's gonna give you the name

**JAMAICAN:** Carlos Alberto. Okay, That's a great soccer player.

**KOJAC:** [Laughs]

**JAMAICAN:** Remember, that's my name.

**FANFAN:** *So, that means once we see the Carlos Alberto's tag then he'll know that it is his. That's how he wants it to be done.*

**JAMAICAN:** And then you can give me the color and all of that.

**KOJAC:** One more thing, Footso, if I may call you like that.

11

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

JAMAICAN:     So...

KOJAC:     Listen to me. There is one thing that he didn't tell you and neither of us told you. We... When I said we, you are included because we are a team, okay? If we cannot deliver... now when I say, "We," it is something about this side, not you. We will be fair to you, to tell you that, "Hey So, this day we cannot do shit." And that's it.

JAMAICAN:     I know that's it.

KOJAC:     If you agree to shoot somewhere else then that's your position.

JAMAICAN:     Right!

KOJAC:     But we will prefer that everything is on my side. Okay, don't deal with anybody else.

JAMAICAN:     No, no...

KOJAC:     Let me explain to you why. The same thing that happened to Maxim might happen to somebody else.

JAMAICAN:     Sure, sure.

KOJAC:     And then listen, this morning he called me and he said, "Hey, you were there." He knows that whatever it is I will never call you, if I call you he knows about it.

JAMAICAN:     I know.

KOJAC:     Are you following me?

12

GA000000533

| NAME | ENGLISH TRANSLATION |
|---|---|
| JAMAICAN: | I follow you. |
| KOJAC: | I will never call you for me or him. I will always call you under the name of the group. |
| JAMAICAN: | Yeah, yeah. |
| KOJAC: | Now by dealing with other people, the more people are... |
| JAMAICAN: | I know and I understand. |
| KOJAC: | And then the doors will be closed very soon. |
| JAMAICAN: | Very soon. |
| KOJAC: | My doors are wide open. Why don't you keep yours... You're not dying. Okay, so you could wait two, three months, or... |
| JAMAICAN: | Not a problem. |
| KOJAC: | We might say, "Hey, we're not going to do anything right now, give us three months, don't look for something else." Okay? |
| JAMAICAN: | Okay, not a problem. |
| KOJAC: | Because that door is your door. You understand what I'm saying? |
| JAMAICAN: | I know that. I appreciate that. |

13

| NAME | ENGLISH TRANSLATION |
|---|---|
| KOJAC: | That's the main idea. Because by dealing with more people, you never know who those people are. And then by closing your door, you are closing my door with a part of it which is, "We." Do you understand what I'm saying? |
| JAMAICAN: | I understand. You know what I noticed about Kojac? He has a style like Maxim. He is a politician. [Laughs] |
| KOJAC: | See, you know why, I'm gonna tell you something else, he always does what I do. |
| JAMAICAN: | Right. |
| KOJAC: | That's his problem with me. Whatever, if I buy a watch with a White Day, he buys it too. Whatever he thinks I'm doing, he tries to do the same thing. That's why he looks like me, maybe sometimes. [Laughs] |
| JAMAICAN: | Okay, right, right, we shoot for... |
| KOJAC: | *I was telling him not to deal with anybody else, because we're here with him already.* |
| JAMAICAN: | *Now look* |
| FANFAN: | *As long as we give him a good job then he will not be dealing with anyone else.* |
| JAMAICAN: | One more important thing, right, and it is very important. When we work and my people do their job the best way, we have to pay them as quickly as possible you follow what I'm saying? |
| KOJAC: | Yeah. |
| JAMAICAN: | You understand? I don't like to hold them out, and nobody asks... |

14

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| FANFAN: | But we need them so we are not gonna messed up. |
| KOJAC: | *He has a point there. Do you think you can offer him the thing to deal for us.* |
| FANFAN: | I *thought you guys said that you have someone to do it. I think we're giving him too much responsibilities.* What time is your flight? |
| JAMAICAN: | About 12:30, I'm gonna meet my girl. [Laughs] Yes let us go ever there [Laughs] All right, you should let me know the amount. |
| FANFAN: | Sunday, from where? |
| JAMAICAN: | From Caracas. |
| KOJAC: | Tonight by when you get there... |
| JAMAICAN: | Right. Okay, and then I will go over and check that Costa Rica people you want, all right? |
| KOJAC: | Whatever it is, you let us know, if we don't have it, we'll work on it. |
| JAMAICAN: | Let me ask you something. Do you have any connection in Ecuador? |
| FLASH: | We can try. |
| JAMAICAN: | Eventually? |
| KOJAC: | *Uh-huh. Do you remember Anterman? Anterman told me that we can ask the other friend those kinds of things. He might have connections over there.* |

15

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**FANFAN:** *About the Ecuadorian guys? Do you see who I'm referring to?*

**JAMAICAN:** Well, let's just keep it for the time being. Let's make a marriage, you know, that is what's important, no? Let's make a marriage.

**FANFAN:** *Work on it. It's good over there.*

**KOJAC:** It's the best thing too. What, you have different sources? You don't want to kill... you might risk everything and then after a few months you're back where you started.

**JAMAICAN:** So we're set then, okay? All right. Take care.

**FLASH:** *I'm leaving, we'll talk later.*

**FANFAN:** Yeah.

**JAMAICAN:** Okay, Kojac.

**KOJAC:** *Call me. We're not going to do anything cheap. On Sunday we're gonna give him anything to start with.*

**FANFAN:** *Or I'll drop the things off to my guys for the time being because those guys are mine. Come here. Talking about Maxim, if I can count, well, Maxim could owe me as much as one million dollars. The first time Maxim traveled he had three suitcases where one suitcase was supposed to be mine and the other two were his. The deal was successful; however, Maxim never paid me. Instead he hid from me and took all three suitcases. Then he dealt again with the guy, by giving him more money so he took the guy's business from me, since he had dealt more than five times with the guy. So if I can count well Maxim owes me more than one million dollars.*

16

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| KOJAC: | Well, let's not talk about all the other trips that he took for the guy. Let's talk about the first trip. How many were in each suitcase? |
| FANFAN: | Each suitcase had 40 that he failed to give me. I barely saved 40 from him. I said 200,000 dollars, but I know it was more than that. |
| KOJAC: | So he has 40 for you? |
| FANFAN: | Exactly. Meaning he has a bag from me that's worth about 280,000 dollars. |
| KOJAC: | Well, let me ask you, once you claim a suitcase that means Maxim would not have paid for the trip fare? |
| FANFAN: | No. |
| KOJAC: | So, he would have just given you the suitcase, so therefore he owes you 40? |
| FANFAN: | Exactly. |
| KOJAC: | Listen to me Fanfan. You can pull back now, because when the time comes for them to get their money from Maxim, they might take him for the money. At that particular time, you must be strong because they will use your name to get the money. For instance, they may say to Maxim, "Three years ago you were supposed to deliver one suitcase for Maxim from the suitcases, and you never did. So now we want you to pay back the 40." |
| JAMAICAN: | Everything is set there, okay? |
| KOJAC: | The guy that you was talking that was the Colombian guy... when he was talking in Spanish... |

17

GA000000538

| **NAME** | **ENGLISH TRANSLATION** |
|---|---|

**JAMAICAN:**   I know. I know. Yeah, yeah, okay, okay... All right. All right.

**KOJAC:**   Tonight he'll be calling you.

**JAMAICAN:**   Okay, so listen, you know what we have to do is important because I have to take you to New York, you understand? So I have to have somebody there to give it to you. You follow what I'm saying?

**KOJAC:**   Oh, yeah, yeah!

**JAMAICAN:**   To give all the particulars too.

**KOJAC:**   Listen, he'll be in New York. I'll be in New York too by Monday, because you know, my sister has a car here that she wants me to bring it to her. I'll be driving just and I'll meet you up there.

**JAMAICAN:**   Okay. No problem.

**KOJAC:**   Okay, Fanfan, that will be his duty to come to you, pick it up and make sure that he gives it to the right person and that's it.

**JAMAICAN:**   Okay.

**KOJAC:**   Every time he will fly to New York and he will come back.

**JAMAICAN:**   Okay, okay. No problem. I gotta go.

**KOJAC:**   *Go ahead. Did you hear me man? I don't want you to pull back from the situation.*

**FANFAN:**   *Are you crazy? Why would I pull back?*

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| KOJAC: | *Do you understand what I said?* |
| FANFAN: | *No, you said that Maxim is gonna come for me. How will he do that?* |
| KOJAC: | *Through threats.* |
| FANFAN: | *Of course, man. He's supposed to pay me.* |
| KOJAC: | *Because they may start by cutting his ears or his fingers to make him pay. And he might have to pay those 40 according to the current prices.* |
| FANFAN: | *I have no problem with that.* |
| KOJAC: | *Do you understand what I said? From the three suitcases he was supposed to give you one, right?* |
| FANFAN: | *Right.* |
| KOJAC: | *Then he took the merchandise and never paid you for it.* |
| JAMAICAN: | Hey, Kojac, I want to mention one another thing to you that I forgot to tell... I forgot to tell you that I have one bank. |
| FANFAN: | You have what? |
| JAMAICAN: | I have a contact. I have to let him explain it. When we exchange the stuff, do you want the money to go back? |
| FANFAN: | Oh yeah, yeah... |

19

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| JAMAICAN: | I'm gonna charge six percent and 16 go right back. The kis are dropped in a couple of days, and the money go right back. |
| KOJAC: | Do you have anybody that can do it from Haiti? |
| JAMAICAN: | What do you mean from Haiti, I thought you had the money here? |
| KOJAC: | Yeah, but you know we have about seven to eight million dollars right now in Haiti that we would want to bring back. |
| JAMAICAN: | You would want to send it back? |
| KOJAC: | To bring it back here. |
| JAMAICAN: | You want to bring it here? I'll have to talk to my people. |
| KOJAC: | Seven to eight right now. |
| JAMAICAN: | Seven to eight million. Okay, all right. You want it here. Okay, no problem. [Laughs] |
| KOJAC: | *Did you hear, man? Because I don't want you to shake up when the time comes, because there will be no room for weakness. They'll tell him, "Do you know Fanfan? Well, three years ago you robbed a suit case from him and you must pay back."* |
| FANFAN: | *Will I be there also?* |
| KOJAC: | *No.* |
| FANFAN: | *Whenever they take him, they will call me?* |

20

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**KOJAC:** *Yes. They will call you, if he wants to talk to you. "There were three suitcases, one suitcase containing 40 was for Fanfan and you never delivered it, so you must pay now." Do you understand?*

**JAMAICAN:** Hey, Kojac, if you need money to move out of the country, I can do that too, okay?

**FANFAN:** *Talk to him about the money.*

**KOJAC:** *Today is Thursday, I don't know what he is up to. Where did he go? If you are going up there Sunday, you'll have money right away.*

**FANFAN:** *Three days, two days man?*

**JAMAICAN:** All right! Nice meeting you, man. Take care.

**KOJAC:** *Take it easy. "When I leave my babe...(singing)" [Laughs]*

**FANFAN:** *Call Jesus and tell him to send me my money, man. I'm gonna go up there and tie him up, man.*

**KOJAC:** *See Jesus. Jesus is not Maxim. Jesus might have a problem now but he might help later. You are broke up until Sunday...*

**FANFAN:** *Well, he may not have money problem, but I cannot afford to give him money like that, because the first thing I told you was, what would happen in case I don't get my money. Then you said that there will not be such problem?*

**KOJAC:** *Exactly, So would you want us to give you the money back... and whenever they release Jesus from prison, then for you to receive more money.*

21

GA000000542

| <u>NAME</u> | <u>ENGLISH TRANSLATION</u> |
|---|---|
| FANFAN: | *When Jesus gets released!* |
| KOJAC: | *Yeah, let's say we find an exit, then we make some money, then Jesus "Boom". What would you rather, take your money now or wait until Jesus gets released from jail? Take it easy O.K.* |
| FANFAN: | *I'd rather have my money now.* |
| KOJAC: | *Get the fuck...* |
| FANFAN: | Yeah, brother. |
| JAMAICAN: | So finally, you're gonna make rich now, finally. |
| FANFAN: | You see, I was not playing. |
| JAMAICAN: | That is a serious thing. |
| FANFAN: | He was the biggest man in Haiti at that time. Now he left Haiti because he doesn't like the situation down there. He was the biggest man in Haiti. He is the one who makes almost everybody rich in Haiti. |
| JAMAICAN: | Okay, okay. |
| FANFAN: | He has all the biggest contact in Colombia and everything. He was the top man. |
| JAMAICAN: | Top guy in Haiti. |
| FANFAN: | Top guy in Haiti. |

22

| NAME | ENGLISH TRANSLATION |
|---|---|

JAMAICAN:    *Number one!* [Laughs]

FANFAN:    All the big chiefs, he's the one to put them... And now everybody who tries to come in the business, tries to fuck up the business. So that's why he is still there because he really knows what he is doing. Everybody who comes to the business now, they mess up and they do shit, all kinds of shit. Like Maxim, Maxim fucked up everybody. Maxim fucked me up. Maxim fucks...

JAMAICAN:    I thought he was dead, you know? I honestly thought he was dead. Because that man is something else, man. He put up a lot of chat.
So look, you worked out the price with them and everything?

FANFAN:    Yeah. How much did you tell me? You told me...

JAMAICAN:    If they run right over in Newark, they'll run anywhere between 75 but 75 for each suitcase. Yeah it's about 3,000 a ki [key], man.

FANFAN:    How about 50 per suitcase.

JAMAICAN:    Fanfan cut that, everything there is a real charge [U/I]... Anyway they used to charge almost 80, did you forget, this guy charges 75. Come on man, there is nothing wrong with that. And then we can invest in this too. How much they sell us a ki [key] for over there?

FANFAN:    I don't know, I don't really know. About the same price in Haiti.

JAMAICAN:    That can't be the same price as Haiti.

FANFAN:    They are not the same price, but it's about that price...I think it's cheaper over there.

| **NAME** | **ENGLISH TRANSLATION** |
|---|---|

**JAMAICAN:** In Caracas. It's next door to Colombia, bro'. Let me tell you. It's about 35. Put it on top, it should past more than five. You understand? So what are you saying? The guy said we can buy some. He said we could buy some. But not this time, but next time, you know?

**FANFAN:** Yeah, next time. I have for myself about a 100.

**JAMAICAN:** Uh-huh. In Caracas.

**FANFAN:** That's why I'm still broke. That's what I keep telling you, because every time that shit has to go to Haiti, and come back here, I have to do small jobs for people selling their 500, you know?

**JAMAICAN:** Why would they want him to do money from Haiti to here? I thought they would wanna send from here to Haiti.

**FANFAN:** But they don't live in Haiti.

**JAMAICAN:** Oh, okay, okay.

**FANFAN:** They have a big company here. I remember one day I went to his office, they sold like 2.5 million dollars of sugar in one minute.

**JAMAICAN:** Ooooooh!

**FANFAN:** Just one phone call. He has it big. That's why you have to make sure that you know what you're doing because you are dealing with the top people.

**JAMAICAN:** The top guy.

**FANFAN:** The top people in Colombia. I think it's the biggest cartel in Colombia, the biggest people. I think those people, if you mess up things, you know, they know everything. That's why I don't want anybody to come after me.

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**JAMAICAN:**    Right, right.

**FANFAN:**    If something goes wrong, they know what happened. They will know, you don't have to tell them. We just tell them what happened and they will find out themselves. They will know what happened, but if they can't find out what happened, that is when you are in trouble.

**JAMAICAN:**    Uh-huh. I know, I know, I know that. Well, you know me, man. I'm straight. you know?

**FANFAN:**    In Haiti you know what they do. They don't act like those guys. If you mess up people's things, they do their shit. They kill you, like they do voodoo.

**JAMAICAN:**    Anyway... [Laughs]

**FANFAN:**    Those guys, man, they know. I have a friend of mine, man, he was going to Haiti with half a million dollars that he got from the Colombian guys, and when he got to Haiti, he found the suitcase empty. That's when they stole the money under the plane. Then he called the guy and said look what happened to me. The Colombian guys said, "Okay, I'll call back in 30 minutes." Then the guys called him back before 30 minutes, in 15 minutes. "Okay, I know who took the money. This guy working at the ramp. His name is such and such and he is the one who stole the money." They found out everything and they told the guy not to worry about it, "I'll hook you up." Then they sent 2,000 kilos [keys] for the guy. Credit the guy who stole the money never went back to work and they killed the guy. Those people... somehow they know everything.

**JAMAICAN:**    I know, I know you have to be straight, man. You can't fuck around everywhere.

**FANFAN:**    When they say: you know Fanfan, everybody knows me. It's like the same thing, probably when they go to the Jamaican connection, they know Futsol.

25

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| JAMAICAN: | No, nobody knows. |
| FANFAN: | It's the same thing, man, if they ask for Kojac. |
| JAMAICAN: | Anyway, are you gonna come up? |
| FANFAN: | Yeah, is this... it's gonna happen. I'm gonna fly out, but we have to make sure that something is gonna happen. |
| JAMAICAN: | Yeah, but I've gotta go, man, and talk to my people. You understand? |
| FANFAN: | Yeah, man. |
| JAMAICAN: | I'll call you back tonight and set everything. You understand? |
| FANFAN: | Make things happen man. |
| JAMAICAN: | And make it happen, all right? |
| FANFAN: | Yo, let's see if we can make a deal on the suitcase, man. |
| JAMAICAN: | Um... |
| FANFAN: | Let's make a deal on the suitcase, man. |
| JAMAICAN: | Yeah. You mean the suitcase, huh? |
| FANFAN: | Yeah. Let's make a deal, like how much? |
| JAMAICAN: | Yeah, yeah. Tell me, tell me, so these people are saying... |

26

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**FANFAN:** That's what he wants me to ask you. Remember...

**JAMAICAN:** I didn't want to bring it up because, then he said... I couldn't disrespect you like that.

**FANFAN:** That's what I told, I told him that I'll talk to you about it.

**JAMAICAN:** Yeah, yeah. You're gonna come between 70 and 75, boy. I'm telling you that's when we follow standards. Because look, look, look... the guy will not be willing to work for less than 3,000 a ki [key]. You multiply 3 by 25 and it's what?

**FANFAN:** Three by 25 is 75.

**JAMAICAN:** Yeah! And nobody works for less than that. That is a gift, bro'. Most guys want four per... four for each one.

**FANFAN:** Let's make deal, let's make it 60.

**JAMAICAN:** I don't expect him going low like that, brother. I know it. I'll tell him the most...

**FANFAN:** Let me know.

**JAMAICAN:** I'll let you know tonight, but what about me now? Obviously, I'm out. "What a Ras call is coming from? What an asshole! You leave me out!

**FANFAN:** Believe me man, [U/I]... But listen, Uh, if the guy in Haiti called me last night to still working on the... to see if you can do it from Haiti, but if he's gonna say what? From Haiti it's gonna be different. The price is gonna be different, I'm telling you that now.

**JAMAICAN:** Like what, you know?

| NAME | ENGLISH TRANSLATION |
|------|---------------------|
| FANFAN: | You're gonna arrange the price for me, because you know in Haiti things are expensive. |
| JAMAICAN: | Now let me ask you something. The guy in Haiti can put it in American |
| FANFAN: | Yeah. That's what he's working on right now. |
| JAMAICAN: | All right. He can do it, right? This is what we will do, this is what we will do. The first thing we'll do is tell him just this, just to prove, because you know, I know they're nervous down there, right? Let's say one suitcase uh, and just [U/I]... one "ki" Just to pay, just to pay the guy who's up here. |
| FANFAN: | Okay, okay. |
| JAMAICAN: | Just to pay the guy who's up there. |
| FANFAN: | Okay, you say, just one suitcase. |
| JAMAICAN: | [U/I]... Just to prove. And if I deliver it, so then, you know, I can do the job. |
| FANFAN: | Okay, all right? |
| JAMAICAN: | I can stand up for that though. |
| FANFAN: | Okay, all right? |
| JAMAICAN: | That one is to pay the guys at the airport... |
| FANFAN: | Okay, but you see [U/I]... is the number five. |
| JAMAICAN: | Yeah. After that we can come with two, right after that, "Bang, bang, bang!" |

28

GA000000549

| NAME | ENGLISH TRANSLATION |
|------|---------------------|

**FANFAN:**   The number five is a loose suitcase, right? A loose suitcase.

**JAMAICAN:**   Number five and then the last hole [U/I]... And then over there, coming out of Haiti, they observe you, okay?

**FANFAN:**   Okay, I'll try that.

**JAMAICAN:**   Okay, I'm gonna split, you hear? So catch up with it, I'll call you later, okay?

**FANFAN:**   Okay, brother.

**JAMAICAN:**   All right.

**FANFAN:**   Thanks for coming.

**JAMAICAN:**   Huh?

**FANFAN:**   Thanks for coming.

**JAMAICAN:**   Yeah. No problem, man. I've spent my money, but I know you're gonna make me make it back. [Laughs] All right.

**FANFAN:**   They weren't sure about what I was telling them.

**JAMAICAN:**   Oh, yes, he knows that you are serious. Then... see, I didn't let you down bro'.

**FANFAN:**   [Laughs]

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CP:SLD                              *One Pierrepont Plaza*
F#2004RO0330                        *Brooklyn, New York 11201*

          *Mailing Address:*   *147 Pierrepont Street*
                               *Brooklyn, New York 11201*

                               November 20, 2007

The Honorable Raymond J. Dearie
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

          Re:  United States v. Robert Douyon
               Criminal Docket No. 05-15 (RJD)

Dear Judge Dearie:

          I write in anticipation of the sentence of the
defendant Robert Douyon, presently scheduled for November 26,
2007 at 2:30 p.m.  For the reasons discussed, given the nature
and circumstances of the case, the government objects to the
defendant's request for a sentence of 24 months imprisonment.

I.   Background

A.   The New York Cocaine Conspiracy

          In 2003, the Drug Enforcement Administration in New
York (the "DEA-NY"), with the assistance of a confidential
informant ("CI"), identified Frantz Bouloute (a cocaine
distributor), Frantz Bruno (a cocaine supplier) and Bruno's
associate, Robert Douyon, and their efforts to import cocaine
into the United States from, among other places, Venezuela.
Following several conversations between the co-conspirators and
the CI, on July 14, 2003, Bruno sent one drug-laden bag on board
a Continental flight from Venezuela to Newark International
Airport.  Before the flight arrived, Bouloute contacted the CI
and provided him with a description of the bag and the flight
information.  In turn, the CI provided that information to law
enforcement, who later intercepted the bag and recovered
approximately 30 kilograms of cocaine inside.

          Later that day, law enforcement conducted a controlled

2

delivery of the bag to Bouloute in Queens, New York.  After
Bouloute took possession of the bag, he was arrested.  Among
other things, law enforcement recovered a business card from
Bouloute at the time of his arrest.  On the back of the card was
a handwritten description of the bag, its baggage claim number
and the flight information.

B.   The Arrest and Conviction of Robert Douyon

        Following the arrest of Bouloute, the DEA-NY prepared
to arrest Douyon.  Before an arrest warrant was issued, ICE in
the Southern District of Florida advised DEA-NY that it was
conducting a wire tap investigation of an airport employee named
Karl Marcelin, the brother-in-law of Douyon.  ICE further
informed DEA-NY that they were intercepting conversations between
the two.  At their request, however, DEA-NY delayed Douyon's
arrest.

        After several months of their investigation, ICE
advised DEA-NY that they were not going to arrest Douyon, the
implication being that they did not have evidence he was involved
in criminal activity.  In October 2003, DEA-NY arrested Douyon,
who agreed to cooperate with law enforcement.  During subsequent
proffer sessions, Douyon described his role in the instant
offense, but denied any other involvement in criminal activity.

        In December 2004, Douyon waived indictment and pled
guilty to an information charging him with conspiring to import
over five kilograms of cocaine into the United States from March
2003 through July 14, 2003.

C.   The Defendant's Assistance to Law Enforcement

        Douyon testified at Bouloute's trial and provided law
enforcement with information regarding the whereabouts of
fugitives, as well as rumors regarding ongoing criminal
activities.  Of note, Douyon's information assisted the DEA-NY in
capturing a fugitive, Maxime Lafontant, a Hatian cocaine
trafficker.

        In between his arrest and Bouloute's trial, Douyon met
with law enforcement and admitted to his role in the New York
conspiracy.  Douyon denied being involved in any other criminal
activity aside from the New York cocaine conspiracy, especially
narcotics trafficking.  In preparation for trial, however, the
government learned of and Douyon admitted to his assistance in
fraudulently acquiring an immigration visa for an individual.  He
continued to deny any other involvement in narcotics trafficking

3

and, when asked about Karl Marcelin, simply stated that he was
his brother-in-law.

At the subsequent trial of Bouloute in January 2005,
Douyon testified consistently with his proffers to the
government. In response to questions on both direct and cross
examination, Douyon denied any other involvement in "narcotics
trafficking," other than that in which he took part in
furtherance of the New York conspiracy. Based in part upon
Douyon's testimony, Bouloute was convicted and later sentenced to
130 months imprisonment.

D.   The Florida Cocaine Conspiracy

In 2006, after Bouloute's trial, the Office of the
United States Attorney in the Southern District of Florida (the
"SDFL") charged Douyon with various narcotics trafficking
activities by way of a sealed indictment. He was later arrested
and this office was notified by defense counsel of the arrest.

In March 2007, Douyon pled guilty to the Florida
charges. As part of his plea agreement, Douyon executed a
twenty-two page stipulation of facts (the "Stipulation"). Among
other things, the Stipulation details and interprets various
telephone conversations of Douyon, as well as several to which he
was not a party. The Stipulation details narcotics activity in
which Douyon attempted to coordinate loads of cocaine into
Florida from Venezuela. In pertinent part, the Stipulation reads
as follows: "Between May 27, 2003 to July 30, 2003, Robert DOUYON
attempted 12 times but failed to import up to 120 kilograms of
cocaine to MIA [Miami International Airport] from Caracus [sic],
Venezuela." Stipulation, ¶ 4.

E.   The Post-Plea Proffer Sessions of Douyon

In June 2007, after several additional conversations
with the parties, the government proffered Douyon to discuss the
apparent discrepancies between his trial testimony and the
Stipulation (the "June Proffer"). In response, Douyon explained
that the Stipulation was untrue and that he pled guilty because
his attorney in Florida wanted too much money for him to defend
the case. Douyon further claimed that while it was him on the
telephone speaking with Marcelin about flights, there was never
any truth to it. As he explained it, Bruno advised him to
contact Marcelin and "bluff" him (Marcelin) into thinking that
there was a load coming in to Florida. This was done so that
everyone's attention would be focused on Florida so that they
(Bruno, Bouloute and Douyon) could discretely get the load into

4

New York.

        After consultation with the SDFL and Douyon's defense
attorney in Florida, we were advised that Douyon did not mean
what he told us at the June Proffer.  The Florida attorney
explained that at the time he had these telephone conversations
with Marcelin, Douyon believed that there was going to be an
incoming load of cocaine from Bruno.  However, at some point
following his arrest, Douyon was informed that it was all a bluff
by Bruno.

        Douyon later repeated this to us at another proffer
session in July 2007.  Furthermore, when questioned with regard
to the apparent discrepancy between his testimony and his guilty
plea in Florida, Douyon maintained that his answers were
truthful.  Douyon explained that because no drugs ever came into
the United States because of his conversations with Marcelin,
that did not, in his mind, amount to "narcotics trafficking."
Douyon further commented that he did not understand until it was
explained to him by his attorney in Florida that it is a crime to
speak about drug trafficking over the telephone, even if the
drugs never actually arrive.  Moreover, Douyon admitted to
several other criminal activities he had disclosed to law
enforcement in Florida, namely: (i) allowing Marcelin to store
approximately six kilograms of cocaine in his garage before it
was given to other individuals; and (ii) collecting approximately
$300,000 on behalf of Bruno from Lafontant (the drug trafficker
he assisted law enforcement with locating).  As to both
activities, Douyon explained that when asked about other drug
deals on the witness stand, he did not volunteer this information
because he did not know these were crimes.  According to the
defendant, his reasoning was that he did not personally store the
drugs in his garage and, while he suspected the money was from
the sale of drugs, he did not know that to be the case.  Douyon
admitted that he had not disclosed this information to any AUSA
in this District, but claimed that he had previously provided the
information to an agent of the DEA-NY upon his arrest.  That
agent, however, does not recall Douyon providing him with his
information.

II.  <u>Discussion</u>

A.  <u>The Offense Conduct</u>

        The government does not oppose either of the
defendant's sentencing proposals as they relate to his role in
the offense and the application of the safety-valve.  Indeed, as
Douyon exercised no discretionary role in the offense, but merely

5

acted at the discretion and direction of co-defendant Frantz
Bruno, we believe that a two-level reduction for his role in the
offense is appropriate. U.S.S.G. § 3B1.2(b). Furthermore, as the
government believes that, at this time, the defendant has
truthfully provided all information regarding this offense, and
that the offense of conviction in Florida was part of the offense
in New York, a two-level reduction pursuant to the safety-valve
is similarly appropriate. U.S.S.G. § 2D1.1(b)(7). There is no
mandatory minimum in this case.

At this time, the government estimates the defendant's
Guidelines calculation to be as follows:

| | |
|---|---|
| Base Offense Level (2D1.1(c)(3)) | 34 |
| Less: Acceptance of Responsibility (3E1.1) | -3 |
| Less: Minor Role in the Offense (3B1.2(b)) | -2 |
| Less: Safety-Valve (2D1.1(b)(7)) | -2 |
| Total: | 27. |

In Criminal History Category I, an offense level of 27 carries a
range of imprisonment of between 70 to 87 months.

B.  Nature and Circumstances of the Case

While the government recognizes that Douyon's
activities assisted in the conviction of another individual and
the arrest of others, those good works have been substantially
undercut. Douyon proffers several alternative scenarios to
account for the present situation. Among them, Douyon claims
that he failed to appreciate that his activities -- telephone
calls about drug importations, storing drugs and collecting money
-- were criminal in nature. Nevertheless, as the defendant is
not seeking a motion from the government pursuant to U.S.S.G. §
5K1.1, there is no need to resolve the bona fide's of his claim.

What is at issue is whether the sentence proposed by
the Guidelines is an appropriate one. In making this
determination, the Second Circuit, interpreting the Supreme
Court's decision in United States v. Booker, has held that
"sentencing judges remain under a duty with respect to the
Guidelines . . . to 'consider' them, along with the other factors
listed in section 3553(a)." United States v. Crosby, 397 F.3d
103, 111 (2d Cir. 2005). Although the Court declined to
determine what weight a sentencing judge should normally give to
the Guidelines in fashioning a reasonable sentence, the Court
cautioned that judges should not "return to the sentencing regime
that existed before 1987 and exercise unfettered discretion to
select any sentence within the applicable statutory maximum and

6

minimum." Id. at 113. The government respectfully submits that
a Guidelines sentence in this case is both reasonable and
appropriate in light of the factors set forth in 18 U.S.C. §
3553(a).

Indeed, the range of imprisonment faced by the
defendant under the Guidelines is no more severe than the crime
for which he has been convicted or the facts and circumstances
surrounding them. As detailed above, the defendant was at the
center of a cocaine conspiracy that imported approximately thirty
(30) kilograms into the United States. While his role was
limited, that has been adequately taken into consideration by the
recommended role reduction. Moreover, as he has, at this point,
provided the government with all his information regarding the
offense, that fact has also been addressed by the recommendation
that he receive the safety-valve. This has the effect of not
only removing the mandatory statutory minimum ten year sentence,
but also rewarding Douyon with a further reduction to his offense
level of two-levels. 18 U.S.C. § 3553(f); U.S.S.G. §§ 2D1.1(c)(7)
and 5C1.1. Clearly, a significant sentence of incarceration is
warranted in this case to reflect the seriousness of the
defendant's offense and to afford adequate deterrence to others.
18 U.S.C. § 3553(a)(2)(A), (B).

As a counterbalance, the defendant submits that his
activities led to the conviction of another individual and the
arrest of others. However, as those activities have been
undermined by the defendant himself, it is respectfully submitted
that the Court should not feel constrained to credit the
defendant's activities generously, and certainly not to the
requested sentence of 24 months.

III. Conclusion

For all these reasons, the defendant Robert Douyon
should receive a minor role reduction and safety-valve. However,
given the nature and circumstances of this case, the Court should

7

deny his request for a sentence of 24 months and impose a
sentence within the Guidelines range.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

By:     Steven L. D'Alessandro
        Assistant U.S. Attorney
        (718) 254-6200

cc:  Richard Rosenberg, Esq.
     (Via ECF and Fax: 212-974-3225)

# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
FRANTZ BOULOUTE,

                              Petitioner,          MEMORANDUM AND ORDER
                                                   07 CV 2201 (ILG)
        -against-

UNITED STATES OF AMERICA,

                              Respondent.
-----------------------------------------------x


GLASSER, United States Senior District Judge:

## INTRODUCTION

Frantz Bouloute ("Bouloute" or "Petitioner") moves to vacate, set aside, or correct

his sentence from his 2005 conviction in this Court pursuant to 28 U.S.C. § 2255

("Section 2255").  In 2003, Bouloute was indicted for conspiracy to import cocaine

pursuant to 21 U.S.C. § 963, importation of cocaine pursuant to 21 U.S.C. § 952(a), and

attempted possession with intent to distribute cocaine pursuant to 21 U.S.C. § 846.  The

jury found Bouloute guilty on all three counts on January 27, 2005.

The Pre-Sentence Report prepared by the United States Probation Department

found Bouloute responsible for 30.19 kilograms of cocaine, the full amount of the drugs

involved in the conspiracy, which corresponded to a base offense level of 34 under the

United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.").  At sentencing on

May 2, 2005, Bouloute's counsel stated that he had reviewed the Pre-Sentence Report,

and that he would not seek any amendments or deletions with respect to that Report.

Tr. at 2.  However, Bouloute's counsel urged the Court to sentence Bouloute below the

1

A-3

applicable Guidelines range, which was 151 to 188 months, because Bouloute was a "minor participant" in the scheme to import and distribute cocaine as compared to his co-conspirators. Tr. at 4-6. Finding that Bouloute was an active participant in the scheme, and after discussing the sentencing factors found in 18 U.S.C. § 3553(a), the Court on May 2, 2005, sentenced Bouloute to 130 months imprisonment to run concurrently on each of the three counts of which he was convicted, to be followed by five years of supervised release, and a $300 special assessment. Tr. at 8-10. The sentence imposed was ten months higher than the mandatory statutory minimum required by 21 U.S.C. §§ 960(b)(1)(B)(ii) and 841(b)(1)(A)(ii)(II).

Bouloute filed a timely appeal of his sentence, arguing that it was unreasonable because this Court failed to consider all the sentencing factors enumerated in 18 U.S.C. § 3553(a), and because the sentence was greater than necessary to do justice. Affirming this Court's sentence, the Second Circuit found that the 130 month sentence was selected "precisely because, after considering all relevant factors, [the district court] concluded that a 151-month sentence was greater than necessary to do justice in the case." United States v. Bouloute, 185 Fed. Appx. 102, 106 (2d Cir. 2006).

Bouloute's habeas petition argues that this Court violated his due process rights when it sentenced him based on what he alleges is "erroneous and unsubstantiated information contained in the Pre-Sentence Investigation Report," and that he suffered from ineffective assistance of counsel when his attorney failed to object to the Court's miscalculation of the offense level under U.S.S.G. § 1B1.3. Pet. Br. at 1. Essentially, Bouloute asserts that, in calculating his base offense level, the Court should have made an individualized finding of the amount of cocaine he was personally responsible for

2

A-4

conspiring to import instead of attributing to him the entire amount of the cocaine seized. He claims that, because "the scheme to import cocaine . . . had many participants all expecting a share of the drugs for their role in the offense," he should only be responsible for the portion of drugs he expected to receive as part of the conspiracy. Pet. Br. at 5.

For the reasons explained below, and based on this Court's findings that Bouloute was an active participant in the conspiracy and that he was found guilty of two substantive counts of direct involvement in the importation, the sentence was correct pursuant to U.S.S.G. § 1B1.3. Therefore, his counsel's failure to object did not constitute ineffective assistance of counsel.

## DISCUSSION

### A.    Section 2255

Section 2255 permits a convicted person in federal custody to petition the sentencing court to vacate, set aside, or correct a sentence. Collateral relief under Section 2255 is available "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)). To obtain collateral relief, the petitioner must prove by a preponderance of the evidence that his sentence was imposed unlawfully. Rodriguez v. United States, 05 CV 5704 (CPS), 2006 U.S. Dist. LEXIS 46321, at *5 (E.D.N.Y. July 10, 2006).

Petitioner contends that: (1) the sentence imposed was procedurally unreasonable because the Court unconstitutionally and erroneously miscalculated his

3

A-5

base offense level, and by extension the applicable sentencing range, and (2) he received

ineffective assistance of counsel based on his attorney's failure to object to or correct

this miscalculation. He frames the issues as separate claims for review under Section

2255. Petitioner, however, failed to raise the constitutional challenge on direct appeal.

A procedural default of even a constitutional issue will bar review of Section 2255 claims

unless a petitioner can show cause excusing the default and actual prejudice that

resulted from the error. Napoli v. United States, 32 F.3d 31, 37 (2d Cir. 1994). Because

Bouloute has not shown cause or prejudice, the Court may not separately consider the

constitutional challenge. The Court may, in any event, examine Bouloute's ineffective

assistance of counsel claim, which is premised on the alleged constitutional error. See

Massaro v. United States, 538 U.S. 500, 505 (2003) (holding that a petitioner may raise

a claim of ineffective assistance of counsel on a habeas petition even if he has failed to

do so on direct appeal).

### B.   Ineffective Assistance of Counsel

To succeed on an ineffective assistance of counsel claim, a defendant must prove:

"(1) that his attorney's performance fell below an objective standard of reasonableness,

and (2) that as a result he suffered prejudice." United States v. Jones, 482 F.3d 60, 76

(2d Cir. 2006) (citing Strickland v. Wash., 466 U.S. 668, 687 (1984)). To show that an

attorney's performance is deficient, a defendant must establish that his attorney's

conduct fell "outside the wide range of professionally competent assistance," and show a

"reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." Strickland, 466 U.S. at 690, 694. The Supreme

Court has taught courts to "indulge a strong presumption that counsel's conduct falls

4

A-6

within the wide range of reasonable professional assistance . . . ." Id. at 689.

As a threshold matter, this Court notes that even if Bouloute's challenge to his five year sentence for the conspiracy count were successful, his prison term would be unaffected because he also received a five year sentence for two substantive counts that run concurrently with his conspiracy sentence, and he does not challenge the validity of the sentences for those two counts. See United States v. Moreno, No. 96-1758, 1998 U.S. App. LEXIS 1206, at *4 (2d Cir. Jan. 27, 1998). Regardless, considering Bouloute's argument as to the conspiracy count alone, it fails because there was no constitutional deprivation or other procedural error made by the Court, and as such, his attorney's failure to object did not render his professional services otherwise deficient.

Whether counsel's conduct was deficient turns on whether the Court miscalculated the base offense level. U.S.S.G. § 1B1.3(a)(1) defines relevant conduct for purposes of calculating the base offense level. Pursuant to this section, a defendant's conduct "shall be determined" on the basis of:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity . . . all reasonably foreseeable acts and omissions of others in the furtherance of the jointly undertaken criminal activity,
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . .

Under the statute, when a defendant is convicted of a controlled substance related offense, he is responsible for the amount of the substance "with which he was directly involved and, in the case of a jointly undertaken criminal activity, all reasonably

5

A-7

foreseeable quantities of contraband that were within the scope of the criminal activity that he jointly undertook." U.S.S.G. § 1B1.3 cmt. n.2. The requirement of reasonable foreseeability "applies only in respect to the conduct (i.e., acts and omissions) of others under subsection (a)(1)(B). It does not apply to conduct that the defendant personally undertakes, aids, abets, counsels, commands, induces, procures, or willfully causes; such conduct is addressed under subsection (a)(1)(A)." Id.; see also United States v. Chalarca, 95 F.3d 239, 243 (2d Cir. 1996) ("The quantity of drugs attributed to a defendant need not be foreseeable to him when he personally participates, in a direct way, in a jointly undertaken drug transaction."); United States v. Gonzalez, 138 Fed. Appx. 349, 350 (2d Cir. 2005) (same); United States v. Baptista, 05 CR 53 (JFK), 2006 U.S. Dist. LEXIS 73897, at *13 (S.D.N.Y. Oct. 10, 2006) (same). Moreover, if a defendant personally participates in a direct manner, then he may be held accountable for the entire quantity of the drugs involved in the jointly undertaken transaction. See United States v. Zapata, 357 F. Supp. 2d 667, 671-72 (S.D.N.Y. 2005). The Second Circuit has held that a defendant convicted of conspiracy may be sentenced under either subsection (A) or (B) depending on the defendant's level of personal involvement. See Chalarca, 95 F.3d at 243.

In Chalarca, the defendant was charged with conspiracy to distribute and possess with intent to distribute cocaine. Although he was at the scene of the drug transaction, the Second Circuit found that the defendant "had no knowledge of what was taking place there." Id. at 244. Based on his minor role in the transaction, the Second Circuit upheld the district court's decision to set the defendant's "offense level at the level representing the least amount of cocaine that appears in the Drug Quantity Table in the Sentencing

6

A-8

Guidelines" instead of the full quantity of cocaine involved in the conspiracy. Id. at 242.

However, the Second Circuit commented that, under different circumstances, if a

defendant knew the purpose of the transaction and was involved in a more direct

manner, a district court's decision to attribute the full amount of drugs involved in the

transaction to that defendant would be proper. Id. at 243-44. The Second Circuit later

applied this reasoning in United States v. Pitcher, 7 Fed. Appx. 119, 121-22 (2d Cir.

2001), wherein it affirmed a district court's decision to attribute the entire amount of

heroin involved in a conspiracy to import and possess to a defendant where he had

directly participated in the importation by recruiting the courier, helping him obtain a

passport, and driving him to the airport, and where he knew that the transaction

involved narcotics.

Here, the Court found that Bouloute was "a very active player in th[e] scheme to

import a lot of cocaine into the United States." Tr. at 10. As the record indicates,

Bouloute proposed the importation scheme, brought the co-conspirators together, and

was involved in planning the importation. He was responsible for arranging to

transport the drugs out of the airport in New York. Indeed, his direct participation was

apparent when, after being informed that the cocaine would not be handed over until he

paid a corrupt airport baggage handler, he personally met with the handler, who was an

undercover DEA agent, and attempted to persuade the handler to turn over the drugs

without payment. Thus, because Bouloute's involvement was "direct" and not "remote,"

no foreseeability inquiry was triggered. Chalarca, 95 F.3d at 244 (quoting United States

v. Corral-Ibarra, 25 F.3d 430, 438 (7th Cir. 1994)). Even if Bouloute's involvement

could not be characterized as "direct," the transaction was nevertheless within the scope

A-9

of the conspiracy, and the amount attributed to him, the full thirty kilograms of cocaine, was thus foreseeable. See United States v. Reyes, 236 Fed. Appx. 731, 734 (2d Cir. 2007) ("Even if Reyes was not 'directly involved' in the drug transaction, the transaction was within the scope of the conspiracy, and the quantity of cocaine attributed to him was foreseeable." (quoting U.S.S.G. § 1B1.3 cmt. n.2)).  Because the full amount of the seized drugs was properly attributed to Bouloute, his attorney's performance was not deficient for his failure to object to the amount of cocaine indicated in the Pre-Sentence Report.

C.    Hearing

Petitioner also requested an evidentiary hearing related to the above issues. Section 2255 requires a district court to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief . . . ." 28 U.S.C. § 2255.  Because Petitioner has failed to prove his ineffective assistance of counsel claim, he is not entitled to an evidentiary hearing, and the Court accordingly denies Petitioner's request.

## CONCLUSION

For the foregoing reasons, Petitioner's motion pursuant to Section 2255 is DENIED.  The Clerk of Court is accordingly ordered to close the above-captioned action.

SO ORDERED.

Dated:      Brooklyn, New York
            January 15, 2008

                                   /s/
                          _____
                          I. Leo Glasser
                          United States Senior District Judge

8

A-10

E.D.N.Y.-Bklyn
07-cv-2201
Glasser, J.

# United States Court of Appeals
### FOR THE
### SECOND CIRCUIT

UNITED STATES COURT OF APPEALS
FILED
JUL 1 8 2008
Catherine O'Hagan Wolfe, Clerk
SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 18ᵗʰ day of July , two thousand eight,

Present:

> Hon. José A. Cabranes,
> Hon. Barrington D. Parker,
> Hon. Reena Raggi,
> > *Circuit Judges.*

---

Frantz Bouloute,

> *Movant-Appellant,*

v.                                                                    08-1616-pr

United States of America,

> *Respondent-Appellee.*

---

Appellant, *pro se*, moves for a certificate of appealability ("COA"), to proceed *in forma pauperis* ("IFP"), and for appointment of counsel. Upon due consideration, it is hereby ORDERED that the motions to proceed IFP and for a COA are DENIED as moot because the district court has already granted them. The motion for appointment of counsel is GRANTED. The Clerk's Office shall appoint counsel pursuant to the Criminal Justice Act and issue a scheduling order.

> FOR THE COURT:
> Catherine O'Hagan Wolfe, Clerk
>
> By: _____

SAO-LB

*A-11*